UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PEB, INC., a California Corporation,<br><br>*Plaintiff,*<br><br>*vs.*<br><br>PREMIUM MERCHANT FUNDING 18, LLC, PREMIUM MERCHANT FUNDING ONE, LLC, ELIE GOLSHAN a/k/a PAYMAN R. GOLSHAN a/k/a ELIE COHEN, and ABE BURGER a/k/a AVRAHAM BURGER,<br><br>*Defendants.* | Civil Action No. 1:26-cv-08712<br><br>**COMPLAINT AND JURY DEMAND** |

Plaintiff PEB, Inc. ("PEB" or "Plaintiff"), by and through its attorneys, Reynolds Law Group LLC, by way of Complaint against Defendants Premium Merchant Funding 18, LLC ("PMF 18"), Premium Merchant Funding One, LLC ("PMF One"), Elie Golshan a/k/a Payman R. Golshan a/k/a Elie Cohen ("Golshan"), and Abe Burger a/k/a Avraham Burger ("Burger," together with PMF 18, PMF One and Golshan, collectively, "Defendants"), alleges as follows:

## INTRODUCTION

1. PEB brings this action to recover damages arising from, *inter alia*, a breach of fiduciary duty, violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.* ("RICO"), breach of contract, fraud and other wrongful and tortious acts committed by Defendants.

2. On September 15, 2023, PEB and PMF 18 entered into a Consulting Agreement (the "Consulting Agreement"), whereby PMF 18 assumed a confidential and fiduciary duty, duty of loyalty and duty of utmost good faith, honesty and disclosure in relation to its dealings with PEB.

3. Under the Consulting Agreement, in exchange for the payment by PEB of $50,000, PMF 18 was to advise PEB on financial matters and to act with the utmost care and loyalty. PMF 18 was expressly empowered to "represent" and "negotiate" with third parties on PEB's behalf.

4. The execution of the Consulting Agreement was a critical first step in an elaborate fraudulent scheme perpetrated by PMF 18 and, *inter alia*, its affiliate, Premium Merchant Funding 26, LLC ("PMF 26"), to gain PEB's trust, confidence and access to and control of PEB's financial information and bank account for unlawful purposes.

5. PMF 18 held itself out as having unique and specialized expertise in alternative financing. Through the Consulting Agreement, PMF 18 falsely represented that it would act in PEB's best interest and guide PEB through the process to obtain working capital. Unbeknownst to PEB, PMF 18 had no intention of ensuring that PEB's business was successful and had adequate working capital. Rather, PMF 18 used its position of trust and confidence to implement a scheme designed to defraud PEB of millions of dollars through various unlawful and unnecessary agreements issued by PMF 26, as well as other parties.

6. Specifically, after PMF 18 lulled PEB into a false belief that PMF 18 would act in PEB's best interest and with undivided loyalty, PMF 18 immediately began to take advantage of PEB's financial condition and its representatives' lack of sophistication and naïveté with the types of financial products offered by PMF 26. Once the fraudulent scheme was implemented, PMF 26, with the aid of co-conspirators, successfully misappropriated millions of dollars in usurious interest from loans masquerading as "Merchant Agreements," which provided little to no economic value to PEB. In reality, the transactions PMF 18 steered PEB into were merely short-term, usurious loans having actual annual interest rates in the triple digits and, in some cases, effective annual interest rates in excess of 1,000% per annum, disguised as revenue-based financing

transactions wrapped in the cloak of "Merchant Agreements."

7. From October 13, 2023 to January 22, 2024, PMF 26 entered into at least ten (10) "Merchant Agreements" with PEB pursuant to which PMF 26 purportedly paid certain amounts to purchase a percentage of PEB's future receivables at a discount.

8. Under those arrangements, PEB was required to make daily or weekly payments of a fixed sum from a designated PEB depository account until the "Purchased Amount" was paid in full. Although described as the purchase of future receivables, these arrangements were in fact high-interest loans for which PMF 26 demanded guaranteed repayment, in fixed installments, on a fixed term and not dependent on the realization of PEB's receivables.

9. Critically, unlike a bona fide purchase of receivables, the risk of non-payment never transferred to PMF 26. Through a series of unconscionable and one-sided contractual provisions contained within the sham Merchant Agreements, at all times, PMF 26 was absolutely entitled to repayment under all circumstances.

10. The Merchant Agreements charged interest far in excess of the maximum 25% per annum interest rate allowed under New York's usury laws -- on their face having implied interest rates as high as 268% or nearly eleven (11) times the maximum rate of interest permitted under New York law. In practice, the effective interest rates were often much higher after consideration of outrageous fees assessed by PMF 26 and its manipulation of the timing and amount of advances it made to PEB.

11. The amount of money illegally obtained from PEB through the loansharking operation of the association-in-fact enterprise alleged below (the "Enterprise") is staggering. In agreements entered into over a period of 3.5 months, PMF 26 received approximately $2.7 million in usurious interest payments from PEB.

12. Central to the Enterprise's scheme was a recurring cycle in which PEB's own financing relationships with other, independent lenders became the raw material for the Enterprise's repeat business. Rather than delivering new working capital, each successive Merchant Agreement was structured so that the amount PMF 26 nominally "purchased" was, in substance, consumed retiring PMF 26's own prior advance and paying off PEB's other outstanding obligations to those lenders -- while PMF 26 charged PEB a substantial new fee and additional usurious interest calculated on the entire, artificially inflated amount.

13. The harm to PEB was the mirror image of that benefit. With each successive Merchant Agreement, PEB was placed on the hook for a larger, more heavily marked-up repayment obligation, while receiving little or nothing that resembled genuine working capital -- in the most extreme instance, an amount equal to a small fraction of one percent of what PEB was contractually obligated to repay. PEB remained subject to crushing daily or weekly withdrawals calculated on the full, inflated amount, even though the overwhelming majority of that amount had never been placed in its hands to begin with. Repeated over a period of months, this cycle compounded PEB's debt burden with each transaction, extracted usurious interest and substantial fees at every stage, and pushed PEB to the brink of insolvency and financial collapse, as set forth more fully below.

14. Many of the transactions recommended to PEB by PMF 18 were offered by PMF 26, while other transactions were offered by lenders which, unbeknownst to PEB, paid PMF 18 and PMF 26 undisclosed referral compensation, profit sharing, kickbacks and/or direct and indirect remunerative benefits. Despite PMF 18 owing a fiduciary duty to PEB, the financial arrangements directly benefiting PMF 18 and/or PMF 26 were not disclosed to PEB in violation of PMF 18's fiduciary duty and duty of loyalty.

15. PMF 18's own members, Sam Lallouz ("Lallouz") and Golshan, are also the members of PMF 26, the counterparty to every Merchant Agreement, and PMF 18 never disclosed that common ownership to PEB. In other cases, upon information and belief, PMF 18 and its members and/or executives had a direct or indirect pecuniary or remunerative interest in the lenders which transacted business with PEB.

16. In derogation of PMF 18's fiduciary duty, it impermissibly engaged in self-dealing, failed to disclose material conflicts of interest and deliberately steered PEB toward financial products that provided outrageous fees and committed PEB to a seemingly never-ending cycle of usurious loan payments to implement a scheme designed to siphon as much money from PEB's bank account as quickly as possible.

17. PMF 26's fraudulent and unlawful activities were substantially aided and abetted by PMF 18's relationship of trust and confidence with PEB, which was established through the Consulting Agreement and PMF 18's false representations of material fact. PMF 18 deceptively used the Consulting Agreement and its trusted position to lull PEB into a false belief that its interests were being looked after by PMF 18 and that PMF 18 was at all times acting in PEB's best interest.

18. This action, *inter alia*, is brought to recover millions of dollars in damages proximately caused by PMF 18's breach of fiduciary duty and by Defendants' participation in a scheme to violate RICO through the collection of unlawful debt, conspiracy to violate RICO, as well as other wrongful, intentional, wanton, and/or malicious conduct perpetrated by Defendants.

19. As an independent and alternative basis for recovery under 18 U.S.C. § 1962(c) -- and regardless whether the Agreements are ultimately characterized as loans or as receivables purchases -- this action also seeks to recover damages caused by the Defendants' pattern of

racketeering activity. As set forth more fully below, Defendants and other parties not named in this action, engaged in a recurring scheme in which they represented to PEB that each Merchant Agreement was a contingent purchase of future receivables collectible over a period of months, while immediately and substantially diverting each agreement's proceeds to retire PMF 26's own prior balance and other lenders' balances, and while concealing referral fees and other compensation received in connection with PEB's financing arrangements. Each such agreement, addendum, and wire transfer effecting this scheme was transmitted electronically and constitutes a predicate act of wire fraud under 18 U.S.C. §§ 1961(1) and 1343, together forming a pattern of racketeering activity independent of, and in addition to, the collection of unlawful debt prohibited by 18 U.S.C. § 1962(c).

20. PEB has commenced an arbitration before the American Arbitration Association against PMF 26 and certain of its employees: *PEB, Inc. v. Premium Merchant Funding 26, LLC, et al.*, Case No. 01-25-0009-5314 (the "Arbitration"). The PMF 26-employees named in the arbitration are: Mason G. Kashat ("Kashat"), James P. Gieselmann, Jr. ("Gieselmann") and Adela Bejko ("Bejko," together with Kashat and Gieselmann, the "PMF 26 Individual Parties").

## THE PARTIES

21. PEB is a corporation organized and existing under the laws of the State of California and has its principal place of business in California.

22. Upon information and belief, Defendant PMF 18 is a limited liability company organized under the laws of the State of Delaware. PMF 18's Delaware registered agent is The Company Corporation, 251 Little Falls Drive, Wilmington, Delaware 19808. On December 14, 2017, PMF 18 registered to do business in the State of New York as a foreign limited liability company. PMF 18's New York registered agent is The LLC, 40 Wall Street, Suite 501, New York,

New York 10005. PMF 18 maintains a principal office at 55 Water Street, 50th Floor, New York, New York 10041, and is also registered to transact business in, among other states, Connecticut, Utah, and Virginia.

23. Upon information and belief, Defendant PMF 18 is an affiliate of PMF 26, which also maintains a principal place of business at 55 Water Street, 50th Floor, New York, NY 10041. Upon information and belief, PMF 18 and PMF 26 share office space, a website, employees, a bank account and have common management and ownership.

24. Upon information and belief, Defendant PMF One is a limited liability company affiliated with PMF 18 and PMF 26 (PMF One, PMF 18 and PMF 26 are collectively referred to herein as the "PMF Entities"), as PMF 26 itself disclosed in its corporate disclosure statement filed in *Premium Merchant Funding 26, LLC v. Sonata Construction LLC*, Civil Action No. 7:25-cv-01086-KMK (S.D.N.Y.) (the "*Sonata* Action"). PMF One shares its principal office at 55 Water Street, 50th Floor, New York, New York 10041, with PMF 18 and PMF 26. PMF One is registered as a foreign limited liability company in California (Entity No. 201627710140) and, upon information and belief, maintains a California office at 16000 Ventura Boulevard, Suite 300, Encino, California 91436. PMF One's California Statement of Information, filed May 16, 2022, lists Defendant Burger as its Manager and Defendant Golshan as its Chief Executive Officer. PMF One's California registered agent is listed as "Elie Cohen" -- upon information and belief, an alias for Defendant Golshan, a disclosed member of PMF 26. PMF One holds California Financing Law License No. 60DBO 67237, under which it shares a website, www.pmfus.com, which represents that "Loans [are] made or arranged pursuant to a California Financing Law license."

25. Upon information and belief, Defendant Burger, also known as Avraham Burger, is a natural person residing in the State of New York. By his own public account, Burger has

served as the Chief Operating Officer and General Counsel of one or more of the PMF Entities, including PMF 18, since at least 2014, in which capacity he has led the legal department, developed underwriting guidelines and implemented the risk-management policies and procedures for the PMF Entities' financing portfolio. Burger executed the Consulting Agreement with PEB on behalf of PMF 18. Upon information and belief, Burger also owns and controls non-party Joshua Capital, Inc. ("Joshua Capital"), and operates Burger Funding Group at 40 Wall Street, Suite 501, New York, New York 10005 -- the same service-of-process address PMF 18 designated in its New York registration.

26. Upon information and belief, Defendant Golshan, also known as Payman R. Golshan, also known as Elie Cohen, is a natural person and a citizen of the Commonwealth of Puerto Rico. Golshan is a disclosed member of PMF 18 and PMF 26, as revealed in PMF 26's corrected corporate disclosure statement filed on April 21, 2026 in the *Sonata* Action (ECF Doc. No. 44). Golshan is the Chief Executive Officer of PMF One, as reflected in PMF One's California Statements of Information filed on or about April 17, 2019 and May 16, 2022, and is identified as the Manager of PMF One in its Florida registration (2026 Annual Report, Florida Doc. No. L16000131295).

**JURISDICTION AND VENUE**

27. PMF 18 is subject to the personal jurisdiction of this Court because it regularly transacts business within the State of New York and has purposely availed itself of the laws of the State of New York for the specific transactions at issue.

28. This Court also has personal jurisdiction over Defendants PMF One, Golshan and Burger. Upon information and belief, PMF One maintains its principal place of business in New York, and Burger resides in and transacts the business of the Enterprise from New York, and

Golshan directs the Enterprise's affairs from Puerto Rico and through the Enterprise's New York offices. Each of these Defendants regularly transacts business within the State of New York, has purposely availed itself of the laws of the State of New York, and participated in the conduct giving rise to PEB's claims through and from the State of New York. Personal jurisdiction over each Defendant is also proper under 18 U.S.C. § 1965(b).

29. This Court has subject-matter jurisdiction over this dispute, pursuant to 28 U.S.C. § 1331, based on PEB's claims for violation of the RICO statute.

30. This Court has jurisdiction over state law and common law claims asserted herein under the doctrines of ancillary and pendent jurisdiction and pursuant to the supplemental jurisdiction provision of 28 U.S.C. § 1367(a).

31. Venue is proper in this District, pursuant to 28 U.S.C. § 1391(b)(2) and 18 U.S.C. § 1965(a), because a substantial part of the events giving rise to this action occurred in this District, and because each defendant resides, is found, has an agent, or transacts its or his affairs in this District.

## **RELEVANT PROCEDURAL HISTORY**

32. On August 28, 2024, PMF 26 commenced an action against PEB and its President and sole shareholder, Harley Padilla ("Padilla" or "Mr. Padilla"), by the filing of a Verified Complaint (the "PMF Complaint") in the Supreme Court of the State of New York, County of Monroe, Index No. E2024014543 (the "Monroe County Action"). None of the Defendants named in this action is a party to the Monroe County Action.

33. PMF 26 asserts two claims in the Monroe County Action. The First Count asserts a claim against PEB for breach of a Merchant Agreement, dated January 16, 2024, and a second Merchant Agreement, dated January 22, 2024. The Second Count asserts a claim against Mr.

Padilla for breach of two guaranty agreements through which he allegedly guaranteed PEB's performance under those two Merchant Agreements. PMF 26 demands judgment against PEB and Padilla in the amount of $2,859,147.40, plus statutory interest, costs and attorneys' fees.

34. On November 18, 2024, PEB and Padilla filed a Verified Answer and Affirmative Defenses in the Monroe County Action, which denied all allegations of actionable misconduct and asserted fifteen separate affirmative defenses. On December 12, 2024, PEB and Padilla served on PMF 26 a First Request for Production of Documents and a First Set of Interrogatories. PMF 26 failed to respond to that discovery.

35. On March 17, 2025, having provided no discovery in the Monroe County Action, PMF 26 moved for summary judgment on both counts of the PMF Complaint and for dismissal of each affirmative defense asserted by PEB and Mr. Padilla. PEB and Mr. Padilla moved for leave to amend their answer to assert counterclaims against PMF 26, and to stay the Monroe County Action pending the Arbitration. It was through PMF 26's July 14, 2026 filings on that motion -- PMF 26 produced fifty-three (53) CitiBusiness Online wire transfer confirmations (NYSCEF Doc. No. 128) and filed the Reply Affidavit of Mason G. Kashat (NYSCEF Doc. No. 125) -- that certain conduct alleged in this Complaint was first revealed to PEB.

36. On September 22, 2026, the court in the Monroe County Action (Doyle, J.) decided all three motions in a Decision and Order (NYSCEF Doc. No. 137) (the "Monroe Decision"). The court denied PMF 26's motion for summary judgment. It held that PEB and Mr. Padilla had identified material issues of fact as to "whether the agreements herein were in fact loans, and whether the plaintiff breached each agreement by setting a remittance amount in excess of what it was entitled to under each agreement," and as to "whether the plaintiff violated the agreements by withdrawing funds not authorized by the agreements' terms." (Monroe Decision at 5, 7). The

court observed that "[e]ach agreement contains materially conflicting terms," and that PEB's forensic accountant had averred, "without contradiction, that the plaintiff withdrew funds in excess of the agreed upon remittance amount, and those withdrawals were not of 'receivables' as contemplated by the parties." (*Id.* at 7 n.7). The court also denied the motion under CPLR § 3212(f) because PMF 26 had not responded to relevant discovery demands, "including discovery relevant to how the plaintiff calculated the weekly remittance amount." (*Id.* at 7).

37. The court granted in part the motion to amend. It accepted counterclaims by PEB and Mr. Padilla against PMF 26 for breach of contract, breach of the implied covenant of good faith and fair dealing, conversion, and money had and received, relating to all ten Merchant Agreements between PEB and PMF 26, and struck the proposed counterclaims for unjust enrichment and an accounting. (*Id.* at 8-10, 12). PMF 26 is the only party against which those counterclaims are asserted; no defendant in this action is named in them.

38. The court granted the motion to stay. Pursuant to CPLR § 2201, it stayed the Monroe County Action "pending resolution of the arbitral proceeding between the parties," reasoning that whether the Merchant Agreements "are 'in substance high-interest, short-term loans' is an issue that will be determined by the parties['] arbitration proceeding," and that such a determination will, "through the application of collateral estoppel," either dispose of a portion of the defenses of PEB and Mr. Padilla or "result in the voiding of the January 16th agreement herein." (*Id.* at 11, 13). The Monroe County Action remains stayed as of the date of this filing.

39. The Monroe Decision did not finally determine any issue. It did not address the Consulting Agreement or any claim against any defendant in this action, and the stay it entered applies only to the Monroe County Action.

40. On November 19, 2024, PEB commenced an action in this Court against PMF 26,

Kashat, Gieselmann and Bejko, asserting two claims under RICO: one under 18 U.S.C. § 1962(c) for the operation of an unlawful enterprise for the purpose of collecting unlawful debt, and one under 18 U.S.C. § 1962(d) for conspiracy to do so. On March 19, 2025, those defendants moved to compel arbitration and to stay that action. Over PEB's objection, on July 1, 2025, this Court entered an Opinion and Order granting that motion and staying that action pending resolution of the arbitration.

41. On or about December 29, 2025, PEB commenced an arbitration by filing with the American Arbitration Association a Statement of Claim and Demand for Arbitration against PMF 26, Kashat, Gieselmann and Bejko. On September 4, 2026, PEB filed an Amended Statement of Claim in the Arbitration. The Arbitration is pending.

42. None of the Defendants named in this action -- PMF 18, PMF One, Golshan and Burger -- is a respondent in the Arbitration, and the deadline for the joinder of additional respondents in the Arbitration has closed. PEB accordingly pursues Defendants in this action for their own independent liability as culpable persons who conducted and participated in the conduct of the Enterprise's affairs, while pursuing PMF 26, Kashat, Gieselmann and Bejko separately in the Arbitration for their wrongful conduct. PEB reserves the right to pursue Defendants in this or any other proceeding and to seek leave in the Arbitration should circumstances warrant, and takes no position in this Complaint as to whether any defendant named herein is bound by, or may invoke, the arbitration provisions contained in the Merchant Agreements, to which no defendant is a party.

43. The Consulting Agreement between PEB and PMF 18 contains no arbitration clause, no delegation clause, and no similar dispute-resolution provision of any kind.

44. Each of the Counts asserted herein is timely. PEB's claims arise out of a course of

conduct beginning with the September 15, 2023 Consulting Agreement, and continuing through the Enterprise's collection of unlawful debt, pattern of racketeering activity and other wrongful acts, through 2024, and this action is commenced within four years of the earliest of those events. PEB's delayed discovery of the facts underlying its claims, and the continuation of PMF 18's fiduciary relationship with PEB through at least September 15, 2024, are alleged, *infra*.

## **FACTUAL ALLEGATIONS**

## **THE CONSULTING AGREEMENT**

45. PEB is a specialty contractor of industrial power plants in the State of California.

46. Like many small businesses, PEB sustained a slowdown in its business operations due to the effect of the Global Coronavirus Disease (Covid-19) Pandemic.

47. In 2022 and 2023, PEB's business had materially slowed, but its owner, Padilla, was determined to retain his employees and avoid mass layoffs experienced by numerous other small businesses.

48. By 2023, PEB's business had continued to slow, so it looked for short-term financing as a "bridge" to make it through what would end up being the waning days of the pandemic.

49. In or around May 2023, PMF 18 made contact with PEB. PMF 18 representatives touted their extensive experience, expertise and capabilities, including PMF 18's financial consulting and advisory services.

50. Although PEB had previously obtained merchant cash advance financing from other funders, PEB lacked the knowledge and sophistication to evaluate the structure and true cost of such alternative financing products, and was uncertain about how to obtain lower-cost, traditional financing. PEB, therefore, reasonably relied on PMF 18's purported experience and

expertise to guide it through the process and steps required to secure financing.

51. According to PMF 18's website, its "goal is to build a strong working relationship, in order to help small businesses stay competitive and grow by providing revolving financing as needed until the business can improve its credit and qualify for a traditional loan."

52. PMF 18 and/or its affiliates purportedly offer lines of credit, equipment financing, mortgage financing, term loans, factoring, merchant cash advances, asset-based financing and financial services consulting.

53. On September 15, 2023, PEB and PMF 18 entered into the Consulting Agreement.

54. Upon information and belief, at the time the Consulting Agreement was executed, PMF 18 was not registered to do business in the State of California and, as of the date of this filing, is not registered to do business in the State of California.

55. Section 1 of the Consulting Agreement provides:

> Description of Services. Premium Merchant Funding's mission is to provide a broad array of services and solutions for small businesses. PMF advises merchants on reliable, safe, and innovative financing and payment solutions combined with individualized attention to provide tailored solutions that respond to the various needs of the business, including but not limited to, Accounting, Payroll Processing, Marketing, Branding, and more. Our all-inclusive consulting bundles will provide Client with a thorough review of the various metrics of their business and provide tailored solutions that solve the business's most pressing needs.

56. Acknowledging its purportedly unique, innovative and specialized expertise in the area of financial products and services, and its specific expertise in financial services consulting, PEB decided to engage PMF 18 to act as its consultant, agent and advisor with respect to PEB's short-term financing needs. PEB is referred to as the "Client" in the Consulting Agreement.

57. PMF 18's fee was not inexpensive. In exchange for the consulting and advisory services to be rendered by PMF 18, PEB was required to pay PMF 18 an upfront flat fee of $50,000.

58. Section 3 of the Consulting Agreement provided that the agreement would "terminate automatically upon completion by PMF of the services contemplated by this agreement or one (1) year from the date of signing, whichever is earlier."

59. Under the Consulting Agreement, PMF 18 was granted broad authorization to act on behalf of PEB and represent its interests. Specifically, Section 4 of the Consulting Agreement provides that PEB "authorizes PMF to communicate on Client's behalf with any party that is required in order to carry out the services contemplated by this Agreement."

60. PMF 18 also was granted broad authorization to represent PEB's interests. In this regard, Section 4 of the Consulting Agreement further provided: "Client authorizes PMF to make all representations on Client's behalf, except for the consummation of any financing or acceptance of an agreement in which Client is to be a party."

61. Critically, PEB was required under the Consulting Agreement to provide PMF 18 with any and all information and documentation reasonably requested to carry out the scope of its duties and obligations under the Consulting Agreement. In fact, the Consulting Agreement required PEB to "supply PMF with updated and current documents and information upon request by PMF."

62. Importantly, the Consulting Agreement vested in PMF 18 the "right to represent, negotiate, and correspond on behalf of Client" in order to "carry out the services contemplated by this agreement."

63. The Consulting Agreement does <u>not</u> disclaim the existence of a fiduciary duty or duty of loyalty.

64. PMF 18 had a duty to act with undivided loyalty to PEB, engage in honest dealings with PEB, disclose any conflicts of interest and to act with PEB's best interest in mind.

65. At all times, PMF 18 had a duty to disclose to PEB direct or indirect compensation it may or did receive in connection with financial transactions arranged, facilitated or brokered by PMF 18.

66. PMF 18 concealed and failed to disclose the compensation or benefit it received for arranging financing on behalf of PEB from third-party lenders and other companies purportedly engaged to provide financing and working capital to PEB, including, but not limited to: PMF 26, PMF One, Zahav Asset Management LLC ("Zahav"), Clearfund Solutions LLC ("Clearfund"), Seamless Capital Group LLC ("Seamless"), Alpine Advance 5, LLC ("Alpine") and Newtek Bank, N.A. ("Newtek Bank"), as well as other persons and entities alleged, *infra*.

67. Upon information and belief, PMF 18 failed to disclose that it shared common ownership and control with PMF 26 and PMF One and/or that PMF 18 would directly or indirectly receive compensation from PMF 26, PMF One and the other lenders identified above in connection with the transactions brokered or arranged by PMF 18.

68. PEB performed all, or substantially all, of its obligations under the Consulting Agreement, including the timely payment of the agreed upon consulting fee of $50,000 and provided PMF 18 with access to PEB's financial records and accounts, as required, authorized and limited by the Consulting Agreement.

69. Despite its contractual obligations and the stated purpose of the Consulting Agreement, PMF 18 provided no actual consulting or advisory services to PEB, despite PEB's timely payment of $50,000.

70. Indeed, notwithstanding its representations, at no time did PMF 18 provide PEB with "innovative financing [solutions]," "tailored solutions," perform a "thorough review of the various metrics" of PEB's business or attempt to "solve the business's most pressing needs."

71. Instead of providing valuable consulting services, as contemplated by the Consulting Agreement and reasonably expected by PEB, PMF 18 misused its relationship of trust and confidence with PEB to gain access to PEB's confidential financial records and information, including PEB's bank records and financial statements.

72. During the course of performance under the Consulting Agreement, PEB entrusted PMF 18 with access to certain data, financial accounts and funds for the limited purpose of facilitating the provision of loans or other capital raises obtained in furtherance of PEB's short-term capital requirements.

73. PMF 18 used its unique access to PEB's financial records and information to ascertain whether PEB was a valuable and worthwhile target for PMF 18's affiliate, PMF 26, and, upon information and belief, shared that information with PMF 26 and PMF One for use in their own dealings with PEB.

74. Instead of attempting to assist PEB with obtaining "solutions" to its most pressing needs, such as short-term financing, PMF 18 deliberately steered PEB into high fee, high-interest, economically disadvantageous transactions under the guise that PMF 18 was acting in PEB's best interests.

75. While some of these transactions were with purported third-party lenders and financing companies, PMF 18 principally advised and steered PEB into what were described as "merchant cash advance" transactions with PMF 18's affiliate, PMF 26.

76. Over a period of approximately four months, PEB entered into numerous, so-called "merchant cash advance" transactions with PMF 26 and other lenders, based on recommendations and advice provided by PMF 18.

77. The result of the transactions that PEB entered into with PMF 26 and other lenders,

at the urging, behest, recommendation and approval of PMF 18, was catastrophic for PEB.

78. After entering into the Consulting Agreement with PEB, PMF 18 wasted little time steering PEB toward PMF 26, as part of a regular practice of steering merchants in need of financing to PMF 26, the PMF Entities' funding entity.

79. Representatives of PMF 18 used their knowledge and information obtained through their role as a confidential and fiduciary consultant and advisor to steer PEB toward, *inter alia*, PMF 26, which then carried out the next step in a fraudulent and unlawful scheme under the false pretense that PEB would be able to obtain a working capital loan, aid its business operations and ultimately obtain traditional financing to lower its monthly debt service payments and position the business for future financial success.

80. PMF 18 and its affiliates were paid in connection with PEB, and PMF 18 disclosed none of those payments to PEB. PEB's $50,000 consulting fee was wired from PEB's account on September 22, 2023 -- before PMF 26 issued a Merchant Agreement to PEB -- to an account maintained by PMF One, after two earlier wires of $50,000 to PMF 26, on September 15 and 21, 2023, were returned as "sent to incorrect account."

81. The Consulting Agreement is a separate contract, between different parties, from each of the Merchant Agreements. The Consulting Agreement was executed twenty-eight (28) days before PMF 26 issued the first Merchant Agreement. PMF 18 is not a party to any Merchant Agreement, and PMF 26 is not a party to the Consulting Agreement. The Consulting Agreement contains no arbitration or delegation provision; it provides that it "shall be governed by the laws of the State of New York."

82. PMF 18's duties to PEB arose from the Consulting Agreement and the relationship of trust and confidence it created: PMF 18's undertaking to advise PEB on its financing, its

authority to "represent, negotiate, and correspond" on PEB's behalf, and its access to PEB's confidential financial information. Those duties arose before PMF 26 issued a Merchant Agreement to PEB.

83. PEB's claims in the Fifth through Fourteenth Counts rest on what PMF 18 promised PEB, what PMF 18 and those acting with it failed to disclose, and what PMF 18 and its affiliates were paid. Those claims do not depend on any term of any Merchant Agreement, on whether the Merchant Agreements are loans or purchases of receivables, or on whether the Merchant Agreements are usurious or enforceable.

84. In the Fifth through Fourteenth Counts, PEB does not seek to enforce, rescind, reform or construe any Merchant Agreement, or to recover any sum under one. The Merchant Agreements are referred to in those Counts only to identify the transactions into which PMF 18 steered PEB and as evidence of the amount of PEB's resulting damages.

**INVOLVEMENT OF PMF 26**

85. The website of PMF 26, much like the website of PMF 18, represents that its "goal is to build a strong working relationship in order to help small businesses stay competitive and grow by providing revolving financing as needed until the business can improve its credit and qualify for a traditional loan."

86. Among the types of financial products and services purportedly sold by PMF 26 are lines of credit, equipment financing, mortgage financing, term loans, factoring and merchant cash advances.

87. Upon information and belief, PMF 26 utilizes a staff of sales officers and brokers, also known as "funders" to identify, sell, broker, underwrite and fund usurious loans to distressed and unsophisticated small businesses that are in immediate need of short-term working capital.

88. PMF 26 representatives involved in the sale of usurious loans are compensated by commissions and other revenue-sharing incentives based on the value of each transaction.

89. Although PMF 26 markets itself as a purveyor of merchant cash advance and factoring services, the "Merchant Agreements" developed and utilized by PMF 26 are actually loan agreements charging per annum interest rates more than twice the amount prohibited by New York's and California's usury laws.

90. PMF 26 falsely markets these usurious loans as revenue-based financing, an alternative to traditional loans, not having an annual percentage rate ("APR") and providing a sound solution to businesses in need of short-term working capital until financial conditions improve and traditional financing at a lower cost becomes available.

91. In reality, PMF 26 has no intention of assisting businesses with obtaining long-term, traditional loans at low interest rates. The exact opposite is true, PMF 26 preys on distressed businesses and their unsophisticated owners who are in need of working capital.

92. Ultimately, PMF 26's goal is to keep each business barely solvent by trapping it in a cycle of high-interest, short-term loans. As the cycle continues, an ever-larger percentage of revenue is needed to cover the high-interest and ever-increasing exorbitant fees, requiring the merchant to pay down each existing cash advance with yet another cash advance, thereby trapping the merchant in a cycle of crushing debt from which it cannot escape except by way of default.

93. PMF 26 is able to increase or decrease the financial distress a merchant may encounter by, which it often did, deliberately disregarding the terms and conditions contained within each Merchant Agreement. For example, PMF 26 often unilaterally accelerated the merchant's time to repay the loan or refused to advance the full principal amount. These tactics

and deliberate unlawful acts forced the merchant into further financial distress and made merchants dependent on the willingness of PMF 26 to continue to advance financing.

94. In a matter of weeks and/or months, the business is transformed into a "zombie" company, existing merely to pay usurious interest and outrageous fees to PMF 26. It is PMF 26's goal to syphon as much money out of the merchant as possible before its inevitable collapse under the weight of the crushing debt obligations imposed by PMF 26's usurious interest rates, fraudulent fees untethered to any actual costs incurred by PMF 26 and willingness to ignore the terms and conditions of the unlawful agreements.

95. Instead of allowing a merchant to "reconcile" the weekly remittance with the realities of receivables collection, PMF 26 routinely required the merchant to "stack" or "roll" funds from one transaction to the next. This practice, which by itself can place a merchant into default, committed all or a portion of the proceeds from a later transaction to satisfy the outstanding obligations of earlier transactions. Of course, such conduct only makes sense if the true nature of the transactions are loans. If the transactions were true purchases of receivables, the merchant would have been required to rebuy the receivables previously sold to PMF 26 and then immediately resell the same receivables, and potentially others, back to PMF 26. PMF 26 never engaged in such circuitous and nonsensical behavior, however, because the transactions were actually loans disguised as merchant cash advances, not purchases of future receipts.

96. When the business inevitably defaults under the weight of the daily or weekly payments and can no longer service the debt, PMF 26 then uses draconian and unconscionable rights and remedies granted to it under each Merchant Agreement to collect from the business, *inter alia*, owner under a personal guaranty and/or through a confession of judgment against the owner-guarantor and merchant. PMF 26 bore no risk in the transactions because the rights granted

to PMF 26 under the agreements assured its ability to recover the full amount due under all circumstances.

## THE TRANSACTIONS

97. Between October 13, 2023 and January 22, 2024 -- a mere four (4) month period -- PEB entered into at least ten (10) Merchant Agreements with PMF 26, pursuant to which PEB paid from its bank account approximately $2.7 million in interest. The face value of the "Purchase Price" under the Merchant Agreements that were partially or wholly funded by PMF 26 equals $6,167,469.63.

### A. The Merchant Agreements

98. The ten (10) Merchant Agreements described below (collectively, the "Agreements" and singularly an "Agreement") were each issued on PMF 26's standard form, and, except for the amounts, payment counts and fees alleged below for each Agreement, their material terms were the same.

99. Each Agreement stated a "Purchase Price" for the purported purchase of a "Specified Percentage" of PEB's "future accounts, contract rights and other entitlements arising from or relating to the payment of monies from Merchant's customers and/or third-party payors," until "the 'Purchased Amount' is delivered by or on behalf of Merchant to PMF." Purportedly, the Purchase Price was based on the fair market value of the Specified Percentage of PEB's future receivables, and payments to PMF 26 were to be conditioned upon PEB's sale of products and services.

100. Critically, despite having wildly disparate weekly remittance obligations, each Agreement set the Specified Percentage at eighteen percent (18%) of PEB's future receipts. This indisputable fact alone is compelling evidence that the Agreements were loans, not purchases of future receipts. *See Lateral Recovery LLC v. Funderz.net, LLC*, No. 1:22-cv-02170 (LJL), 2024

WL 4350369, at *29 (S.D.N.Y. Sept. 27, 2024) (holding, "most critically," where each of six agreements contained "'good faith estimate" of 10%, yet where "daily payments varied from $9,999 to $69,999 on agreements signed" over five-week period, "[i]t is not tenable that [merchant's] receivables increased sevenfold in less than a month," "[t]he daily amount was not a good faith estimate of [merchant's] receivables" and, therefore, the transactions were usurious loans, not purchases of receivables, and violated RICO's prohibition on collection of unlawful debt); *Lateral Recovery LLC v. Funderz.net, LLC*, No. 1:22-cv-02170 (JLR), 2024 WL 216533, at *11-12 (S.D.N.Y. Jan. 19, 2024) (finding plausible allegation that transactions were loans where Specified Percentage in six receivables purchase agreements was 10%, yet daily payments differed wildly between agreements executed over five-week period); *Haymount Urgent Care PC v. GoFund Advance, LLC*, 609 F.Supp.3d 237, 244, 249 (S.D.N.Y. 2022) (allegations that six agreements entered into within months of one another setting Specified Percentage at either 25% or 45% was sufficient to establish element of RICO claim where daily remittances did not appear to be "good faith estimates of the merchant's receivables").

101. The Agreements also provided that upon an "Event of Default under Section 3 of the MERCHANT AGREEMENT TERMS AND CONDITIONS the Purchased Percentage shall equal 100%." Thus, upon a single failure of PEB to give PMF 26 twenty-four hours' notice that PEB had insufficient funds to cover a withdrawal, or any other non-material violation of the Terms and Conditions, PMF 26 purportedly would be entitled to PEB's entire revenue stream.

102. Each Agreement described its "Daily Remittance" as "a good faith estimate of (a) Purchased Percentage multiplied by (b) the daily revenues of Merchant during the previous calendar month divided by (c) the number of business days in the calendar month." But each Agreement was accompanied by an Addendum that converted the Specified Percentage into a fixed

weekly sum, debited by Automated Clearing House ("ACH") transfer from PEB's operating account for a fixed number of weeks, which the Agreement described as a "good faith estimate" of the Specified Percentage. Once so converted, repayment no longer depended on PEB's sales; each Agreement became a loan with guaranteed repayment, fixed weekly payments and a predetermined term.

103. Each Agreement charged a one-time "Underwriting Fee" and a "Financing Fee." Upon information and belief, neither fee bore any relation to PMF 26's actual underwriting or financing costs, which were a fraction of the amounts charged. Both were additional interest disguised as fees.

104. Upon information and belief, PMF 26 intended each Agreement as a loan requiring fixed installments that would guarantee it a desired return within a specified period, rather than as a purchase of a percentage of PEB's receivables carrying the risk of PEB's collections, and PMF 26's internal approval of each Agreement was based on guaranteed payment within a projected period, not on the timing of payment by PEB's account debtors. In several instances, PMF 26 also advanced the Purchase Price in tranches rather than in a lump sum, which increased the effective interest rate and allowed PMF 26 to control the amount of capital PEB could realize.

105. Each Agreement's reconciliation provision left reconciliation to PMF 26's sole discretion, and each Agreement required PEB to grant PMF 26 a security interest in all of its present and future assets and required Padilla to personally guarantee PEB's performance, as alleged, infra.

106. As used throughout this Complaint, each stated implied interest rate is calculated on the amount PMF 26 actually advanced to PEB after deduction of its Underwriting Fee, which, as alleged herein, was itself additional disguised interest, and each such rate is stated on a simple,

non-compounded basis. Each implied rate alleged below exceeds twice the twenty-five percent (25%) maximum per annum rate permitted under New York law, exceeded the lawful maximum annual interest rate permitted under California law, and in practice the effective rates were substantially higher than 50% per annum.

**1. The October 13, 2023 Merchant Agreement**

107. On October 13, 2023, PEB and PMF 26 entered into a Merchant Agreement (the "October 13, 2023 Agreement"). The Agreement stated a "Purchase Price" of $500,000.

108. The October 13, 2023 Agreement's Addendum converted the Specified Percentage of 18% to a fixed sum in the amount of $14,326.92 per week, to be remitted in the form of weekly ACH withdrawals from PEB's operating account. Thus, the October 13, 2023 Agreement expressly contemplated 52 payments in the amount of $14,326.92 per week, for a total of $745,000.00.

109. The October 13, 2023 Agreement also included a one-time "Underwriting Fee" of $47,005 and a "Financing Fee" of $2,995.

110. Thus, the October 13, 2023 Agreement was a loan of $500,000 that required repayment of $745,000 in just 52 weeks and payable in fixed weekly installments. This translated into an implied interest rate of approximately 64% per annum.

111. Although the October 13, 2023 Agreement was issued by PMF 26, PEB is unaware of any transactions occurring in connection with this Agreement. Upon information and belief, the October 13, 2023 Agreement may have been superseded or overwritten by the Merchant Agreement entered into four days later, on October 17, 2023.

**2. The October 17, 2023 Merchant Agreement**

112. On October 17, 2023, PEB and PMF 26 entered into a Merchant Agreement (the "October 17, 2023 Agreement"). The Agreement stated a "Purchase Price" of $461,285.36.

113. The October 17, 2023 Agreement's Addendum converted the Specified Percentage of 18% to a fixed sum in the amount of $13,217.60 per week, to be remitted in the form of weekly ACH withdrawals from PEB's operating account. Thus, the October 17, 2023 Agreement expressly contemplated 52 payments in the amount of $13,217.60 per week, for a total of $687,315.19.

114. The October 17, 2023 Agreement also included a one-time "Underwriting Fee" of $43,133.54 and a "Financing Fee" of $2,995.

115. Thus, the October 17, 2023 Agreement was a loan of $461,285.36 that required repayment of $687,315.19 in just 52 weeks and payable in fixed weekly installments. This translated into an implied interest rate of approximately 64% per annum.

116. Under the October 17, 2023 Agreement, PEB was to receive a net Purchase Price of $415,157, which was repayable over a period of 52 weeks.

117. On October 18, 2023, PMF 26 deposited $47,486 into PEB's operating account.

118. On October 20, 2023, PMF 26 withdrew $525,000 from PEB's bank account in two (2) separate transactions of $262,500 each, and then an additional $162,315, three (3) days later (October 23, 2023).

119. Thus, not only did PMF 26 fail to provide the funding it promised, it withdrew from PEB's bank account $687,315 within days of the initial funding, which was contrary to the terms and conditions of the October 17, 2023 Agreement.

120. Under the October 17, 2023 Agreement, PEB should have been permitted to repay the Purchased Amount ($687,315) over 52 weeks in the amount $13,217.60 per week. Instead, PMF 26 took the entire amount it was entitled to recoup over the life of the October 17, 2023 Agreement and did so within six (6) days of the agreement being issued.

### 3. The October 25, 2023 Merchant Agreement

121. On October 25, 2023, PEB and PMF 26 entered into a Merchant Agreement (the "October 25, 2023 Agreement"). The Agreement stated a "Purchase Price" of $250,000.

122. The October 25, 2023 Agreement's Addendum converted the Specified Percentage of 18% to a fixed sum in the amount of $21,527.78 per week, to be remitted in the form of weekly ACH withdrawals from PEB's operating account. Thus, the October 25, 2023 Agreement expressly contemplated 18 payments in the amount of $21,527.78 per week, for a total of $387,500.

123. The October 25, 2023 Agreement also included a one-time "Underwriting Fee" of $22,005.00 and a "Financing Fee" of $2,995.

124. Thus, the October 25, 2023 Agreement was a loan of $250,000 that required repayment of $387,500 in just 18 weeks and payable in fixed weekly installments. This translated into an implied interest rate of approximately 202% per annum.

125. Under the October 25, 2023 Agreement, PEB was to receive a net Purchase Price of $225,000, which was repayable over a period of 18 weeks.

126. On October 25, 2023, PMF 26 deposited $47,241 into PEB's operating account.

127. On November 1, 2023, PMF 26 withdrew $46,528 from PEB's bank account in two (2) separate transactions of $25,000, and $21,528.

128. On November 3, 2023, PMF 26 withdrew an additional $120,000 from PEB's bank account.

129. Thus, not only did PMF 26 fail to provide the funding it promised, it withdrew from PEB's bank account $166,528 within days of its initial deposit, which was contrary to the terms and conditions of the October 25, 2023 Agreement.

130. Under the October 25, 2023 Agreement, PEB should have been permitted to repay the Purchased Amount ($387,500) over 18 weeks in the amount $21,527.78 per week.

131. Instead, PMF 26 withdrew from PEB's bank account nearly four times the $43,055.56 in weekly remittances the October 25, 2023 Agreement authorized during that period, and did so within nine (9) days of issuing the October 25, 2023 Agreement.

132. The October 25, 2023 Agreement was created two days after the Purchased Amount of the October 17, 2023 Agreement was satisfied in full. Between October 18, 2023 and November 3, 2023, PMF 26 withdrew $853,843 from PEB's bank account and deposited only $94,727.

**4. The November 6, 2023 Merchant Agreement**

133. On November 6, 2023, PEB and PMF 26 entered into a Merchant Agreement (the "November 6, 2023 Agreement"). The Agreement stated a "Purchase Price" of $750,000.

134. The November 6, 2023 Agreement's Addendum converted the Specified Percentage of 18% to a fixed sum in the amount of $83,035.71 per week, to be remitted in the form of weekly ACH withdrawals from PEB's operating account. Thus, the November 6, 2023 Agreement expressly contemplated 14 payments in the amount of $83,035.71 per week, for a total of $1,162,500.

135. The November 6, 2023 Agreement also included a one-time "Underwriting Fee" of $75,000 and a "Financing Fee" of $2,995.

136. Thus, the November 6, 2023 Agreement was a loan of $750,000 that required repayment of $1,162,500 in just 14 weeks and payable in fixed weekly installments. This translated into an implied interest rate of approximately 268% per annum.

137. Under the November 6, 2023 Agreement, PEB was to receive a net Purchase Price of $674,860, which was repayable over a period of 14 weeks in the amount of $83,035.71 per week. This Agreement differed from the previous Agreements in that it attached an "Addendum to Payment Rights Purchase and Sale Agreement" (the "November 6, 2023 Addendum").

138. The purpose of the November 6, 2023 Addendum appears to show that $364,546

of the Purchase Price was paid directly to third parties, in addition to $152,500 paid to PMF 26 (for a total of $517,046).

139. There is no supporting documentation attached to the November 6, 2023 Addendum to confirm that PEB owed these amounts or whether PMF 26, in fact, made these payments as indicated on the November 6, 2023 Addendum.

140. From the net Purchase Price of $674,860, PEB received net proceeds of $157,814. PEB has requested that PMF 26 provide the documents in question, but PMF 26 has failed and/or refused to do so.

141. On November 7, 2023, PMF 26 deposited $157,814 into PEB's account. One week later, on November 14, 2023, PMF 26 withdrew $80,000 from the same bank account.

142. Then on November 20, 2023, PMF 26 withdrew another $860,000 from PEB's bank account. Then, on November 22, 2023, a further $100,000 was wired from PEB's bank account -- not to PMF 26, but to its affiliate PMF One, under PMF One's own beneficiary identifier and with the payment details "MANGEMENT FEES JAMES G." PEB's own accounting records, which recorded the transfer only as "Loan Fees?," reflect that PEB did not know its purpose.

143. In total, $1,040,000 was withdrawn from PEB's bank account for PMF 26 and PMF One within sixteen (16) days of the November 6, 2023 Agreement.

144. Under the November 6, 2023 Agreement, PEB was supposed to have the opportunity to repay the Purchased Amount ($1,162,500) over fourteen (14) weeks in the amount $83,035.71 per week.

145. Instead of following the terms and conditions of the November 6, 2023 Agreement, PMF 26 and PMF One together withdrew from PEB's bank account nearly ninety percent (90%) of the entire Purchased Amount, and more than four times the $249,107.13 in weekly remittances

the Agreement authorized over that period, and did so within sixteen (16) days of issuing the November 6, 2023 Agreement.

146. During a span of approximately 35 days -- from the date of PMF 26's first deposit through the date of its last withdrawal[1] (10/18/2023 through 11/22/2023) -- PMF 26 deposited $252,542 into PEB's bank account, while PMF 26 and PMF One withdrew $1,893,843, during the same time period.

147. Transmitted with the November 6, 2023 Agreement was a further addendum, captioned "Pre-Payment Addendum," issued in the name of Defendant PMF 18 -- an affiliated entity that was not a party to the agreement. That Addendum recites a Funding Amount of $750,000.00 and a Payback Amount of $1,162,500.00, matching the November 6, 2023 Agreement's stated Purchase Price and Purchased Amount exactly, and states that "Premium Merchant Funding 18, LLC will accept a full payment of $975,000.00 if the merchant wishes to pay off the complete merchant cash advance within 21 days of the funding date."

148. The Pre-Payment Addendum is inconsistent with the Agreement's own characterization of the transaction as a purchase of future receivables at a discount. A purchaser of future receivables holds those receivables until the Purchased Amount is delivered; no fixed sum retires the arrangement irrespective of what the receivables in fact produce. By fixing, at signing, a sum certain at which "the complete merchant cash advance" could be paid off within a stated twenty-one (21) day window, PMF 18 and PMF 26 treated the transaction as what it was in substance: a loan of a definite principal sum, for a definite term, carrying a payoff balance.

149. In the alternative, and applying the same methodology stated above, had PEB

[1] "Last withdrawal" means the final withdrawal date before PMF 26 issued a new Merchant Agreement, "stacking" or "rolling" the debt obligations.

exercised the pre-payment option the effective rate of interest on this Agreement would have been approximately 770% per annum: a charge of $300,140.00 over the $674,860.00 PMF 26 advanced net of the $75,140.00 origination fee deducted under the November 6, 2023 Addendum, over a period of no more than twenty-one (21) days, computed on a simple, non-compounded basis. That rate, like the rate at which the debt was in fact incurred, is at least twice the twenty-five percent (25%) maximum enforceable rate under New York Penal Law § 190.40 and exceeds the maximum per annum interest permitted under California law.

150. The Pre-Payment Addendum is also direct evidence of PMF 18's own participation in the transactions at issue. PMF 18 was not a counterparty to the November 6, 2023 Agreement, yet PMF 18 -- not PMF 26 -- designated itself as the entity that "will accept" PEB's payoff of that Agreement, and did so on a document transmitted to PEB together with the Agreement itself. PMF 18 thus stood to receive, in its own name, the proceeds of a transaction that PMF 18's own Consulting Agreement with PEB had produced. PMF 18 never disclosed that fact to PEB.

**5. The November 22, 2023 Merchant Agreement**

151. On November 22, 2023, PEB and PMF 26 entered into a Merchant Agreement (the "November 22, 2023 Agreement"). The Agreement stated a "Purchase Price" of $350,000.

152. The November 22, 2023 Agreement's Addendum converted the Specified Percentage of 18% to a fixed sum in the amount of $27,125 per week, to be remitted in the form of weekly ACH withdrawals. Thus, the November 22, 2023 Agreement expressly contemplated 20 payments in the amount of $27,125 per week, for a total of $542,500.

153. The November 22, 2023 Agreement also included a one-time "Underwriting Fee" of $35,000 and a "Financing Fee" of $2,995.

154. Thus, the November 22, 2023 Agreement was a loan of $350,000 that required repayment of $542,500 in just 20 weeks and payable in fixed weekly installments. This translated into an implied interest rate of approximately 188% per annum.

155. The Addendum to the November 22, 2023 Agreement purports to show that $114,649 of the Purchase Price was paid directly to "Consolidated Electrical Distributors." Consolidated Electrical Distributors, Inc. is a legitimate, arm's-length trade creditor of PEB. PMF 26 has not, however, produced documentation confirming that it made the payment in the amount indicated on the November 22, 2023 Addendum.

156. From the net Purchase Price of $314,930, PEB received net proceeds of $200,281. Without the aforementioned documentation, it is not possible to verify that these transactions occurred or the amounts advanced by PMF 26.

157. Even though, on November 27, 2023, PMF 26 deposited $200,281 into PEB's account, on December 7, 2023, PMF 26 withdrew $75,000 from PEB's bank account. Then, on December 11, 2023, PMF 26 withdrew an additional $50,000.

158. PMF 26 withdrew a total of $125,000 within nineteen (19) days of the November 22, 2023 Agreement, even though the terms and conditions of the November 22, 2023 Agreement authorized PMF 26 to receive only $73,625 during that time period.

159. Under the November 22, 2023 Agreement, PEB should have been permitted to repay the Purchased Amount ($542,500) over twenty (20) weeks in the amount $27,125.00 per week. Instead, PMF 26 took far more than the Agreement's remittance schedule authorized, and did so within nineteen (19) days of issuing the November 22, 2023 Agreement.

**6. The December 11, 2023 Merchant Agreement**

160. On December 11, 2023, PEB and PMF 26 entered into a Merchant Agreement (the "December 11, 2023 Agreement"). The Agreement stated a "Purchase Price" of $635,672.23.

161. The December 11, 2023 Agreement's Addendum converted the Specified Percentage of 18% to a fixed sum in the amount of $52,442.96 per week, to be remitted in the form of weekly ACH withdrawals from PEB's operating account. Thus, the December 11, 2023 Agreement expressly contemplated 20 payments in the amount of $52,442.96 per week, for a total of $1,048,859.18.

162. The December 11, 2023 Agreement also included a one-time "Underwriting Fee" of $35,000 and a "Financing Fee" of $2,995.

163. Thus, the December 11, 2023 Agreement was a loan of $635,672.23 that required repayment of $1,048,859.18 in just 20 weeks and payable in fixed weekly installments. This translated into an implied interest rate of approximately 217% per annum. Through the December 11, 2023 Agreement, PMF 26 charged PEB an interest rate at least twice the 25% maximum per annum interest rate permitted under New York law

164. Additionally, the Offer for Summary Advance appended to the December 11, 2023 Agreement further provides that PEB is to be charged a Prepaid Finance Change: Origination/Closing Fee in the amount of $63,567.23.

165. Although the December 11, 2023 Agreement appears to have been issued by PMF 26, PEB is unaware of any transactions occurring in connection with this Agreement. Upon information and belief, the December 11, 2023 Agreement may have been superseded or overwritten by the Merchant Agreement entered into the following day, December 12, 2023. PEB's bank records confirm that no funds were deposited into PEB's account under the December 11, 2023 Agreement, and that the payment in its Addendum allocated to Consolidated Electrical Distributors, Inc. was instead made by PEB itself, in wires of $74,500 on each of December 13 and December 22, 2023.

**7. The December 12, 2023 Merchant Agreement**

166. On December 12, 2023, PEB and PMF 26 entered into a Merchant Agreement (the "December 12, 2023 Agreement"). The Agreement stated a "Purchase Price" of $125,000.

167. The December 12, 2023 Agreement's Addendum converted the Specified Percentage of 18% to a fixed sum in the amount of $10,763.89 per week, to be remitted in the form of weekly ACH withdrawals from PEB's operating account. Thus, the December 12, 2023 Agreement expressly contemplated 18 payments in the amount of $10,763.89 per week, for a total of $193,750.

168. The December 12, 2023 Agreement also included a one-time "Underwriting Fee" of $6,250 and a "Financing Fee" of $1,750.

169. Thus, the December 12, 2023 Agreement was a loan of $125,000 that required repayment of $193,750 in just 18 weeks and payable in fixed weekly installments. This translated into an implied interest rate of approximately 182% per annum.

170. On December 13, 2023, PMF 26 deposited $118,715 into PEB's bank account.

171. On December 15, 2023, PMF 26 made two (2) withdrawals in the amount of $478,000 and $10,764. Although in this rare instance PMF 26 deposited the amount required under the December 12, 2023 Agreement, PEB should have been permitted to repay the Purchased Amount ($193,750) over eighteen (18) weeks in the amount $10,763.89 per week.

172. Additionally, PMF 26 withdrew more than two and one-half times (252%) the Purchased Amount within two (2) days of its initial deposit, plainly violating the express terms and conditions of the December 12, 2023 Agreement.

**8. The December 18, 2023 Merchant Agreement**

173. On December 18, 2023, PEB and PMF 26 entered into a Merchant Agreement (the "December 18, 2023 Agreement"). The Agreement stated a "Purchase Price" of $880,000.

174. The December 18, 2023 Agreement's Addendum converted the Specified Percentage of 18% to a fixed sum in the amount of $56,833.33 per week, to be remitted in the form of weekly ACH withdrawals from PEB's operating account. Thus, the December 18, 2023 Agreement expressly contemplated 24 payments in the amount of $56,833.33 per week, for a total of $1,364,000.

175. The December 18, 2023 Agreement also included a one-time "Underwriting Fee" of $88,000 and a "Financing Fee" of $2,995.

176. Thus, the December 18, 2023 Agreement was a loan of $880,000 that required repayment of $1,364,000 in just 24 weeks and payable in fixed weekly installments. This translated into an implied interest rate of approximately 156% per annum.

177. On December 18, 2023, PMF 26 deposited $791,965 into PEB's operating account.

178. PMF 26 then swiftly processed three (3) withdrawals from the account as follows: First, on December 21, 2023, PMF 26 withdrew $41,500 from PEB's bank account. Second, on January 4, 2024, PMF 26 withdrew an additional $625,000 from PEB's bank account. Third, on January 12, 2024, PMF 26 withdrew an additional $500,000 from PEB's bank account.

179. Although in this rare instance PMF 26 provided the required funding, it withdrew a total of $1,166,500 from PEB's bank account within twenty-five (25) days following PMF 26's initial deposit of $791,965.

180. Under the December 18, 2023 Agreement, PEB was supposed to have the opportunity to repay the Purchased Amount ($1,364,000) over twenty-four (24) weeks in the amount $56,833.33 per week. Instead, PMF 26 took approximately 85% of the entire Purchased Amount, more than five times the $227,333.32 in weekly remittances the Agreement authorized over that period, and did so within a mere twenty-five (25) days of issuing the December 18, 2023

Agreement.

181. Plainly, PMF 26 violated the express terms and conditions of the December 18, 2023 Agreement.

**9. The January 16, 2024 Merchant Agreement**

182. On January 16, 2024, PEB and PMF 26 entered into a Merchant Agreement (the "January 16, 2024 Agreement"). The Agreement stated a "Purchase Price" of $666,706.

183. The January 16, 2024 Agreement's Addendum converted the Specified Percentage of 18% to a fixed sum in the amount of $43,058.09 per week, to be remitted in the form of weekly ACH withdrawals. Thus, the January 16, 2024 Agreement expressly contemplated 24 payments in the amount of $43,058.09 per week, for a total of $1,033,394.30.

184. The January 16, 2024 Agreement also included a one-time "underwriting fee" of $66,670.60 and a "Financing Fee" of $2,995.

185. Thus, the January 16, 2024 Agreement was a loan of $666,706 that required repayment of $1,033,394.30 in just 24 weeks and payable in fixed weekly installments. This translated into an implied interest rate of approximately 156% per annum.

186. On January 16, 2024, PMF 26 deposited $600,000 into PEB's account.

187. On January 17, 2024, PMF 26 withdrew $43,058 from PEB's bank account, and then, on January 19, 2024, PMF 26 withdrew an additional $10,885.

188. Although PMF 26 provided the required funding under the January 16, 2024 Agreement, it withdrew a total of $53,943 from PEB's operating account within two (2) days following PMF 26's initial deposit of $600,000.

**10. The January 22, 2024 Merchant Agreement**

189. On January 22, 2024, PEB and PMF 26 entered into a Merchant Agreement (the "January 22, 2024 Agreement"). The Agreement stated a "Purchase Price" of $2,684,478.27.

190. The January 22, 2024 Agreement's Addendum converted the Specified Percentage of 18% to a fixed sum in the amount of $113,574.08 per week, to be remitted in the form of weekly ACH withdrawals. Thus, the January 22, 2024 Agreement expressly contemplated 39 payments in the amount of $113,574.08 per week, for a total of $4,429,389.15.

191. The January 22, 2024 Agreement also included a one-time "underwriting fee" of $268,447.83 and a "Financing Fee" of $2,995.

192. Thus, the January 22, 2024 Agreement was a loan of $2,684,478.27 that required repayment of $4,429,389.15 in just 39 weeks and payable in fixed weekly installments. This translated into an implied interest rate of approximately 111% per annum.

193. On May 3, 2024, PMF 26 withdrew $70,000 from PEB's bank account.

194. On May 6, 2024, PMF 26 withdrew $10,000 from PEB's bank account; on May 9, 2024, it withdrew $39,999; and on May 10, 2024, it withdrew a further $35,000.

195. On May 13, 2024, PMF 26 withdrew $67,500 from PEB's bank account.

196. The following day, May 14, 2024, PMF 26 withdrew an additional $32,500 from PEB's bank account.

197. Thus, during a twelve-day period between May 3 and May 14, 2024, PMF 26 withdrew from PEB's bank account a total of $254,999, in six transfers of irregular amounts on six separate business days, rather than the single fixed Weekly Remittance of $113,574.08 that the January 22, 2024 Agreement specified.

198. Instead of adhering to the terms and conditions of the January 22, 2024 Agreement, PMF 26 withdrew arbitrary amounts from PEB's bank account and did so at irregular intervals, in some cases withdrawing funds on a daily basis in direct contravention of the terms and conditions of the January 22, 2024 Agreement.

199. PEB received only a small fraction of the stated $2,684,478.27 Purchase Price. By PMF 26's own sworn account, $1,841,250.88 of the Purchase Price was applied as a credit against balances PMF 26 claimed PEB owed it under prior agreements (a figure the Addendum itself allocates to "PMF AND CLEARFUND"), $550,585.56 was allocated to payments PMF 26 was to make to Seamless and Zahav, and PMF 26 charged a $268,447.83 Underwriting Fee. (Monroe County Action, NYSCEF Doc. No. 125, ¶ 7). The only funds PMF 26 transmitted to PEB upon closing were $22,689.00, wired on January 23, 2024, which is less than one percent of the stated Purchase Price. And PMF 26 never disbursed the full Purchase Price. PMF 26's own statement for the January 22, 2024 Agreement records an "Advance Amount" of $2,281,620.34, disbursed in weekly installments that stopped after May 29, 2024, and Kashat's damages calculation uses a "Purchased Amount" of $3,764,673.56 -- exactly 1.65 times that sum, rather than the $4,429,389.15 stated in the Agreement. (Monroe County Action, NYSCEF Doc. No. 8 ¶¶ 8, 25; NYSCEF Doc. No. 12).

200. Because the amount PEB actually received was far below $2,500,000, the exemption in General Obligations Law § 5-501(6)(b) for loans of $2,500,000 or more does not remove the January 22, 2024 Agreement from New York's usury laws, including Penal Law § 190.40. *See JADR Consulting Grp. Pty Ltd v. Ault Alliance, Inc.*, 2025 NY Slip Op 30344(U) (Sup. Ct. N.Y. Cnty. 2025) (Chan, J.) (holding exemption inapplicable where borrower actually received $2,249,996 on a note with a $2,756,245.10 face amount); *Concrete Capital, LLC v. Olympic Prop. Partners, LLC*, 2018 NY Slip Op 30804(U) (Sup. Ct. N.Y. Cnty. 2018) (Crane, J.) (same, where $1,950,000 was disbursed on a loan with a face amount of up to $3,050,000).

**B. <u>PMF 26 Closely Monitored PEB's Operating Account to Immediately Seize Deposits it Had No Right to Withdraw</u>**

201. PEB's bank records reflect that PMF 26 took money from PEB's operating account

by two different means. The first was the weekly ACH debit that the Agreements' Debit Authorization Forms purported to authorize, which PMF 26 originated under its own ACH company identifier and numbered sequentially ("W003," "W008," "W009," "W011" and so on). The second was the lump-sum outgoing wire transfer. Between October 20, 2023 and May 9, 2024, seventeen (17) outgoing wire transfers, totaling $3,791,814.19, were sent from PEB's operating account to accounts of PMF 26 and PMF One -- including each of the transfers of $262,500, $162,315.19, $120,000, $860,000, $100,000, $478,000, $625,000 and $500,000 alleged in this Complaint. None of those wire transfers correspond to the remittance schedule of any Agreement.

202. Although these wires were sent through PEB's online banking platform, they were not initiated by PEB. Upon information and belief, each was initiated by PMF 26 personnel using the online banking credentials -- usernames, passwords and security-question answers -- that the Agreements required PEB to surrender, as alleged below. The timing of the wires is consistent with that conclusion: several were sent at hours when PEB's California offices were closed, including the $162,315.19 wire on October 23, 2023, sent at 7:02 a.m. EST (4:02 a.m. PST), and the $39,999 wire on May 9, 2024, sent at 5:04 a.m. EST (2:04 a.m. PST). As used in this Complaint, a "withdrawal" by PMF 26 refers both to the ACH debits PMF 26 originated and to the wires PMF 26 initiated from PEB's account.

203. PMF 26 did not withdraw funds from PEB's operating account based on a reliable, fixed or predictable schedule. As a result, PEB was constantly at risk of having its operating account balance materially reduced without advance notice. The unpredictable nature of PMF 26's unauthorized debits caused substantial disruption and uncertainty to PEB's ability to operate efficiently and impeded its ability to obtain new contracts and maintain existing contracts and

projects.

204. Upon information and belief, rather than withdraw funds from PEB's account based on a reliable, fixed or predictable schedule, PMF 26 instead elected to monitor PEB's bank account closely and immediately seize sizable deposits irrespective of whether PMF 26 possessed a contractual right to withdraw the funds in the manner it did. This practice forced PEB into a subservient position of depending on PMF 26's willingness to enter into additional Merchant Agreements and advance funds to PEB so that it could maintain business operations. PEB itself and the viability of its business operations was dependent on the whims and capriciousness of PMF 26's conduct.

205. For example, on or about October 23, 2023, Newtek Bank approved PEB for a U.S. Small Business Administration guaranteed loan in the original principal amount of $1,500,000 to be used for, *inter alia*, as working capital (the "Newtek Loan"). The Newtek Loan was arranged by and at the behest and recommendation of the PMF Entities under the guise that Newtek Bank was a willing source of available capital for PEB, but in reality the transaction was merely a scheme to infuse more capital into PEB's account, which PMF 26 and/or PMF 18 could then steal from PEB, leaving PEB with a debt on its balance sheet in the sum of $1,500,000 with no corresponding financial benefit.

206. The coordination between PMF Entities and Newtek Bank is further demonstrated by the PMF Entities' and NewtekOne's co-branded partner webpage they currently maintain offering merchants "an array of solutions to help your business grow, reduce costs and minimize risks."

207. PMF One -- which heretofore had no apparent and/or direct contractual relationship with PEB -- obtained a fee of $21,250 for purported "consultant services" paid out of the closing

of the Newtek Loan. PMF One's "consultant services" fee was paid notwithstanding that PEB had entered into the Consulting Agreement with PMF 18 a mere 38 days before Newtek Bank approved the Newtek Loan and paid PMF 18 a $50,000 consulting fee, in part, to assist PEB to obtain financing.

208. Newtek Bank's own Credit Summary described the primary loan purpose as: "Equipment Purchase, Working Capital, Debt Refinance." Newtek Bank's Credit Summary further stated that PEB "will be purchasing $661 M of various equipment to help expand ongoing operations. $437M of funds will be used to refinance existing loans. Working capital funds will be used for initial project costs, advertisement, payroll and to cover closing costs."

209. The practice of extending a high-interest and high upfront-fee usurious loan disguised as a "merchant cash advance" transaction and then use the proceeds from a traditional loan to repay it is known as a "Flip to Loan" scheme. Following the consummation of an unlawful merchant cash advance transaction, the merchant cash advance lender promptly orchestrates a loan from a traditional or asset-based lender. The new loan is presented to the merchant as a "healthy refinancing option" to resolve liquidity and daily cash flow challenges and lower monthly debt servicing obligations.

210. Although the traditional loan proceeds are disbursed, instead of being directed to the merchant to help its business, the loan proceeds are immediately diverted by the merchant cash advance lender to accelerate the payoff of an existing merchant cash advance transaction.

211. The "Flip to Loan" scheme allows the merchant cash advance lender to realize accelerated repayment, eliminate any potential risk that the merchant will be unable to repay the funds borrowed from the merchant cash advance lender and issue another merchant cash advance requiring payment of usurious interest and outrageous, upfront fees having no reasonable relation

to the value of services rendered.

212. Additionally, the "Flip to Loan" scheme allows the ultimate holder of the debt to obtain a more favorable, secured-creditor position in the event the merchant files for bankruptcy.

213. Effective June 1, 2025, the U.S. Small Business Administration, in SOP 50 10 8, made merchant cash advance obligations ineligible for refinancing with SBA 7(a) loan proceeds. *See* SBA SOP 50 10 8, Section B, Ch. 2 (7(a) Small & SBA Express), ¶ A (Eligible Uses of Proceeds).

214. On November 20, 2023, PEB received a deposit from Newtek Bank of $960,195. Fifty-four minutes later, PMF 26 withdrew $860,000 from PEB's bank account.

215. The Newtek Loan was *not* a receivable. None of the Agreements authorized PMF 26 to seize $860,000 in loan proceeds from PEB's bank account by a single wire transfer initiated from PEB's account. Moreover, the $860,000 PMF 26 seized corresponds to no line item in the use of proceeds Newtek Bank approved for the loan.

216. The result of PMF One's and PMF 26's actions was to prevent PEB's use and/or benefit of the Newtek Loan proceeds, thereby accelerating the repayment of the Merchant Agreement issued by PMF 26, allowing PMF One to capture an undeserved "consultancy fee" of $21,250 and forcing PEB to enter into still more transactions with PMF 26 due to its and PMF One's deliberate and intentional deprivation of loan proceeds that should have flowed to the benefit of PEB.

217. That is, by wrongfully and unlawfully controlling PEB's access to capital and misappropriating the capital in unpredictable and arbitrary ways, PEB was forced into a subservient position where its only option was to continue to work with PMF 26 or risk insolvency due to the high-debt obligations imposed by PMF 26's wrongful conduct and usurious interest

charges.

218. Notwithstanding PMF 26's seizure of $860,000 of the Newtek Loan proceeds and PMF One's $21,250 fee for purported "consultant services," PEB remains contractually obligated to Newtek Bank for repayment of the full $1,500,000 Newtek Loan, including principal and interest, over the loan's term -- meaning PEB, not PMF 26 or the Enterprise, continues to bear the burden of repaying a loan whose proceeds PMF 26 and PMF One overwhelmingly diverted to themselves.

219. Similarly, PEB received two (2) payments from its customer, "Southern California" on December 14, 2023 and December 15, 2023, in the amount of $359,346 and $236,528, respectively (totaling $595,874).

220. On December 15, 2023, PMF 26 withdrew $478,000 from PEB's bank account.

221. None of the Agreements potentially in effect at that time authorized PMF 26 to withdraw $478,000 from PEB's bank account by a single wire transfer initiated from PEB's account, and only two days after PMF 26's initial advance made under the December 12, 2023 Agreement.

222. These examples of PMF 26's brazen misconduct are not exhaustive, only illustrative of the type of wrongful conduct commonly perpetrated by PMF 18, PMF One and/or PMF 26 throughout the course of the parties' dealings.

223. PEB has discovered numerous other instances where, immediately after PEB received funds from the sale of goods and services or from other sources, PMF 26 promptly withdrew the majority of the funds through single lump-sum transfers leaving PEB's bank account depleted and the company starved for operating capital it depended upon to pay employees and vendors and fund its business operations. None of these irregular transactions can be correlated to

any of the Agreements' terms and conditions.

224. This is the Enterprise's regular practice. In the *Sonata* Action, an October 2024 group text among Kashat, PMF broker Simon Goldman, and the merchant shows PMF 26 debiting $34,000 that the merchant protested was "[n]ot what we discussed to pull"; Goldman's response -- "Nope it was a mistake" -- followed by Kashat's demand to "remove the block," documents the Enterprise's practice of unauthorized ACH debits and its principals' direct participation in collections.

### C. PMF 26 Falsely Represented that the Agreements Implicated Purchases of Future Receivables

225. PMF 26 shrouded its usurious loans in contracts purporting to provide for the purchase of future receivables.

226. PMF 26 disguised the high-interest loan agreements it relied upon to establish the usurious loans by deceptively titling each as a "Merchant Agreement" and characterizing the transactions as factoring, merchant cash advances or revenue-based financing.

227. Each Merchant Agreement falsely represented that "Merchant is selling a portion of a future revenue stream to PMF at a discount, not borrowing money from PMF, therefore there is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by PMF."

228. The Agreements purportedly required PEB to sell, assign and transfer to PMF 26 a "Specified Percentage" of PEB's "future accounts, contract rights and other entitlements arising from or relating to the payment of monies from Merchant's customers and other third party payors" arising from "Merchant's sale of goods and/or services (the "Transactions")."

229. In an effort to obscure the Agreements' true economic nature and avoid state usury laws, PMF 26 included gratuitous provisions purporting to disclaim any collection of interest.

230. The Agreements also stated: "Merchant and PMF agree that the Purchase Price under this Agreement is in exchange for the Purchased Amount, and that such Purchase Price is not intended to be, nor shall it be construed as a loan from PMF to Merchant. . . . In no event shall the aggregate of all amounts or any portion thereof be deemed as interest hereunder, and in the event it is found to be interest despite the parties hereto specifically representing that it is NOT interest, it shall be found that no sum charged or collected hereunder shall exceed the highest rate permissible at law."

231. The Agreements further contained language purporting to bring the otherwise unlawful Agreements into compliance by reducing any judicially-determined interest rate to the maximum rate of interest permitted by applicable law, providing:

> In the event that a court nonetheless determines that PMF has charged or received interest hereunder in excess of the highest applicable rate, the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and PMF shall promptly refund to Merchant any interest received by PMF in excess of the maximum lawful rate, it being intended that Merchant not pay or contract to pay, and that PMF not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law.

232. The Agreements also contained unlawful and ineffective attempts to waive any defense of usury, providing: "As a result thereof, Merchant knowingly and willingly waives the defense of Usury in any action or proceeding."

233. Tellingly, the Agreements also incorporated a religious-law financing instrument inconsistent with a true purchase of receivables. Section 1.17 of the form Merchant Agreement provided that the advance "is made pursuant to the Premium Merchant Funding heter iska and shall not in any way impair the rights of the seller/merchant." A "heter iska" is a rabbinical instrument used to restructure what would otherwise be an interest-bearing loan so as to avoid

religious prohibitions against charging interest. By incorporating a heter iska into its Merchant Agreements, PMF 26 itself recognized and admitted that the transactions bore the economic characteristics of interest-bearing loans rather than true purchases of future receivables.

234. The Agreements further required PEB to surrender direct, continuous access to its bank accounts in a manner inconsistent with a true purchase of receivables. The Agreements required PEB to provide PMF 26 with its online banking credentials, including usernames, passwords, and security-question answers, so that PMF 26 could access PEB's operating account directly each business day. The Agreements further provided that, if PMF 26 could not access the account, it would debit an estimated payment plus a daily fee. This arrangement gave PMF 26 continuous surveillance over and control of PEB's banking activity, exposed PEB to potential violations of its bank's online-access rules, and reflected lender-like dominion over PEB's finances inconsistent with the purported purchase of a discrete percentage of future receivables.

**D. The Agreements Functioned as Usurious Loans With Fixed Terms**

235. The notion that PMF 26 was acquiring future receivables was deceptive, misleading and intended to obfuscate the true, usurious nature of the loans PMF 26 extended. In reality, PMF 26 demanded payment of a precise "Purchased Amount," and guaranteed payment through its control over, and security interest in, all of PEB's future receivables, personal guarantees and authorization to execute and file confessions of judgment. Among the Agreements' false, deceptive and misleading terms were:

(a) Each Agreement specified a precise dollar figure that PEB must repay -- the "Purchased Amount."

(b) Until that precise dollar amount was repaid, PMF 26 exercised dominion and control over all of PEB's receivables and other assets.

(c) To ensure repayment of the Purchase Price, the Agreements required PEB to grant a security interest in all of its assets, including all of its bank accounts and all accounts receivable, and required PEB's owner, Padilla, to execute a personal guaranty of PEB's performance under each of the Agreements.

(d) Belying the notion that the transactions involved a purchase of receipts, the collection of which PMF 26 bore risk, the Agreements authorized PMF 26 to execute a confession of judgment against PEB and Padilla for the full amount due upon default and for PEB to execute an assignment of rents, both instruments to be executed and filed without notice or demand to PEB.

(e) The notion that PMF 26 was acquiring only a "Specified Percentage" of PEB's future receipts also was illusory. Although each Merchant Agreement initially set the "Specified Percentage" of receipts at 18%, each Agreement provided that upon an Event of Default or breach of the Terms and Conditions the Specified Percentage shall increase to 100% -- thereby entitling PMF 26 to every dollar on deposit in the designated account irrespective of whether or not the amounts on deposit related to the "Specified Percentage" or even constituted "Merchant's sale of goods and/or services."

(f) Further, the Agreements do not specify which receivables and/or which account debtor's payments had been purchased by PMF 26. Instead, the Agreements vaguely assign a fixed percentage of receivables arbitrarily set by PMF 26 to justify its anticipated rate of return throughout the duration of the transaction. By not identifying which receivables it was purportedly purchasing, PMF 26 was in effect purchasing only the receivables that paid first. Consequently, PMF 26

always "purchased" PEB's top performing receivables, taking only the very minor risk that none of PEB's customers would pay, rather than taking the risk that specific customers may not pay, which would be the case in a *bona fide* receivables purchase transaction.

(g) PEB retained the obligation to collect revenues from its accounts and was permitted to possess and use those revenues so long as the Daily Remittance was paid.

(h) The Agreements substituted the "Specified Percentage" for a specific dollar amount that PMF 26 would withdraw from PEB's account at any time. Whether in the Agreement, an Appendix or Debit Authorization Form, in each instance PMF 26 substituted the "Specified Percentage" of future receipts for a specific "Daily Remittance," "Weekly Remittance" or "Daily Agreed Remittance" that PMF 26 would debit from PEB's account.

(i) Because the Agreements required payment of a specified "Purchased Amount" instead of actual receipts and extracted a specified daily or weekly withdrawal amount instead of a "Specified Percentage" of receivables, the Agreements compelled payment of a precise dollar amount over a fixed term. That is, the Agreements functioned like loans. Because the repayment term was so short and the repayment amount so high, the loans were usurious.

(j) Critically, because the Agreements required payment of a specified "Purchased Amount" instead of actual receipts and extracted a specified daily or weekly withdrawal amount instead of a "Specified Percentage" of receivables, PMF 26 no longer bore the risk of PEB's collections, as a true purchaser of

receivables would. Rather, the Agreements granted PMF 26 the right to seize the full daily or weekly withdrawal amount from PEB's account, irrespective of the actual rate and amount of PEB's collections, until the entire Purchased Amount was repaid.

### E. The Agreements Contained Sham and Illusory Reconciliation Provisions

236. PMF 26 included in the Agreements sham and illusory reconciliation provisions. It did so in an attempt to provide a veneer of legitimacy to the transactions while ensuring it collected the Purchased Amount in a fixed amount and finite term.

237. Each of the Agreements contained a reconciliation provision (Section 1.4), but on terms designed to ensure PEB would be unable to take advantage of it or obtain any actual reduction in the amount owed to PMF 26.

238. First, PMF 26 required PEB to represent that the daily withdrawal amount set forth in each Agreement was a "good faith estimate" of the Specified Percentage of future receivables. That way, if PEB complained the payment amount was too high, and that actual receipts were lower, doing so would constitute a breach of a representation and warranty, trigger PMF 26's right to accelerate the debt, transform the "Specified Percentage" into 100% of PEB's receivables, and authorize PMF 26 to exercise all remedies upon default.

239. Second, and perhaps most critically, reconciliation remained entirely at PMF 26's sole discretion. The reconciliation provision states that PMF 26 "may" grant a reconciliation request. Under no circumstance was PMF 26 under an obligation to modify the Daily Remittance to reflect the true pace and amount of PEB's collections. Each of the Agreements is devoid of any standards or criteria establishing the circumstances under which PMF 26 may grant a merchant's request for reconciliation.

240. Third, PEB's ability to even request reconciliation was substantially curtailed. The Agreements permitted PEB to make a reconciliation request "every two (2) calendar weeks after the funding of the Purchase Price to Merchant." Thus, even while PMF 26 made daily or weekly withdrawals from PEB's account, PEB could only seek reconciliation during a limited window, which substantially eroded, or in some cases eliminated, the benefit of a purported right to reconciliation. Conveniently, the window for reconciliation would close the further away from the funding date, effectively making reconciliation unlikely when it would be most helpful to avoid a default. In many cases, PMF 26 failed to advance the entire Purchase Price, thereby depriving PEB of any purported right to reconciliation. Additionally, PMF 26 unilaterally obtained repayment of the Purchased Amount within the first "two (2) calendar weeks," eliminating any right to reconciliation.

241. If PEB had sufficient revenue to pay the Daily Remittance, reconciliation would be unnecessary. Whereas, if PEB sustained a sudden decrease in revenue requiring reconciliation, it would be in default of the Agreement before it would even have a chance to request reconciliation. These functional realities made the right to reconciliation virtually meaningless.

242. Fourth, the Agreements do not contain any consequences to PMF 26 if it refuses to grant a *bona fide* reconciliation request submitted by PEB.

243. Fifth, PEB was not permitted to request reconciliation if it was in default. Because the Agreements were structured in a way to make default ultimately inescapable, it was a near-certainty that the merchant would already be in default before it even had reason to know that it needed to request reconciliation to avoid default.

244. In practice, as PEB's financial condition deteriorated, it was never able to exercise the reconciliation provision. Instead, when the pace and amount of PMF 26's withdrawals became

excessively burdensome and/or resulted in an overdraft or the designated account contained insufficient funds to cover PMF 26's withdrawal, PMF 26 instead insisted that PEB enter into yet another Merchant Agreement, each one charging additional fees and each having onerous and demanding repayment terms and conditions, descending PEB into a spiral of increasing and unsustainable payments to PMF 26 and effectively losing control over the ability to manage its finances and ensure it had sufficient funds on deposit to remit payment owed to vendors and other third-party payees.

245. Upon information and belief, PMF 26 does not grant reconciliation requests. Instead, when a merchant falls behind on payments, PMF 26 either declares an Event of Default, entitling it to accelerate the entire Purchased Amount, or convinces the merchant, on the brink of financial collapse, to enter into yet another Merchant Agreement.

246. Sixth, the purported right to reconciliation was illusory for the additional reason that it only offered the potential to modify the weekly remittance amount, it did not adjust the total amount PEB was obligated to pay PMF 26. That is, the right to reconciliation only offered the possibility of modifying the timeline for repayment to PMF 26, not the amount to be paid. This way, if PEB's collection of accounts receivable diminished, PMF 26 still required 100% repayment of the Purchased Amount.

247. Working together, the Agreements' mechanisms which (i) replaced the purchase of receivables with a specific "Purchased Amount"; (ii) replaced the "Specified Percentage" of receipts with a specific daily or weekly remittance amount; and (iii) made the right to reconciliation entirely discretionary and illusory served PMF 26's ultimate goal and intent of requiring repayment of a specific amount on a specific timeline generating a specific (usurious) rate of return.

**F. <u>PMF 26 Retained Recourse if PEB filed for bankruptcy</u>**

248. Another hallmark of a loan is the lender's right to repayment if the debtor files for bankruptcy. Here, the transactions were structured in such a way to ensure repayment under all circumstances.

249. Although the Agreements gratuitously provided that "Merchant going bankrupt or going out of business, or experiencing a slowdown, or a delay in collecting its receivables, in and of itself, does not constitute a breach of this Agreement," PMF 26 included other provisions in the Agreement to ensure the debt would be repayable under all circumstances, even if PEB filed for bankruptcy.

250. First, each Agreement required PEB to represent and warrant that it "does not contemplate filing for bankruptcy in the next six months" and that it "does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it."

251. Because the Agreements generally had unilaterally imposed, short-duration, fixed terms, the representations and warranties provided by the merchant protected PMF 26 against a bankruptcy filing by all but assuring that a bankruptcy filing during the first six months of the repayment term would result in a breach of PEB's representations and warranties.

252. Second, the Security Agreement and Guarantee provides that "PMF is not required to file a motion for relief from a bankruptcy action automatic stay to realize on any of the Secured Assets" and, notwithstanding this right, "Merchant and Guarantor(s) agree(s) not to contest or object to any motion for relief from the automatic stay filed by PMF." Therefore, while the mere filing of bankruptcy is not "in and of itself" a breach of the Agreements, PMF 26 was empowered to ignore a merchant's bankruptcy filing and proceed to recover outstanding amounts directly from the merchant's pledged security, which upon an event of default constitutes virtually every asset

of the merchant and, upon information and belief, is contrary to United States Bankruptcy Code, including, but not limited to, 11 U.S.C. § 362.

253. Third, if PEB filed for bankruptcy, PMF 26, as a secured creditor, would still be entitled to pursue recovery of the debt through its broadly defined security interest. Under the Security Agreement, there are virtually no assets of PEB that would not be sucked into PMF 26's broadly defined security interest, which includes: equipment, general intangibles, instruments, inventory, proceeds therefrom, all funds in the merchant's bank account, present and future electronic check collection and any amount due to PMF 26 under the Agreement.

254. Fourth, if PEB filed for bankruptcy, PMF 26 still had the right to recover the debt through enforcement of the personal guaranty by PEB's owner, Padilla. Relatedly, Padilla, as the purported guarantor, is not only obligated to indemnify PMF 26 for any and all losses associated with the debt, he also is required to indemnify PMF 26 for any amounts that it may be required to return to PMF 26 as a result of a bankruptcy filing.

255. Fifth, while the filing for bankruptcy is not "in and of itself" a breach of the Agreements, a merchant who files for bankruptcy is almost certain to have triggered a default by: (i) transferring or selling all or substantially all of its assets; (ii) using multiple depository accounts without PMF 26's written consent; (iii) changing its depositing account without PMF 26's consent; or (iv) defaulting under any other agreement with PMF 26.

256. Therefore, while a bankruptcy is not "in and of itself" a breach of the Agreements, there are virtually no circumstances where the merchant would not default and breach the Agreements in the run up to and participation in a bankruptcy proceeding.

### G. PMF 26 Deliberately Camouflaged the True Nature of the Transactions

257. Despite their documented form and gratuitous disclaimers, the transactions that PMF 26 entered into with PEB are, in economic reality, loans that are absolutely repayable under all circumstances. The Agreements' indicia of a loan include:

(a) The Daily Remittance was fixed and the so-called reconciliation provision was illusory to avoid state usury laws. Rather, just like a typical loan, the Purchased Amount was required to be paid within a specific time and in equal installments.

(b) The default and remedy provisions purported to hold PEB absolutely liable for repayment of the Purchased Amount. The loans sought to obligate PEB to ensure sufficient funds were maintained in the designated account to make the daily or weekly payments and, after a single failure by PEB to provide PMF 26 with 24 hours' notice that the designated account will have insufficient funds to cover the Daily Remittance, PMF 26 was authorized to declare an Event of Default, accelerate the entire debt and demand that PEB immediately pay the outstanding balance plus fees.

(c) The Agreements do not identify specific receivables being purchased or the account debtors whose payments have been purchased by PMF 26.

(d) The transactions were underwritten based on PEB's credit, not the credit of the account debtors whose receivables were purportedly being purchased by PMF 26.

(e) The Purchased Amount was not calculated based upon the fair market value of future receivables, but rather was unilaterally dictated by PMF 26, based

upon the interest rate it wanted to be paid and the duration until payment in full.

(f) The amount of the Daily or Weekly Remittance was determined based upon when and how much PMF 26 wanted to be paid, and not based upon any good faith estimate of PEB's future account receivables. Critically, even though the Purchased Amount varied from agreement-to-agreement, the Specified Percentage in each of the ten Agreements always remained 18%.

(g) PMF 26 required PEB to undertake certain affirmative obligations and make certain representations and warranties that were aimed at ensuring the company would continue to operate and generate receivables and that a breach of such obligations, representations and warranties constituted a default, which fully protected PMF 26 from any risk of loss resulting from PEB's failure to collect receivables.

258. Usurious intent can also be discerned from PMF 26's practices. PMF 26 determined the repayment schedule based on the number of days in which it wanted to be repaid. The number of days for repayment had no relation to the timing of the percentage of PEB's receivables that PMF 26 was purporting to purchase.

259. Additionally, PEB was required to pledge additional collateral, in amounts disproportionate to the extent of collateral necessary to secure repayment. Under the Agreements, PEB granted to PMF 26 all rights, title and interest in and to any and all equipment, receivables or other chattels comprising PMF 26's broad security interest. That is, PMF 26 claimed priority status as a secured creditor under Article 9 of the Uniform Commercial Code, enabling PMF 26 to ensure full repayment in the event of PEB's default.

### H. PMF 26's Conduct Demonstrates that the Transactions Were Usurious loans

260. PMF 26 understood and intended the true, usurious nature of the loans they extended, as evidenced by their execution of Agreements in short succession, on irreconcilable terms and before the completion of the previous transaction.

261. PMF 26 regularly withdrew from PEB's designated account amounts in excess of the Weekly Remittance and at intervals not permitted by the terms and conditions of the Agreements. PMF 26's unlawful actions had the effect of depriving PEB of funds it depended upon to operate its business. PMF 26's actions compelled PEB to enter into subsequent Merchant Agreements in order to remain solvent.

262. For example, from October 17, 2023 through December 18, 2023, PMF 26 issued six (6) Agreements (excluding the October 13, 2023 and December 11, 2023 Agreements). **Table 1** is a summary of the terms and conditions of these six (6) Agreements, and PMF 26's deposits and withdrawals from PEB's bank account. Column (d) shows the number of weeks PEB had to repay the Purchased Amount under each Agreement, and Column (i) shows the number of days it took PMF 26 to withdraw funds from PEB's designated depository account, from the date of each initial deposit to the date of each final withdrawal.

263. From the October 17, 2023 Agreement to the December 18, 2023 Agreement, a span of sixty-two (62) days, PMF 26 deposited a total of $1,363,502 into PEB's bank account, while a total of $3,674,107 was withdrawn from it, for a net outflow of $2,310,605. **Table 1**'s withdrawal figure for the November 6, 2023 Agreement includes the $100,000 wired from PEB's account to PMF One, on November 22, 2023.

**Table 1**

| (a) | (b) | (c) | (d) | (e) | (g) | (h) | (i) |
|---|---|---|---|---|---|---|---|
| Per PMF Merchant Agreements | | | | | Per BoA #0280 Bank Statements | | |
| Agreement Date | Purchase Price Net of Fees | Purchased Amount | Number of Weekly Payments | Weekly Payments | Withdrawals | Deposits | Time [1, 2] |
| 10/17/23 | $ 415,157 | $ 687,315 | 52 wks | $ 13,218 | $ 687,315 | $ 47,486 | 5 days |
| 10/25/23 | $ 224,965 | $ 387,500 | 18 wks | $ 21,528 | $ 166,528 | $ 47,241 | 9 days |
| 11/06/23 | $ 157,814 | $ 1,162,500 | 14 wks | $ 83,036 | $ 1,040,000 | $ 157,814 | 15 days |
| 11/22/23 | $ 200,281 | $ 542,500 | 20 wks | $ 27,125 | $ 125,000 | $ 200,281 | 14 days |
| 12/12/23 | $ 118,715 | $ 193,750 | 18 wks | $ 10,764 | $ 488,764 | $ 118,715 | 2 days |
| 12/18/23 | $ 791,965 | $ 1,364,000 | 24 wks | $ 56,833 | $ 1,166,500 | $ 791,965 | 25 days |
| **Total** | | | | | **$ 3,674,107** | **$ 1,363,502** | |
| **Net Withdrawals (g)-(h)** | | | | | **$2,310,605** | | |

[1] Number of days or weeks between PMF's deposits and withdrawals to and from BoA #0280.

(Highlighted) Agreement has an addendum showing PMF made payments directly to other Merchants and third parties, no information has been provided in support of these payments, analysis will be updated pending new information.

[2] Withdrawal date before PMF issued a new Merchant Agreement.

264. PMF 26 purported to engage in extensive underwriting and due diligence concerning PEB's business, accounts, and receivables (charging as much as $268,447 in a single transaction for such "underwriting").

265. Over the span of only approximately four (4) months, PMF 26 assessed total Underwriting Fees of $686,511.97 and Financing Fees of $28,705.

266. Additionally, the "Specified Percentage" contained in the Agreements was not a "good faith estimate" of PEB's future receivables.

267. Under each Agreement, PMF 26 purportedly purchased 18% of PEB's future receivables. In reality, the Specified Percentage was not proportional to PEB's actual receivables. Rather, the Specified Percentage was unilaterally selected by PMF 26 based on its desired rate of return and duration of the loan. For example, while the January 16, 2024 Agreement estimated the Weekly Remittance to be $43,058.09, the January 22, 2024 Agreement -- executed only six days after the January 16, 2024 Agreement -- estimated the Weekly Remittance to be $113,574.08 -- an increase of more than 160% in only six days.

268. Similarly, the December 12, 2023 Agreement calculated PEB's Weekly Remittance

to be $10,763, while the December 18, 2023 Agreement calculated PEB's Weekly Remittance to be $56,833 -- an increase of more than 400% in only six days.

269. PMF 26 was aware that PEB's future receivables were not expected to increase more than four-fold between December 12, 2023 and December 18, 2023, or more than two-and-one-half-fold between January 16, 2024 and January 22, 2024.

270. PMF 26's own sworn account of PEB's revenue confirms that the Weekly Remittances were not good-faith estimates. In the Monroe County Action, Kashat swore that, "[d]uring the initial underwriting process with PMF, Merchant represented generating $751,000.17 in gross monthly revenues per month." (NYSCEF Doc. No. 8, ¶ 6). Eighteen percent of that monthly revenue, stated on a weekly basis, is approximately $31,195. Yet PMF 26 set the Weekly Remittance under the November 6, 2023, December 11, 2023, December 18, 2023, January 16, 2024 and January 22, 2024 Agreements at between $43,058.09 and $113,574.08 -- as much as three and one-half times the amount PMF 26's own underwriting figure supports. The Monroe County court held that this showing permits "an inference that the initial remittance amount far exceeds the negotiated percentage of the purchase of the defendants' receivables." (Monroe Decision at 5-6).

271. The aforementioned large disparities between the Daily Remittance in these Merchant Agreements belies any claim by PMF 26 that the Daily Remittance constitutes a "good faith estimate" of the "Specified Percentage" of PEB's future receivables. Indeed, this fact establishes that PMF 26 and the PMF 26 Individual Parties manipulated the Daily Remittance amount to achieve their desired rate of return, the time period within which they desired repayment, and the maximum payments PMF 26 and the PMF 26 Individual Parties believed PEB might be able to sustain long enough for them to unlawfully extract as much usurious interest as they could

before PEB collapsed under the crushing burden of PMF 26's demands, triggering an Event of Default permitting PMF 26 to accelerate the debt and enforce its draconian rights under the Agreements.

272. Indeed, after the weight of the Weekly Remittance payments grew increasingly unsustainable, and with PEB nearing financial collapse, PMF 26 seized the opportunity to take further advantage of PEB and its owner, Padilla, by offering to purchase PEB out from under Padilla for a fraction of its actual value. Thankfully, Padilla had the wherewithal and determination to refuse PMF 26's attempt to rob him of his life's work and family business.

## I. <u>The Agreements Placed PEB in Default at the Moment It Signed Them</u>

273. Each Agreement, including the January 16, 2024 and January 22, 2024 Agreements on which PMF 26 sues in the Monroe County Action, is on the same PMF 26 form. Section 2 of that form provides that "Merchant represents warrants and covenants that, as of this date and during the term of this Agreement," each of a series of statements is true. Several of those statements were false on the day PMF 26 had PEB sign each January Agreement, and PMF 26 knew it.

274. Section 2.10 warrants that PEB "has good, complete, unencumbered, and marketable title to all Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges, and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of PMF." PEB did not have that title when it signed either January Agreement.

275. PMF 26 itself claimed to own a portion of the same Receipts. Under its own form, PMF 26 "has purchased and shall own all the Receipts described in this Agreement up to the full Purchased Amount as the Receipts are created," (§ 1.10). When PEB signed the January 22, 2024

Agreement, PMF 26 claimed to own Receipts under the January 16, 2024 Agreement, signed six days earlier, and under its other prior Agreements. Kashat has sworn that $1,841,250.88 of the January 22, 2024 Purchase Price was applied to retire PMF 26's own prior balances.

276. Third-party funders claimed interests in the same Receipts. PEB had entered into a receivables agreement with Clearfund on December 28, 2023, stating a Purchased Amount of $861,800.00. Seamless had funded PEB $197,605.00 on or about January 5, 2024, and Zahav had credited PEB's account with $183,166.00 on January 12, 2024. Each of those obligations was outstanding when PEB signed both January Agreements. PMF 26 knew of each: the January 22, 2024 Agreement's own Addendum applied $550,585.56 of its Purchase Price to Seamless and Zahav, and beginning January 23, 2024, PMF 26 wired Clearfund, Seamless and Zahav weekly from its own account.

277. In the Security Agreement that forms part of each Agreement, PEB "represents and warrants that no other person or entity has a security interest in the Secured Assets," agrees to obtain PMF 26's written consent "prior to granting a security interest of any kind in the Secured Assets to a third party," and agrees, in a Negative Pledge, "to not create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the Collateral." The Secured Assets include all of PEB's accounts, general intangibles and proceeds, and "all funds at any time in the Merchant's … Account, regardless of the source of such funds." Upon information and belief, Clearfund, Seamless and Zahav each held a security interest in PEB's receivables, perfected by the filing of a UCC-1 financing statement, when PEB signed each January Agreement.

278. Section 2.12 warrants that PEB's "execution of, and/or performance under this Agreement, will not cause or create an event of default by Merchant under any contract with another person or entity." The Clearfund agreement of December 28, 2023 provides that PEB will

not enter into "with any party other than CF any arrangement … that relates to or involves the Receivables … without the prior written consent of CF," on pain of a stacking fee equal to 25% of the outstanding balance. Each January 2024 Agreement was itself a purported sale of Receipts. Upon information and belief, Clearfund did not consent to either one. PEB's execution of each January 2024 Agreement therefore breached the Clearfund agreement, and the warranty in § 2.12 was false when made.

279. Under PMF 26's form, those facts were an Event of Default from the moment of execution. An Event of Default occurs whenever "[a]ny representation or warranty by Merchant in this Agreement shall prove to have been incorrect, false, or misleading in any material respect when made," (§ 3.1.2), or PEB "violate[s] any term or covenant in this Agreement," (§ 3.1.1). Upon an Event of Default, "[n]otwithstanding anything to the contrary in the Agreement or any other agreement between PMF and Merchant, … the Purchased Percentage shall equal 100%." PMF 26 also becomes entitled to accelerate "[t]he full uncollected Purchased Amount plus all fees," enforce Padilla's guaranty, enter a confession of judgment executed in PEB's name, enforce its security interest, and debit any of PEB's accounts "wherever situated." Section 3.1.11 cross-defaults every other agreement between PEB and PMF 26. And because "[n]o failure on the part of PMF to exercise, and no delay in exercising any right under this Agreement shall operate as a waiver thereof" (§ 4.4), PMF 26 held each of those remedies in reserve from the first day of each Agreement, to invoke whenever it chose.

280. The default existing at signing also foreclosed reconciliation. Section 1.4 permits an adjustment of the remittance only "[i]f an Event of Default has not occurred." Because an Event of Default existed when each January Agreement was signed, PEB never held a right to request

reconciliation under either of them. That is so wholly apart from the discretionary and illusory character of the reconciliation provision alleged in Section E above.

281. PMF 26 drafted these terms, had PEB's bank statements, had been debiting PEB's operating account for months, structured the January 22, 2024 Addendum to pay Seamless and Zahav, and paid Clearfund, Seamless and Zahav from its own account. It therefore knew, when it had PEB sign each January Agreement, that PEB's warranties were false. PMF 26 did not decline to fund, require a cure or declare a default. It took PEB's signature on warranties it knew to be untrue, and it kept the resulting Event of Default available to accelerate the full Purchased Amount, sweep 100% of PEB's Receipts, and enforce the guaranty whenever it wished.

282. The form's central representations about risk were therefore untrue from the outset. The form recites that "PMF assumes the risks" that PEB's business "may slow down or fail," but only "based on Merchant's representations, warranties and covenants." It also recites that PEB and its guarantor "are only guaranteeing their performance … and are not guaranteeing the payment of the Purchased Amount." Because those representations, warranties and covenants were breached on signing, PMF 26 assumed no risk at all. From the first day, it could demand the entire Purchased Amount and enforce the guaranty whether or not PEB's receivables ever materialized. A purchaser that bears no risk that the receivables it bought will fall short has not purchased receivables. It has made a loan.

**J. <u>Concealment, Discovery and Timeliness</u>**

283. Neither the Consulting Agreement, the Merchant Agreements, nor any Addendum disclosed to PEB that PMF 18 or Burger would be compensated in connection with PEB's entry into the Merchant Agreements; that PMF 26 was administering a centralized collection-and-disbursement mechanism through which amounts collected from PEB were allocated among PMF 26 and third-party funders before any residual reached PEB; or that any of the PMF Entities received compensation in

connection with the Newtek Loan beyond the amount stated on SBA Form 159. Defendants concealed each of these facts from PEB.

284. PEB did not discover, and in the exercise of reasonable diligence could not have discovered, the facts underlying its claims sounding in fraud, constructive fraud and concealment until the PMF Entities' own disclosures in other proceedings, each of which post-dates the conduct alleged herein. On April 21, 2026, in the *Sonata* Action, PMF 26 filed a corrected disclosure statement under Federal Rule of Civil Procedure 7.1 (ECF No. 44), disclosing for the first time that PMF 18 and PMF One are corporate affiliates of PMF 26 and that Lallouz and Golshan are its members.

285. On July 14, 2026, in the Monroe County Action, PMF 26 filed fifty-three (53) CitiBusiness Online wire transfer confirmations, (NYSCEF Doc. No. 128), and the Reply Affidavit of Mason G. Kashat, dated and filed on July 14, 2026, (NYSCEF Doc. No. 125), which together revealed the operation of the centralized collection-and-disbursement mechanism, the identity of the persons who set up and approved each transfer effected through it, and the actual allocation of the January 22, 2024 Purchase Price among PMF 26's own prior balance, third-party funders and PMF 26's underwriting fee.

286. The information described in the preceding paragraphs was at all relevant times within the exclusive possession and control of Defendants and PMF 26. PEB had no means of obtaining that information, and no reason to suspect its existence, before those disclosures were made. PEB has commenced this action within the applicable limitations periods, measured from the dates of discovery alleged above.

287. The fiduciary relationship created by the Consulting Agreement continued until the agreement automatically terminated by its own terms. Section 3 of the Consulting Agreement provides that it "shall commence on the date of signing and terminate automatically upon completion by PMF of

the services contemplated by this agreement or one (1) year from the date of signing, whichever is earlier." PMF 18 never completed the services contemplated by the Consulting Agreement. The fiduciary relationship accordingly continued until no earlier than September 15, 2024.

288. In addition to money damages, PEB seeks equitable relief on its claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, faithless servant, unjust enrichment and constructive trust, including the forfeiture and disgorgement of all compensation, fees, commissions and profits obtained by PMF 18 and the other Defendants through the conduct alleged herein, an accounting of those amounts, and the imposition of a constructive trust upon them.

289. The breaches of fiduciary duty alleged herein were accomplished through, and are inseparable from, the affirmative misrepresentations and the concealment of material facts alleged above. Fraud is an essential element of PEB's fiduciary duty claims as pled.

290. Upon information and belief, the relationship between the PMF Entities and Newtek Bank and its affiliates, including NewtekOne, Inc. (collectively, the "Newtek Entities"), extends beyond the referral role reflected on the SBA Form 159 described below. PEB is presently unable to plead the full nature and extent of that relationship because the facts establishing it are within the exclusive possession of Defendants and the Newtek Entities. Neither PMF 18 nor any other Defendant disclosed to PEB the existence, nature or extent of any ownership, joint venture, partnership, referral-partner, loan-agent or other business relationship between one or more of the PMF Entities and one or more of the Newtek Entities, or any compensation flowing to any of the PMF Entities from any such relationship(s).

291. The damages sought on each Count of this Complaint are sought without duplication of any overlapping recovery for the same dollars on any other Count, or in the Arbitration or any other proceeding. To the extent any portion of the relief awarded on one Count would duplicate relief actually recovered on another, PEB requests that such amount be credited against, and not added to, PEB's total

recovery.

**FIRST COUNT**
**(Violation of 18 U.S.C. § 1962(c))**

292. PEB repeats and realleges the allegations contained in each of the preceding paragraphs as if set forth at length herein.

**A. Culpable Persons**

293. The Enterprise is an association in fact within the meaning of 18 U.S.C. § 1961(4), consisting of the Defendants and the other members identified herein, who associated with one another for the common purpose of soliciting, underwriting, funding, servicing, and collecting upon usurious loans extended to PEB and to other small businesses. The Enterprise solicited, underwrote, funded, serviced and collected upon such loans as a regular part of its business, and it functioned as a continuing unit for that purpose over a period of years. The Enterprise was engaged in, and its activities affected, interstate commerce.

294. The culpable persons on this Count -- the RICO "persons" whom PEB seeks to hold liable here -- are the Defendants: PMF 18, PMF One, Golshan and Burger. Each is a "person" within the meaning of 18 U.S.C. § 1961(3) in that each is an individual, corporation or limited liability company capable of holding a legal or beneficial interest in property. PMF 26, the PMF 26 Individual Parties, Joshua Capital, Yosef Scheff ("Scheff"), the third-party funders Zahav, Clearfund, Seamless, Alpine, Kapitus, LLC ("Kapitus") and Meged Funding Group Corp. ("Meged"), and Newtek Bank are alleged as members of the Enterprise and not as Defendants on this Count; PEB pursues PMF 26 and the PMF 26 Individual Parties separately in the Arbitration.

295. Each Defendant is a person distinct from the Enterprise. The Enterprise is not merely a single corporation together with its own employees and agents acting within the scope of their employment to carry on that corporation's ordinary business. Its members include multiple

legally and economically distinct persons -- among them Joshua Capital, which shares no common ownership, parent or subsidiary relationship with PMF 18, PMF One or PMF 26, and Zahav, Clearfund, Seamless, Alpine, Kapitus and Meged, none of which shares common ownership with the PMF Entities (subject, as to Zahav, to the alternative allegations set forth below) -- who associated together for the Enterprise's common purpose in the manner described above.

296. Each Defendant was employed by or associated with the Enterprise within the meaning of 18 U.S.C. § 1962(c), and each participated in the operation or management of the Enterprise's affairs, in the roles alleged in Section C below. PMF 18 delivered PEB to the Enterprise through the Consulting Agreement, and designated itself, in the Pre-Payment Addendum transmitted with the November 6, 2023 Agreement, as the entity that would accept PEB's payoff of that Agreement (¶¶ 373-380). PMF One supplied the Enterprise's California license and California office and served as its agent of record on the Newtek Loan (¶¶ 381-388). Golshan, a member of PMF 18 and PMF 26 and the Chief Executive Officer of PMF One, approved, as "Approver 2," every one of the fifty-three (53) wires through which PMF 26 administered its collection of PEB's debt (¶¶ 353-356). Burger, the Chief Operating Officer of PMF 18, who has also sworn that he was the Chief Executive Officer of PMF One (¶ 310), executed the Consulting Agreement on PMF 18's behalf and, by his own account, developed the underwriting guidelines and implemented the risk-management policies for the PMF Entities' financing portfolio (¶¶ 361-368). Each Defendant derived a financial benefit from the unlawful debt solicited from, extended to and collected from PEB: PMF 18 through the $50,000 fee charged under its Consulting Agreement (¶ 80); PMF One through its receipt of that $50,000 fee, the $21,250 taken from the closing of the Newtek Loan and the $100,000 wired to it on November 22, 2023 (¶ 385); Golshan through his membership interests in PMF 18 and PMF 26 and his position

at PMF One (¶ 356); and Burger through his executive positions at PMF 18 and PMF One and his ownership and control of Joshua Capital (¶ 368).

297. Each Defendant knowingly conducted and participated, directly and indirectly, in the conduct of the Enterprise's affairs through the collection of unlawful debt within the meaning of 18 U.S.C. § 1961(6). Each Defendant was aware of the generally unlawful nature of the Agreements and of the Enterprise's practice of soliciting, funding and collecting upon such agreements as a regular part of its business.

298. Each Agreement evidences an unlawful debt within the meaning of 18 U.S.C. § 1961(6) in that (a) it is unenforceable in whole or in part as to principal or interest under the laws relating to usury of the State of New York and of the State of California, and (b) it was incurred in connection with the business of lending money at a rate usurious under the laws of each of those States, and the usurious rate was at least twice the enforceable rate.

299. The enforceable rate under New York law, as to a corporate borrower such as PEB, is twenty-five percent (25%) per annum. N.Y. Penal Law § 190.40; N.Y. Gen. Oblig. Law § 5-521. Twice that rate is fifty percent (50%) per annum. The enforceable rate under California law is the greater of ten percent (10%) per annum or five percent (5%) per annum above the Federal Reserve Bank of San Francisco's primary credit rate, Cal. Const. art. XV, § 1, which was approximately ten and one-half percent (10.5%) per annum during the period of the Agreements. Twice that rate is approximately twenty-one percent (21%) per annum. The effective annual rates of the Agreements, calculated at ¶¶ 107-192, range from approximately 64% to approximately 98,360% per annum. Each Agreement therefore bore a usurious rate at least twice the enforceable rate under the law of each State.

300. Because each Agreement was made at a criminally usurious rate to a corporation,

each is void and unenforceable in its entirety as to both principal and interest. *See Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320 (2021).

301. This Count is premised upon the Enterprise's collection of unlawful debt and does not depend upon proof of a pattern of racketeering activity. PEB's allegations of a pattern of racketeering activity, within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5), are pleaded in the alternative under the Second and Third Counts, *infra*.

**B. The Enterprise**

302. The members of the Enterprise, as described below, together constitute an "Enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

303. The Enterprise is an association-in-fact comprised of multiple separate and distinct legal entities, including PMF 26 and the PMF 26 Individual Parties, together with PMF 18, PMF One, Golshan, Burger, Scheff, Joshua Capital, Zahav, Clearfund, Seamless, Alpine, Kapitus, Meged and Newtek Bank.

304. The PMF 26 Individual Parties, along with Scheff, Golshan and Burger, are natural persons who direct, manage and facilitate the Enterprise's operations. PMF 26, together with PMF 18, PMF One, Zahav, Seamless, Clearfund, Alpine, Kapitus, Meged, Newtek Bank and Joshua Capital, are each legally distinct entities, separately organized and separately capable of holding a legal or beneficial interest in property, which associated with one another -- together with the individuals who own, direct, and operate them -- in the structure through which the Enterprise solicited, funded, serviced and collected upon unlawful debt. Each is a distinct juridical person with its own legal existence, capable of holding a legal or beneficial interest in property, and none is merely an employee or agent of another carrying on the ordinary business of a single company.

305. Although maintained as separate corporate entities, these corporate members of the Enterprise share common control, management, personnel, office space, telephone numbers, email domains, and other operational infrastructure. State corporate records and PMF 26's corrected Rule 7.1 disclosure statement identify Lallouz and Golshan -- not Burger -- as the members of PMF 18 and PMF 26, as set forth further below. Joshua Capital, by contrast, is independently owned and controlled by Burger, who holds no disclosed ownership interest in PMF 18, PMF One or PMF 26, but who simultaneously serves as an executive of PMF 18. Joshua Capital accordingly shares no common ownership, parent, or subsidiary relationship with any of the PMF Entities; its connection to the Enterprise arises from Burger's own, personal management and control of both operations -- precisely the kind of association of legally and economically distinct persons, joined by common personnel rather than corporate affiliation, that establishes an enterprise separate from any single company acting through its own employees.

306. By operating through this network of separate but commonly controlled entities -- including PMF 26, PMF 18, PMF One, and Joshua Capital -- the principals of the Enterprise sought to obscure the true scope of their operations, fragment the claims of the merchants they harmed, and insulate themselves and the Enterprise's assets from detection and recovery.

307. Upon information and belief, PMF 26 and PMF 18 are under common ownership. State corporate records identify Lallouz and Golshan as the members of PMF 18, and PMF 26 has likewise identified Lallouz and Golshan as its members.

308. The PMF Entities also share common officers and management. Burger serves as the Chief Operating Officer of PMF 18, as reflected in PMF 18's sworn corporate filings in multiple states, and executed the Consulting Agreement with PEB on PMF 18's behalf and in his capacity as "C.O.O.". Bradley Yucht ("Yucht") serves as in-house counsel and authorized

signatory for PMF 18 in those same filings. The PMF Entities share the same principal office at 55 Water Street, 50th Floor, New York, New York 10041, and the same "@pmfus.com" email domain.

309. The common control and interchangeable management of the PMF Entities is confirmed by the principals' own sworn statements across multiple actions, in which Burger and Kashat each swore to holding the same managing roles in the same entities.

310. In an affidavit sworn on August 25, 2023 in *JJCA LLC v. Premium Merchant Funding One, LLC*, Index No. 656557/2022 (Sup. Ct. N.Y. Cnty. 2022) (the "*JJCA* Action"), Burger averred that he was "the Managing Director for defendants, Premium Merchant Funding One, LLC and Premium Merchant Funding 18, LLC." Earlier, in an affidavit sworn to on August 9, 2018 in *Premium Merchant Funding One, LLC v. White Meat Market, Inc.*, Index No. 62584/2018 (Sup. Ct. Westchester Cnty. 2018), Burger swore that he was "the Chief Executive Officer of Premium Merchant Funding One, LLC." Kashat likewise swore, in an affidavit filed July 24, 2023 in *Premium Merchant Funding One, LLC v. Duffey*, Index No. 654479/2020 (Sup. Ct. N.Y. Cnty. 2020), that he was "the Managing Director for Plaintiff, Premium Merchant Funding One, LLC," and, in a reply affidavit affirmed January 30, 2024 in *Premium Merchant Funding 18, LLC v. Arya Int'l Inc.*, Index No. 516646/2023 (Sup. Ct. Kings Cnty. 2023), that he was "the Managing Director of Premium Merchant Funding 18, LLC" with "at least ten years of experience working for PMF." In the Monroe County Action, Kashat averred that he is the Managing Director of PMF 26. That Burger and Kashat each swore to serving as Managing Director of the same entities, and that Burger swore alternately to being Managing Director and Chief Executive Officer of PMF One, reflects the common control and shared management of the PMF Entities.

311. PMF One has conceded the lending character of the Enterprise's business in sworn litigation papers. In *Duffey*, *supra* -- the same action in which Kashat swore he was PMF One's Managing Director -- PMF One's own Rule 19-a submission recites that "PMF provides merchant advances or loans," and the sworn submissions on both sides repeatedly describe PMF's product as "loans" and its merchants as "borrowers."

312. PMF 18's own sworn corporate filings further confirm that the Enterprise was engaged in lending rather than the purchase of receivables. In its Annual Report filed with the Secretary of the State of Connecticut on March 24, 2026 -- signed by Burger as Chief Operating Officer and filed by Yucht -- PMF 18 classified its own business under North American Industry Classification System (NAICS) code 522310, "Mortgage and Nonmortgage Loan Brokers." PMF 18 thus described itself, under penalty of false statement, as a loan broker, not a purchaser of future receivables.

313. The Enterprise's own public marketing confirms the lending nature of its business. The Enterprise's shared website, www.pmfus.com, markets "PMF Advisory" -- the same consulting and advisory service PMF 18 sold to PEB through the Consulting Agreement -- alongside "Term Loan," "SBA Loan," "Line of Credit," "Merchant Cash Advance," and "CRE Lending," among other financial products. The footer of every page of www.pmfus.com states: "Loans made or arranged pursuant to a California Financing Law license, License # 60DBO 67237." The Enterprise thus publicly represents to prospective borrowers, regulators, and the world that it makes or arranges "loans" -- not purchases of future receivables. Agents of the PMF Entities likewise solicit merchants in expressly loan-denominated terms -- "term loan," "APR," "120 months," "line of credit" -- and a disclaimer in an email sent by a Funding Manager affiliated with the PMF Entities refers to the company as "Premium Bank."

314. PMF 18 and Kashat, who has sworn that he is its Managing Director, have a pattern of making false statements about the PMF Entities' corporate identities in sworn filings submitted to courts. PMF 18 was, and is, a Delaware limited liability company; it was formed in Delaware on July 19, 2017, and registered as a foreign limited liability company to do business in New York on December 14, 2017. Nevertheless, in a verified complaint filed in *Premium Merchant Funding 18, LLC v. New Tech Restoration LLC*, Index No. 500006/2020 (Sup. Ct. Kings Cnty. 2020), Kashat verified under penalty of perjury that PMF 18 "was a New York corporation." That statement was false: PMF 18 was not and is not a corporation and was not and is not a New York entity. It is a Delaware limited liability company merely registered to do business in the State of New York.

315. Kashat's false verification in *New Tech Restoration LLC*, *supra*, was not isolated. Kashat has executed dozens of substantially identical sworn verifications on behalf of the PMF Entities in collection actions across the country.

316. This conduct is part of a broader pattern by the Enterprise and its principals. In the *Sonata* Action, PMF 26 -- itself a Delaware limited liability company -- represented that it was a New York limited liability company, and corrected that representation only after the discrepancy was raised with the court. In that same action, the district court declined to credit Kashat's declaration, describing it as "comparatively conclusory" and "not responsive to the evidence." (*Sonata*, Op. & Order, ECF No. 41, at 36-37).

317. Although PMF 26 was formed in Delaware in 2018 and did not obtain authority to do business in the State of New York until February 20, 2025, PMF 26 filed at least 120 verified pleadings in New York courts between June 2022 and February 2025 -- nearly all verified by Kashat -- falsely swearing that PMF 26 was "registered to do business in New York."

318. PMF 26's corporate disclosure history in the *Sonata* Action further evidences the Enterprise's concealment of its ownership and structure. Although the action was removed to federal court on February 6, 2025, PMF 26 did not provide a corporate disclosure statement under Federal Rule of Civil Procedure 7.1 until January 15, 2026, and did so only after the defendants in that action demanded compliance. That disclosure falsely described PMF 26 -- a Delaware limited liability company formed on October 16, 2018 -- as "a New York limited liability company," identified no members, and disclosed no corporate affiliates. Only after the district court's adverse March 30, 2026 ruling denying PMF 26's motion to dismiss and granting an injunction against it did PMF 26 file the corrected disclosure statement (*Sonata*, ECF No. 44), which, without acknowledgment or explanation, abandoned the "New York limited liability company" characterization and disclosed for the first time that PMF 18 and PMF One are corporate affiliates of PMF 26 and that Lallouz and Golshan are its members. That corrected disclosure statement was itself internally inconsistent: although filed under a caption naming PMF 26 as the plaintiff, its certification was made expressly on behalf of "Premium Merchant Funding LLC" -- a differently named entity that is not the plaintiff in that action.

319. The interchangeable use of the PMF Entities is further reflected in the PMF Entities' own public court filings. In the same *Sonata* Action, PMF 26 sued the defendant merchant on Merchant Agreements that are substantially similar in form to the Agreements at issue here, and those agreements are attached as exhibits to PMF 26's publicly filed complaint. Although the named counterparty on those agreements is PMF 26, each agreement includes a "Pre-Payment Addendum" that repeatedly designates Premium Merchant Funding 18, LLC -- not PMF 26 -- as the entity that "will accept" the merchant's early payoff. Like the November 6, 2023 Agreement at issue in this action, the addendum states, for example, that "Premium Merchant

Funding 18, LLC will accept a full payment of" specified discounted amounts if the merchant pays off the advance within 30, 60, or 90 days of the funding date, while the addendum itself is issued in the name of "Premium Merchant Funding 26, LLC." The designation of PMF 18 to receive payoffs on PMF 26's Merchant Agreements confirms that PMF 18 performs, *inter alia*, a standing collection function for the Enterprise on Merchant Agreements to which it is not a party.

320. PEB does not plead any of the litigation conduct described in the preceding paragraphs as a predicate act of racketeering activity. That conduct is alleged as evidence of the Enterprise's continuing method of operation, of the threat that its collection of unlawful debt would continue, and of the Enterprise's concealment of its structure and affiliations from PEB.

321. The Enterprise's common purpose, *inter alia*, is the solicitation, funding, servicing, and collection of usurious loans charging interest at more than twice the enforceable rate under the laws of New York, California and other states, and the conduct of the Enterprise's affairs through the patterns of racketeering activity alleged in the Second and Third Counts. The members of the Enterprise that shared that purpose, and those alleged to be members of its associational structure only, are identified in paragraph 328.

322. The Enterprise issued usurious loans under the guise of Merchant Agreements to borrowers such as PEB, facing financial distress and who lack sophistication of experienced borrowers.

323. The Enterprise also has a common goal of entering into sham Merchant Agreements while having no intention of abiding by their terms and conditions. In large part, the Merchant Agreement is merely a vehicle through which the Enterprise may gain access to and control over a merchant's bank account and make transactions having no legitimacy, necessity or authority even under the terms and conditions of the sham Merchant Agreements.

324. Since at least May 2023 and continuing to present, the Enterprise members have had ongoing relations with each other through common control, common ownership (as among the PMF Entities), employment, shared personnel, and/or one or more contracts or agreements relating to and for the purpose of originating, underwriting, servicing, and collecting upon unlawful debt issued to small businesses throughout the United States.

325. Each of PMF 18, PMF One, Golshan and Burger is accordingly a "person" distinct from the Enterprise whose affairs each conducted, within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c). *See Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163-166 (2001); *Boyle v. United States*, 556 U.S. 938, 946 (2009).

### C. The Roles of Defendants, PMF 26 and the PMF 26 Individual Parties in Operating the Enterprise

326. At all relevant times, Defendants, PMF 26, the PMF 26 Individual Parties and the other members of the Enterprise organized the Enterprise into a group with defined positions, titles, functions and reporting relationships, in order to operate as a unit, to accomplish the common goals and purposes of soliciting, funding, servicing and collecting upon unlawful debt, and to give that operation the veneer of a lawful business.

327. That structure did not follow, and was not confined to, the internal organization of any single company. Kashat, a Managing Director of PMF 26, reported to and took direction from Burger, the Chief Operating Officer of PMF 18, who executed the Consulting Agreement on PMF 18's behalf. Golshan, the Chief Executive Officer of PMF One and a disclosed member of both PMF 18 and PMF 26, personally approved, as "Approver 2," all fifty-three (53) wires by which PMF 26 disbursed the proceeds of PEB's debt, and Scheff set up and approved those same wires as "Approver 1." The roles of each Defendant, PMF 26, the PMF 26 Individual Parties, and of the other members of the Enterprise in operating the Enterprise's affairs are alleged below.

328. The members of the Enterprise do not stand in the same position, and PEB does not allege the same things about each of them. PMF 18, PMF One, Golshan and Burger are the Defendants in this action, and are alleged to be RICO "persons" liable under 18 U.S.C. § 1962(c) for conducting and participating in the conduct of the Enterprise's affairs. PMF 26, the PMF 26 Individual Parties, Scheff, Joshua Capital, Zahav, Clearfund and Seamless are alleged to be members of the Enterprise who shared its unlawful purpose, but are not Defendants in this action; PMF 26 and the PMF 26 Individual Parties are pursued separately in the Arbitration. Alpine, Kapitus, Meged and Newtek Bank, based on knowledge and information presently known to PEB, are alleged to be part of the Enterprise's associational structure only, and PEB does not allege that they knew of or shared its unlawful purpose. Membership in an association in fact within the meaning of 18 U.S.C. § 1961(4) describes the structure through which the Enterprise's affairs were conducted; it is not, by itself, an allegation of wrongdoing, and PEB seeks relief in this action only against the Defendants.

**1. Kashat**

329. Kashat is a member of the Enterprise. He is not a defendant in this action and is pursued separately in the Arbitration. At all relevant times, Kashat was a Managing Director at PMF 26 and a supervisor and point person of the Enterprise. At times, Kashat communicated directly with representatives of PEB. Upon information and belief, Kashat regularly reported to, was supervised by and took direction from, *inter alia*, Burger.

330. Kashat had managerial and supervisory authority and oversaw the day-to-day operations of the Enterprise and had decision-making authority on all financial decisions, including, without limitation, which usurious loans the Enterprise would extend, how such loans would be funded and the ultimate repayment terms, including the amount to lend, the rate of return, the amount of fees charged and the term of the loan.

331. In his capacity as a manager and supervisor of the Enterprise, Kashat, together with Gieselmann, was responsible for creating, approving and implementing the policies, practices and instrumentalities used by the Enterprise to accomplish its common goals and purposes, including (i) the form of Merchant Agreements used to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of unlawful debt; (ii) the method of collecting the daily or weekly payments via ACH withdrawals; (iii) exercising discretion granted to PMF 26 under the merchant agreements to deny merchants of the benefit of certain contractual provisions; (iv) obtaining authorizations to file confessions of judgment without demand or notice to collect upon the unlawful debt if the merchant defaulted upon its obligations; and (v) engaging in high-pressure sales tactics and/or threats of financial ruin designed to further the Enterprise's unlawful scheme and generate more revenue by charging usurious interest.

332. Kashat has also taken actions and directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of the Enterprise including its affairs, funding the Enterprise, directing its members to collect upon the unlawful loans, and executing legal documents in support of the Enterprise.

333. Kashat has operated PMF 26 as part of an unlawful enterprise to collect upon unlawful debt. As a member of the Enterprise, Kashat has: (i) underwritten the usurious loans and determined the ultimate rate of usurious interest to be charged under each loan; (ii) entered into sham merchant agreements on behalf of the Enterprise; (iii) serviced the usurious loans; and (iv) set-up and implemented the ACH withdrawals used by the Enterprise to collect upon the unlawful debt; (v) charged usurious interest disguised as legitimate fees; and (vi) submitted sworn statements in legal proceedings, including proceedings involving PEB and Mr. Padilla, that

misdescribed the PMF Entities' corporate identities and the nature of the Enterprise's transactions.

334. Kashat sent text messages and made phone calls to employees of PEB. Kashat made phone calls directly to Mr. Padilla making threats of penal action unless PEB granted him and PMF 26 access to the company's bank account.

335. Kashat personally participated in the collection of the unlawful debt from PEB. Kashat communicated directly with PEB's principal, Padilla, by text message from telephone number (989) 529-9486, identifying himself as "Mason Kashat with Premium Merchant Funding." In those communications, Kashat pressed Mr. Padilla over PEB's "very large balance," demanded that PEB provide access to its bank account so that PMF could debit it -- complaining that Mr. Padilla was "withholding" his "account details" -- and stated that he had "approved enough money to keep [PEB's] business up and running over the past year."

336. Kashat's statements that he had "approved" money to keep PEB operating, and his insistence on direct access to PEB's bank account, are consistent with the conduct of a lender exercising control over a borrower, not a purchaser of receivables, and constitute direct participation in the Enterprise's collection of unlawful debt.

337. Kashat has ultimately benefited from the Enterprise's unlawful activity by receiving a portion of the usurious loan proceeds through PMF 26 under the guise of commissions and other compensation disguised as legitimate and lawful income from employment.

**2. Gieselmann**

338. Gieselmann is a member of the Enterprise. He is not a defendant in this action and is pursued separately in the Arbitration. At all relevant times, Gieselmann was a Director at PMF 26 and reported to, and was supervised by, Kashat. Gieselmann was responsible for the day-to-day operations of the Enterprise and routinely had direct communications with representatives of PEB.

339. Together with Kashat, Gieselmann was responsible for the day-to-day operations of the Enterprise and had day-to-day decision-making authority on all financial decisions, including, without limitation, which usurious loans the Enterprise would extend, how such loans would be funded and the ultimate repayment terms, including the amount to lend, the rate of return, the amount of fees charged and the term of the loan.

340. In his capacity as a Director within the Enterprise and in charge of day-to-day operations of the Enterprise, Gieselmann, together with Kashat, was responsible for creating, approving and implementing the policies, practices and instrumentalities used by the Enterprise to accomplish its common goals and purposes, including (i) the form of Merchant Agreements used to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of unlawful debt; (ii) the method of collecting the daily or weekly payments via ACH withdrawals; (iii) exercising discretion granted to PMF under the Merchant Agreements to deny merchants of the benefit of certain contractual provisions; (iv) obtaining authorizations to file confessions of judgment without demand or notice to collect upon the unlawful debt if the merchant defaulted upon its obligations; and (v) engaging in high-pressure sales tactics and/or threats of financial ruin designed to further the Enterprise's unlawful scheme and generate more revenue by charging usurious interest.

341. Gieselmann has also taken actions and directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of the Enterprise including its affairs, funding the Enterprise, directing its members to collect upon the unlawful loans, and executing legal documents in support of the Enterprise.

342. Gieselmann, together with Kashat, has operated PMF 26 as part of an unlawful enterprise to collect upon unlawful debt. As a member of the Enterprise, Gieselmann has: (i)

underwritten the usurious loans and determined the ultimate rate of usurious interest to be charged under each loan; (ii) entered into sham merchant agreements on behalf of the Enterprise; (iii) serviced the usurious loans; (iv) set-up and implemented the ACH withdrawals used by the Enterprise to collect upon the unlawful debt; and (v) charged usurious interest disguised as legitimate fees.

343. Gieselmann sent emails, text messages and made phone calls to employees of PEB. Gieselmann made phone calls directly to Padilla making threats of penal action unless PEB granted him and PMF 26 access to the company's bank account.

344. Gieselmann's emails, text messages and phone calls to PEB personnel, and his insistence on direct access to PEB's bank account, are consistent with the conduct of a lender exercising control over a borrower, not a purchaser of receivables, and constitute direct participation in the Enterprise's collection of unlawful debt.

345. Gieselmann has ultimately benefited from the Enterprise's unlawful activity by receiving a portion of the usurious loan proceeds through PMF 26 under the guise of commissions and other compensation disguised as legitimate and lawful income from employment.

**3. Bejko**

346. Bejko is a member of the Enterprise. She is not a defendant in this action and is pursued separately in the Arbitration. At all relevant times, Bejko was a Senior Credit Analyst at PMF 26 and took orders and direction from Gieselmann and/or Kashat. Upon information and belief, Bejko has since been identified in PMF 26's public materials as Head of Underwriting & Risk for the PMF Entities.

347. In her capacity as a Senior Credit Analyst, Bejko was responsible for the funding operations of the Enterprise and contributed to funding decisions of the Enterprise including,

without limitation, which usurious loans would be funded, how such loans were to be funded, the source of funding and the ultimate payment terms, amount and the term of each usurious loan.

348. As a Senior Credit Analyst, Bejko, together with Kashat and Gieselmann, was responsible for creating, approving and implementing the policies, practices and instrumentalities used by the Enterprise to accomplish its common goals and purposes, including (i) the form of merchant agreements used to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt; (ii) the method of collecting the daily or weekly payments via ACH withdrawals; (iii) exercising discretion granted to PMF 26 under the Agreements to deny merchants the benefit of certain contractual provisions; (iv) obtaining authorizations to file confessions of judgment without demand or notice to collect upon the unlawful debt if the merchant defaulted upon its obligations; and (v) engaging in high-pressure sales tactics and/or threats of financial ruin designed to further the Enterprise's unlawful scheme and generate more revenue by charging usurious interest.

349. Bejko has also taken actions and directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of the Enterprise including its affairs, funding the Enterprise, directing its members to collect upon the unlawful loans, transmitting the Agreements through interstate commerce, and executing legal documents in support of and on behalf of the Enterprise.

350. Bejko has operated PMF 26 as part of an unlawful enterprise to collect upon unlawful debt. As a member of the Enterprise, Bejko has: (i) underwritten the usurious loans and determined the ultimate rate of usurious interest to be charged under each loan; (ii) entered into sham merchant agreements on behalf of the Enterprise; (iii) serviced the usurious loans; (iv) set-up and implemented the ACH withdrawals used by the Enterprise to collect upon the unlawful debt;

and (v) charged usurious interest disguised as legitimate fees.

351. On numerous occasions, Bejko prepared the sham Merchant Agreements and transmitted those agreements to PEB through the Internet via third parties, such as DocuSign and Pandadoc.

352. Bejko has ultimately benefited from the Enterprise's unlawful activity by receiving a portion of the usurious loan proceeds through PMF 26 under the guise of commissions and other compensation disguised as legitimate and lawful income from employment.

**4. Golshan**

353. Golshan is a member of the Enterprise. He is a defendant in this action. He is employed by or associated with the Enterprise within the meaning of 18 U.S.C. § 1962(c), and he conducted and participated, directly and indirectly, in the conduct of the Enterprise's affairs. At all relevant times, Golshan was the Chief Executive Officer of PMF One and a disclosed member of PMF 18 and PMF 26, and personally directed and participated in the conduct of the Enterprise's financial affairs.

354. Golshan personally approved every wire transfer PMF 26 used to administer its collection of PEB's debt through the shared, multi-creditor mechanism described elsewhere in this Complaint. PMF 26's own Citibank wire transfer records show that Golshan served as "Approver 2" on all 53 wires produced in *Premium Merchant Funding 26, LLC v. P.E.B., Inc., et al.*, Index No. E2024014543 (Sup. Ct. Monroe Cnty.) -- wires directed to nine (9) different recipients -- including every one of the thirty-one (31) wires to Zahav, Seamless and Clearfund, without a single exception, working in tandem with Scheff (or, on two occasions, Jared Biller) as "Approver 1." Those fifty-three (53) wires also included five (5) wires to Meged Funding and eleven (11) wires by which PEB's own funds were routed back to PEB out of PMF 26's own account.

355. Golshan's standing, repeated, and final approval authority over this mechanism -- spanning at least January 2024 through July 2024 -- establishes that Golshan personally operated and managed the Enterprise's shared collection-and-disbursement infrastructure, rather than merely holding a nominal title or acting at the direction of others.

356. Golshan has ultimately benefited from the Enterprise's unlawful activity through his membership interests in PMF 18 and PMF 26 and his position as Chief Executive Officer of PMF One, and through his direct control over the Enterprise's collection of unlawful debt from PEB and other merchants.

**5. Scheff**

357. Scheff is a member of the Enterprise. He is not a defendant in this action. Upon information and belief, he works from the PMF Entities' shared offices at 55 Water Street, 50th Floor, New York, New York 10041. Scheff acted for two separately organized members of the Enterprise in the transactions at issue: for PMF One in the Newtek Loan, and for PMF 26 in administering its collection of PEB's debt.

358. On November 7, 2023, Scheff executed SBA Form 159 on PMF One's behalf as its Agent Contact Person, signing over the designation "Accountant" even though the same form identifies PMF One's Type of Agent as "Consultant." The form represented that PMF One's compensation in connection with the Newtek Loan would be $21,250.00. Thirteen days later, fifty-four minutes after the Newtek Loan's proceeds reached PEB's account, $860,000.00 of those proceeds was wired to PMF 26.

359. Scheff also administered the centralized collection-and-disbursement mechanism through which PMF 26 serviced PEB's debt in 2024. PMF 26's own Citibank wire transfer records show that Scheff set up, and approved as "Approver 1," substantially all of the fifty-three (53) wires PMF 26 produced in the Monroe County Action -- including the wires to Zahav, Seamless,

Clearfund and Meged described below -- with Golshan approving each as “Approver 2.” On two occasions, Jared Biller acted in Scheff’s place. Upon information and belief, Scheff acted at the direction of Golshan.

360. Scheff was thus the individual through whom both the Enterprise’s agent role on the Newtek Loan and its payment operation for PEB’s debt were carried out, and he participated in the conduct of the Enterprise’s affairs within the meaning of 18 U.S.C. § 1962(c). His title, his employer, his compensation, and any interest he holds in PMF One or PMF 26 are within the exclusive knowledge of the PMF Entities, and PEB will seek them in discovery.

**6. Burger**

361. Burger is a member of the Enterprise. He is a defendant in this action. He is employed by or associated with the Enterprise within the meaning of 18 U.S.C. § 1962(c), and he conducted and participated, directly and indirectly, in the conduct of the Enterprise’s affairs. At all relevant times, Burger was, by his own public account, the Chief Operating Officer and General Counsel of one or more of the PMF Entities, including PMF 18, and, by his own sworn account, the Managing Director of both PMF 18 and PMF One. He is also the California-registered Manager of PMF One.

362. Burger personally executed the Consulting Agreement on behalf of PMF 18, as its “C.O.O.” -- the instrument through which the Enterprise obtained PEB’s trust, PEB’s confidential financial information, and authority to act on PEB’s behalf.

363. By his own public account, Burger led the legal department of the PMF Entities and developed the underwriting guidelines and implemented the risk-management policies for their financing portfolio. Upon information and belief, the Agreements were underwritten under those guidelines and collected under those policies.

364. The Enterprise's confidentiality notices direct recipients of misdirected communications to "notify Abe Burger immediately."

365. Burger owns and controls Joshua Capital, whose telephone number appears on the "MCA TRACK" account statements PMF 26 used to service and collect PEB's debt, and whose website routes customer-support inquiries to the Enterprise's shared support@pmfus.com address.

366. Burger used the same method against at least one other merchant. As alleged in *JLK Construction, LLC v. Premium Merchant Funding 18, LLC, Abe Burger, and Samuel A. Brugman*, Adv. Pro. No. 23-04032 (Bankr. W.D. Mo.) (the "*JLK* Action"), Burger executed the PMF 18 consulting agreement through which PMF 18 assumed fiduciary duties to that merchant before steering it into an SBA-guaranteed loan from whose proceeds an undisclosed commission was taken and merchant agreements issued by one or more of the PMF Entities.

367. Through the conduct described above, Burger participated, directly and indirectly, in the conduct of the Enterprise's affairs and in the operation and management of the Enterprise itself.

368. Upon information and belief, Burger benefited from the Enterprise's collection of unlawful debt through his executive positions at PMF 18 and PMF One, and through his ownership and control of Joshua Capital, which received proceeds of the Enterprise's transactions with PEB without any independent contractual basis for doing so.

**7. PMF 26**

369. PMF 26 is a member of the Enterprise. It is not a defendant in this action and is pursued separately in the Arbitration. The PMF 26 Individual Parties have operated PMF 26 as part of an unlawful enterprise to collect on unlawful debt.

370. PMF 26, acting through the PMF 26 Individual Parties, has knowingly and intentionally participated in unlawful and criminal conduct in furtherance of the Enterprise,

including but not limited to: (i) selecting and using the form of merchant agreements used to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt; (ii) the method of collecting the daily or weekly payments via ACH withdrawals; (iii) exercising discretion granted to PMF 26 under the merchant agreements to deny merchants the benefit of certain contractual provisions; and (iv) obtaining authorizations to file confessions of judgment without demand or notice to collect upon the unlawful debt if the merchant defaulted upon its obligations.

371. Through the actions of the PMF 26 Individual Parties, PMF 26 has: (i) underwritten the usurious loans and determined the ultimate rate of usurious interest to be charged under each loan; (ii) entered into sham Merchant Agreements on behalf of the Enterprise; (iii) serviced the usurious loans; (iv) set-up and implemented the ACH withdrawals used by the Enterprise to collect upon the unlawful debt; and (v) charged usurious interest as legitimate fees.

372. PMF 26 has ultimately benefited from the Enterprise's unlawful activity by receiving usurious interest proceeds through PMF 26 under the guise of loan and revenue-based financing income, usurious interest disguised as fees and other revenue disguised as legitimate and lawful income.

**8. PMF 18**

373. PMF 18 is a member of the Enterprise. It is a defendant in this action. It is employed by or associated with the Enterprise within the meaning of 18 U.S.C. § 1962(c), and it conducted and participated, directly and indirectly, in the conduct of the Enterprise's affairs. PMF 18's role in the Enterprise was distinct from that of PMF 26. PMF 18 did not sign, fund or service the Agreements. Its function was origination: to secure a merchant's trust through a fiduciary engagement, to obtain the merchant's confidential financial information and authority to act on its behalf, and to deliver that merchant, and that information, to the Enterprise's funding entity.

374. PMF 18 performed that function here. On September 15, 2023, PMF 18, acting through Burger as its Chief Operating Officer, entered into the Consulting Agreement with PEB, collected a $50,000 fee, and obtained both the contractual right to require PEB to "supply PMF with updated and current documents and information upon request by PMF" and the "right to represent, negotiate, and correspond on behalf of Client." Twenty-eight (28) days later, on October 13, 2023, PMF 26 issued the first of the Agreements. Within one hundred twenty-nine (129) days of the Consulting Agreement, PMF 26 had issued all ten.

375. The Consulting Agreement tied PMF 18's own compensation to the delivery of financing rather than to the delivery of consulting services. Section 2 of the Consulting Agreement provides that PMF 18's fee "shall be earned upon the signing of this agreement and payable at the earlier of: (i) The completion of any of the services contemplated by this agreement or (ii) the delivery of any financing."

376. PMF 18 also participated directly in the collection of the unlawful debt. As alleged above, the Pre-Payment Addendum transmitted to PEB with the November 6, 2023 Agreement was issued in PMF 18's own name and designated PMF 18, not PMF 26, as the entity that "will accept a full payment of $975,000.00" in satisfaction of that Agreement. By fixing the sum at which that debt could be retired and designating itself to receive it, PMF 18 aided the collection of the debt. *See United States v. Biasucci*, 786 F.2d 504, 512-13 (2d Cir. 1986) (collection of unlawful debt is established where, among other things, "the defendant aided collection of the debt in some manner").

377. PMF 18's role in collecting on Merchant Agreements to which it is not a party is a standing function, not an isolated event. As alleged above, the Pre-Payment Addenda attached to

PMF 26's Merchant Agreements in the *Sonata* Action likewise designate PMF 18 as the entity that "will accept" the merchant's early payoff within 30, 60 or 90 days of funding.

378. PMF 18 performs the same origination role for other merchants. As alleged in the *JLK* Action, PMF 18, through a consulting agreement executed on its behalf by Burger, assumed fiduciary duties to a small-business merchant and then arranged an SBA-guaranteed loan funded by Newtek Small Business Finance, LLC, out of whose proceeds a commission of nine percent (9%) was taken. PMF 18 classifies its own business, in its Annual Report filed with the Connecticut Secretary of the State, as that of a mortgage and nonmortgage loan broker (NAICS 522310), and the Enterprise's shared website markets PMF 18's "PMF Advisory" service alongside the Enterprise's loan products.

379. PMF 18 acted with knowledge of the Enterprise's unlawful purpose. As alleged, *supra*, PMF 18's members, Lallouz and Golshan, are also the members of PMF 26, and PMF 18's Chief Operating Officer, Burger, has, by his own public account, served as Chief Operating Officer and General Counsel of one or more of the PMF Entities, including PMF 18, leading their legal department and developing the underwriting guidelines and risk-management policies for their financing portfolio. PMF 18 therefore knew, when it steered PEB to PMF 26, the terms of the Agreements into which it was steering PEB, including their fixed remittances, sham reconciliation provisions, and rates of interest exceeding twice the enforceable rate.

380. PMF 18 is a juridical person separate from the Enterprise and from each of the Enterprise's other members. It is a Delaware limited liability company, formed on July 19, 2017 and registered to transact business in New York, Connecticut, Utah and Virginia, that contracts and litigates in its own name, including as plaintiff in *Premium Merchant Funding 18, LLC v. Arya Int'l Inc.* and *Premium Merchant Funding 18, LLC v. New Tech Restoration LLC*, cited above. It

is the only member of the Enterprise that undertook a fiduciary engagement with PEB. PMF 18 is named as a Defendant because it is a RICO "person" that conducted and participated in the conduct of the Enterprise's affairs; it is not alleged to be the Enterprise.

**9. PMF One**

381. PMF One is a member of the Enterprise. It is named as a defendant. It is employed by or associated with the Enterprise within the meaning of 18 U.S.C. § 1962(c), and it conducted and participated, directly and indirectly, in the conduct of the Enterprise's affairs. PMF One's role in the Enterprise was distinct from those of PMF 18 and PMF 26. It supplied the Enterprise's California license and California office, and it served as the Enterprise's agent of record on the SBA-guaranteed refinancing through which the Enterprise collected its unlawful debt from PEB.

382. PMF One was the Enterprise's agent of record on the Newtek Loan. Newtek Bank's Credit Summary identifies PMF One as the "Referral Source" for the loan. SBA Form 159, executed subject to 18 U.S.C. § 1001, identifies PMF One as the Agent, states its Type of Agent as "Consultant," discloses compensation of $21,250.00 paid by the Applicant and $0.00 paid by the lender, and names as PMF One's Agent Contact Person Yosef Scheff, at 55 Water Street, 50th Floor, New York, New York 10041. Scheff is the same individual who, as "Set Up By" and "Approver 1," initiated substantially all of the wire transfers from PMF 26's Citibank account through which the Enterprise administered its collection of PEB's debt, as alleged above. Scheff executed the form on PMF One's behalf on November 7, 2023, the day after the November 6, 2023 Agreement.

383. On November 20, 2023, at 2:29 p.m. Eastern Time, $960,195.36 of the Newtek Loan's proceeds was wired into PEB's operating account. At 3:23 p.m., fifty-four (54) minutes later, PMF 26 wired $860,000.00 out of that account to itself and applied it to amounts PMF 26 claimed under the Agreements. Upon information and belief, PMF One's position as agent of

record on the Newtek Loan is what gave personnel of the PMF Entities, who held access to PEB's loan file on Newtek Bank's loan-servicing portal through "@pmfus.com" email addresses, advance knowledge of the loan's closing and disbursement, and so made the seizure possible. Through PMF One, the Newtek Loan served as a vehicle for the Enterprise's collection of its unlawful debt: PMF One arranged the refinancing, and PMF 26 applied its proceeds to that debt within the hour.

384. PMF One did not disclose on SBA Form 159, or to PEB, that it was affiliated with PMF 26, that it was representing to third parties to be PEB's agent or that PMF 26 was positioned to collect money out of the Newtek Loan's proceeds. As alleged above, PEB was not told that any of the PMF Entities would receive, or was positioned to receive, any compensation out of the Newtek Loan beyond the $21,250.00 stated on the face of that form, and none of the Agreements executed by PEB authorized the seizure of Newtek Loan proceeds.

385. PMF One received the proceeds of the Enterprise's conduct through its own channel. It took $21,250.00 out of the closing of the Newtek Loan. PEB's own bank records further reflect that on November 22, 2023, two days after the Newtek seizure, $100,000.00 was wired to PMF One, with the payment details "MANGEMENT FEES JAMES G" (Service Ref. 592034) -- upon information and belief, a reference to Gieselmann -- under a beneficiary identifier different from the one used for PMF 26's own remittances. PMF One also received the $50,000 fee PEB paid under PMF 18's Consulting Agreement, as alleged above.

386. PMF One has itself described the Enterprise's business as lending. In *Duffey*, *supra*, PMF One's own Rule 19-a submission recites that "PMF provides merchant advances or loans."

387. PMF One acted with knowledge of the Enterprise's unlawful purpose. Its Manager is Burger, and its Chief Executive Officer is Golshan, who personally approved, as "Approver 2," every one of the fifty-three (53) wire transfers through which PMF 26 administered its collection of PEB's debt.

388. PMF One is a juridical person separate from the Enterprise and from each of the Enterprise's other members. It holds its own California license, maintains its own California office, received funds under its own beneficiary identifier, and has sued and been sued in its own name, including in *Premium Merchant Funding One, LLC v. White Meat Market, Inc.*, *Premium Merchant Funding One, LLC v. Duffey* and the *JJCA Action*, cited above. PMF One is named as a defendant because it is a RICO "person" that conducted and participated in the conduct of the Enterprise's affairs; it is not alleged to be the Enterprise.

**D. <u>Non-PMF Participants</u>**

389. PMF 26's dealings with PEB were intertwined with those of the other funders that extended financing to PEB. Upon information and belief, one or more members of the Enterprise had a pecuniary or remunerative interest in the funders identified in this section, whose financing the Enterprise used to repay Agreements issued by PMF 26.

390. PMF 26 did not merely compete or coexist with those funders. The Enterprise used their financing as a source of its own repeat business, and the money moved in both directions. In one direction, PMF 26 originated new Merchant Agreements, represented to PEB as purchases of future receivables that would deliver new working capital, whose stated Purchase Price was applied largely to paying down PMF 26's own prior balance and the balances PEB owed other funders: of the $750,000.00 stated Purchase Price of the November 6, 2023 Agreement, PEB received $157,814.30, and of the $2,684,478.27 stated Purchase Price of the January 22, 2024

Agreement, PEB received $22,689.00 at closing. In the other direction, advances from other funders reached PEB's account and were sent on to PMF 26 within hours or days. Either way, PMF 26 recovered its own money well ahead of the remittance schedule it had itself set, and PEB's obligations were rolled into a larger and more heavily marked-up balance.

391. On each such Merchant Agreement, PMF 26 charged PEB a fresh underwriting or origination fee, calculated as a percentage of the entire inflated Purchase Price rather than of the capital PEB actually received. The Enterprise thereby profited twice from the same debt -- once by accelerating collection of its own balance without waiting out the return it purported to have purchased, and again by charging PEB a new fee for the privilege of retiring debt owed to others.

392. The clearest documented instance of the second of those flows occurred during the six-day period of October 18 through 23, 2023. The October 17, 2023 Agreement stated a Purchase Price of $461,285.36 and a Purchased Amount of $687,315.19, payable over a term of fifty-two (52) weeks. On October 19, 2023, at 3:18 p.m. Eastern Time, Clearfund wired $333,000.00 into PEB's operating account. On October 20, 2023 at 12:53 p.m., Alpine wired a further $162,000.00 into the same account. Two hours and twenty-nine minutes after the Alpine wire landed, at 3:22 p.m. and again at 3:23 p.m. on October 20, 2023, $262,500.00 and a further $262,500.00 were wired from PEB's account to PMF 26, each captioned "Other Loan payback."

393. On October 23, 2023 at 7:02 a.m., a further $162,315.19 was wired from PEB's account to PMF 26, captioned "BALANCE." Those three payments totaled $687,315.19 -- the entire Purchased Amount of the October 17, 2023 Agreement, to the penny -- retiring within six days an obligation PMF 26 had structured to run fifty-two weeks. PMF 26 was able to do so because Clearfund's and Alpine's funds, and not PEB's receivables, were in the account.

**1. Zahav Asset Management LLC**

394. Zahav is a member of the Enterprise. It is not a defendant in this action. Zahav is a merchant cash advance company that provided PEB with a purported advance memorialized by a credit of $183,166.00 to PEB's account on January 12, 2024, followed by an additional credit of $104,584.00 on February 20, 2024, and an ACH debit of $41,639.00 on January 19, 2024, with recurring debits of $500.00 continuing under Zahav’s name from May through July 2024.

395. Zahav’s debit activity on PEB’s own bank ledger is captioned using the same sequential internal numbering convention used elsewhere in the ledger exclusively by PMF 26’s own debits: Zahav’s January 19, 2024 debit is numbered “W012,” falling numerically and chronologically between PMF 26’s own “W011” debit (January 17, 2024) and PMF 26’s own “W013” debit (January 19, 2024).

396. PMF 26’s own Citibank wire transfer records, produced by PMF 26 in the Monroe County Action, show no fewer than foutreen wires, each in the amount of $41,639.00 (stepping down to $20,000.00 beginning in March 2024), sent directly from PMF 26’s own Citibank account to Zahav’s account at Flagstar Bank, N.A., on a recurring basis between January 23, 2024 and at least May 2024, each captioned “Payoff for PEB” or “Balance Payment PEB” and referencing “Contract # 5674119946” -- a number in the identical numeric format and sequence as PMF 26’s own internal contract identifiers used elsewhere in its dealings with PEB, and not an identifier independently associated with Zahav anywhere in the record. Every one of these wires was set up and approved by the same two PMF 26 personnel, Scheff and Defendant Golshan, who administered every other third-party payment described in this Complaint.

397. Kashat, PMF 26’s Managing Director, swore in a Reply Affidavit filed in the Monroe County Action that, under the Addendum to the January 22, 2024 Agreement, PEB’s principal “agreed to deduct $550,585.56 from the Purchase Price representing payments PMF was

to make to Seamless and Zahav" -- a sworn admission by PMF 26's own Managing Director that PMF 26 itself, not Zahav independently, was responsible for making Zahav's payments out of PEB's own loan proceeds.

398. Upon information and belief, Zahav is not, in substance, an entity independent of the Enterprise, but is instead a d/b/a, affiliate, or an account administered by the Enterprise operating under a separate name to obscure the true scope of PEB's aggregate obligations owed to PMF 26; in the alternative, and to the extent Zahav is confirmed to be a legally distinct entity, Zahav knowingly participated in the Enterprise by accepting payments funneled through PMF's own internal numbering and collection infrastructure in a manner that could not have occurred without Zahav's knowledge that PMF 26 was collecting and redirecting PEB's receivables on Zahav's behalf.

399. The Enterprise benefited from Zahav's involvement with PEB, and Gieselmann had a hand in shaping it. Ten days after the first of the Zahav credits described above, PMF 26 originated the January 22, 2024 Agreement, which -- per Kashat's own sworn admission -- applied $550,585.56 of its stated Purchase Price to Zahav and Seamless and $1,841,250.88 to accelerating retirement of PMF 26's own prior balances, while PMF 26 charged a $268,447.83 underwriting fee.

400. Between January 10 and February 15, 2024, Gieselmann corresponded directly with Zahav's principal concerning the structure and terms of Zahav's own further refinancing of PEB -- a new and larger obligation of $255,000 in Purchase Price against $382,245 in Purchased Amount, refinancing an existing $124,916 balance at a disclosed annual percentage rate of 471.13%. PMF 26 thereafter sent fourteen wires to Zahav, aggregating $445,112.00, each referencing the same internal PMF 26 contract identifier described above. Gieselmann thus helped

shape the terms on which PEB took on further third-party debt at 471.13% per annum.

**2. Clearfund Solutions LLC**

401. Clearfund is a member of the Enterprise. It is not a defendant in this action. Clearfund entered into no fewer than three separate funding agreements with PEB between September 2023 and December 2023. Clearfund's first advance, in the amount of $237,500.00, funded on September 11, 2023 -- four days before PEB executed its Consulting Agreement with PMF 18 on September 15, 2023 -- with weekly debits of $12,083.33 beginning the same day the Consulting Agreement was signed. A PMF-sourced debit of $25,000.00 posted to PEB's account on September 13, 2023, two days after Clearfund's advance and two days before the Consulting Agreement's execution.

402. Clearfund's second advance, of $333,000.00 on October 19, 2023, is described in paragraph 392. The November 6, 2023 Addendum to PEB's Merchant Agreement with PMF 26 itemizes a $38,000.00 payment "to pay off Clearfund balance" -- a partial paydown, at most, of a Clearfund balance that stood at $555,000.00 as of October 18, 2023 and $495,535.71 as of November 3, 2023 according to Clearfund's own payment-history statement.

403. On December 28, 2023 -- ten days after PMF 26 issued its largest Merchant Agreement to PEB to date -- PEB executed a third, separate Clearfund agreement with a Purchase Price of $556,000.00 and weekly remittance of approximately $39,172.73, while PEB was, upon information and belief, carrying up to four simultaneous PMF 26 remittance obligations, equaling an astounding 72% of PEB's future receivables. That agreement's own "Stacking" provision purported to require Clearfund's prior written consent before PEB entered into any other receivables arrangement, subject to a stacking fee; Clearfund neither invoked this provision nor otherwise objected to PEB's contemporaneous PMF 26 obligations.

404. PMF 26's own Citibank wire transfer records show eight wires, aggregating $281,997.00 -- seven of them in the amount of $39,172.00 each -- sent directly from PMF 26's own account to Clearfund's account at BankUnited, N.A., between January 23, 2024 and March 28, 2024, each captioned "Payoff for PEB / Ref CF01797" -- the identical reference number on Clearfund's own settlement/payoff letter. As with the Zahav wires, every one of these wires was set up and approved by Scheff and Defendant Golshan. Kashat's original summary-judgment affidavit in the Monroe County Action likewise admits that the January 22, 2024 Agreement's Purchase Price was reduced by "payments that PMF made directly to third-party MCA companies (Seamless, Zahav and Clearfund) at Merchant's direction."

405. The repeated, closely-timed cross-funding between Clearfund and PMF 26; Clearfund's non-enforcement of its own contractual stacking protection against PMF 26's larger, contemporaneous obligations; and PMF 26's direct administration of Clearfund's collections through its own personnel and account, together establish that Clearfund knowingly participated in, facilitated, or at minimum knowingly accepted the benefit of, the debt-stacking and consolidation scheme alleged in this Complaint. PMF 26 benefitted from the funds advanced by Clearfund to PEB.

406. The third Clearfund facility described above was obtained on an application submitting Gieselmann, by his own first name and initial, as PEB's business reference. That balance was in turn swept into PMF 26's January 22, 2024 Agreement, on which PMF 26 charged a $268,447.83 underwriting fee, and was thereafter reduced by the PMF 26 wires to Clearfund described above. At every stage of that sequence, Clearfund's capital or Clearfund's balance was the occasion for a PMF 26 Merchant Agreement from which the Enterprise took a fee and an accelerated recovery of its own money.

**3. Seamless Capital Group LLC**

407. Seamless is a member of the Enterprise. It is not a defendant in this action. Seamless funded PEB $197,605.00 on or about January 5, 2024, with weekly debits of approximately $23,555.72 beginning shortly thereafter, followed by a seven-week gap with no payments between January 24 and March 12, 2024, a resumption on March 13, 2024, and a reduction to approximately $16,000.00 per week beginning April 9, 2024.

408. PMF 26's own Citibank wire transfer records show no fewer than six wires of $23,555.70 each sent directly from PMF 26's own account to Seamless's account at BankUnited, N.A., between January 23, 2024 and February 28, 2024, each captioned "Balance Payment PEB / Contract ID:11922." As with the Zahav and Clearfund wires, every one of these wires was set up and approved by Scheff and Defendant Golshan.

409. Kashat's sworn affidavits in the Monroe County Action twice admit PMF 26's role in Seamless's payments: his original affidavit names Seamless among the "third-party MCA companies (Seamless, Zahav and Clearfund)" PMF paid "at Merchant's direction," and his Reply Affidavit states that PEB's principal "agreed to deduct $550,585.56 from the Purchase Price representing payments PMF was to make to Seamless and Zahav."

410. The direct wires from PMF 26's own account, administered by the same PMF 26 personnel who administered every other third-party payment described in this Complaint, referencing Seamless's own contract identifier, together with Kashat's sworn admissions naming Seamless specifically, establish that Seamless knowingly participated in, facilitated, or at minimum knowingly accepted the benefit of, the debt-stacking and consolidation scheme alleged in this Complaint. PMF 26 benefited from the funds Seamless advanced to PEB, at PMF 26's insistence.

411. PMF 26's own Citibank records show nine wires in all, aggregating $203,445.60,

sent from PMF 26's own account to Seamless. Seamless's balance was, in substance, the consideration PMF 26 offered PEB for an obligation of $4,429,389.15, on which PMF 26 simultaneously accelerated recovery of $1,841,250.88 of its own prior lending and took a quarter-million-dollar fee for the privilege.

**4. Alpine Advance 5 LLC**

412. Alpine is a member of the Enterprise's associational structure. PEB does not allege that it knew of or shared the Enterprise's unlawful purpose, and it is not a defendant in this action. Alpine's $162,000.00 advance of October 20, 2023, captioned "MERCHANT FUNDING," is described in paragraph 392. The $162,315.19 "BALANCE" wire to PMF 26 three days later corresponds closely to the amount of Alpine's advance.

413. The Addendum to the November 6, 2023 Agreement includes a line item of $195,000.00 "to pay off Alpine balance," showing that PMF 26 proceeds were used within weeks to retire a balance owed to Alpine, mirroring the reverse flow by which Alpine's own October advance had, upon information and belief, been coordinated with or known to PMF 26 at the time it was extended, rather than independently and separately arranged.

**5. Kapitus, LLC**

414. Kapitus is a member of the Enterprise's associational structure. PEB does not allege that it knew of or shared the Enterprise's unlawful purpose, and it is not a defendant in this action. Kapitus had a merchant cash advance relationship with PEB, under facility ID B1539741, that pre-dates the PMF Entities' own first contact with PEB by approximately sixteen months, with continuous weekly ACH debits from on or about January 7, 2022 through November 9, 2023. On October 18, 2023, PMF 26 advanced $47,486.24 to PEB; the very next day, October 19, 2023, PEB made a partial paydown of its outstanding Kapitus balance in the identical amount, $47,486.24. The November 6, 2023 Addendum to PEB's Merchant Agreement with PMF 26

itemizes a further payment of $131,545.70 "pay off Kapitus balance" -- Kapitus's last recorded account activity occurred three days later, on November 9, 2023, consistent with this payment representing Kapitus's full and final payoff. PMF 26 proceeds were accordingly used, on two separate occasions three weeks apart, to retire the entirety of a pre-existing Kapitus balance, tying Kapitus's collection activity directly into the same reverse-consolidation mechanism described throughout this Complaint.

415. Neither of those payments delivered capital to PEB. Each converted a balance owed to an independent funder into a larger balance owed to PMF 26 at PMF 26's own marked-up rate, and each was accompanied, in the same instrument, by an accelerated retirement of PMF 26's own prior balance and by fees PMF 26 charged on the full Purchase Price.

**6. Newtek Bank, N.A.**

416. Newtek Bank is a member of the Enterprise's associational structure. It is not a defendant in this action, and PEB does not allege that it knew of or shared the Enterprise's unlawful purpose. On at least two occasions, one of the Newtek Entities was the lender on an SBA-guaranteed loan that one of the PMF Entities arranged for a merchant that had signed a consulting agreement with PMF 18: the Newtek Loan, on which PMF One was the "Referral Source" and agent of record, and the $5,000,000 loan made by Newtek Small Business Finance, LLC in the *JLK* Action. The PMF Entities played a principal role in completing and submitting financial information to Newtek Bank on behalf of PEB.

417. The relationship between the PMF Entities and the Newtek Entities is a standing one. The co-branded webpage alleged in paragraph 206, at partners.newtekone.com/pmfus, is generated through NewtekOne's "Newtek Alliance Suite Builder." NewtekOne describes, in its annual report, a network of "hundreds of alliance partners who have entered into Referral Promotion Agreements or BizExec Agreements," under which "the alliance partners are eligible

for a referral fee when their referral leads to the creation of a new account," and a platform, NewTracker, that "provides our referral partners with digital access into our back office" to follow "the processing of their referred customers." NewtekOne, Inc., Annual Report (Form 10-K) for the fiscal year ended December 31, 2025, Item 1. Upon information and belief, one or more of the PMF Entities is such an alliance partner; that relationship is the source of the access to PEB's loan file that personnel of the PMF Entities held through "@pmfus.com" email addresses (¶ 383); and, as such a partner, PMF One was eligible for a referral fee from a Newtek Entity in connection with the Newtek Loan, which SBA Form 159 -- reporting $0.00 in compensation paid by the lender -- does not disclose.

418. PEB pleads Newtek Bank's membership in the Enterprise's structure only. Its function in that structure was to supply SBA-guaranteed capital to merchants carrying merchant cash advance debt, which the Enterprise could then capture: fifty-four minutes after the Newtek Loan's proceeds reached PEB's account, PMF 26 wired $860,000.00 of them to itself, in an amount corresponding to no line item in the use of proceeds Newtek Bank had approved. PEB's inability to benefit from the Newtek Loan drove PEB deeper into debt and even more dependent on PMF 26's willingness to extend financing. PEB does not allege that Newtek Bank knew of, agreed to, or knowingly participated in the Enterprise's collection of unlawful debt or pattern of racketeering activity, or that it knew of PMF 26's seizure of the Newtek Loan proceeds.

**7. Meged Funding Group Corp.**

419. Meged is a member of the Enterprise's associational structure. PEB does not allege that it knew of or shared the Enterprise's unlawful purpose, and it is not a defendant in this action.

420. Meged received no fewer than five wire transfers, totaling $77,000.00, sent directly from PMF 26's own Citibank account -- the same account, administered by the same PMF 26 personnel, Scheff and Defendant Golshan, that PMF 26 used to pay Zahav, Seamless, and

Clearfund, as described above. PMF 26's own ledger for the January 22, 2024 Agreement shows Meged receiving payments from the same single, PMF-controlled pool of funds, on the same dates, as PMF 26 itself, Zahav, Seamless, and Clearfund. Upon information and belief, Meged separately operates a shared collections and legal servicing function used by at least one other merchant cash advance company with no other apparent connection to PMF 26, having transmitted a formal notice of default on that other company's behalf in November 2024 -- indicating that Meged's role in servicing and collecting merchant debt is not confined to any single merchant cash advance fund's own internal operations.

421. Upon information and belief, the payments PMF 26 made to Meged were made from funds PMF 26 had withheld from, or charged against, the Purchase Price of one or more of its Merchant Agreements with PEB, such that PEB remained obligated to repay the full marked-up Purchased Amount attributable to a payment it never received in cash.

422. PEB alleges that Alpine, Kapitus, and Meged are members of the Enterprise's associational structure in that each is shown by PMF 26's own records to have functioned as a node within the same PMF-administered network of advances and collections described throughout this Complaint, and that Newtek Bank is such a member for the reasons alleged in paragraphs 416 through 418. PEB pleads their membership in the Enterprise's structure only, reserving the right to amend these allegations, including to allege knowing participation, should discovery reveal facts supporting it.

**8. Joshua Capital**

423. Joshua Capital is a member of the Enterprise. It is not a defendant in this action. At all relevant times, Joshua Capital operated as an integrated component of the Enterprise's shared collection and servicing infrastructure, functioning alongside PMF 26, PMF 18 and PMF

One rather than as an independent, arm's-length merchant cash advance provider.

424. Joshua Capital is owned and controlled by Burger, who simultaneously serves as the Chief Operating Officer of PMF 18 and who executed the Consulting Agreement with PEB on PMF 18's behalf. Burger's dual role as an officer of PMF 18 and the owner and controller of Joshua Capital placed Joshua Capital directly within the same chain of command and decision-making structure through which the PMF 26 Individual Parties operated the Enterprise's day-to-day affairs.

425. Joshua Capital's telephone number, (212) 931-6858, appears on the "MCA TRACK" merchant account statements that PMF 26 itself maintained and provided to PEB in connection with the servicing and collection of the usurious debt at issue in this action. Upon information and belief, PMF 26 would not have caused Joshua Capital's telephone number to appear on records PMF 26 generated and used to service and collect PEB's debt unless Joshua Capital was itself functioning as part of the same collection operation as PMF 26, sharing personnel, call-handling, or servicing infrastructure with PMF 26 in connection with PEB's account.

426. Joshua Capital further held itself out to the public, and to merchants such as PEB, as an extension of the same operation as PMF 18 and PMF 26. Joshua Capital's website, www.joshuacap.com, is a near-verbatim clone of the website used by the PMF Entities, www.pmfus.com, and Joshua Capital routes its own customer-support inquiries to support@pmfus.com -- the Enterprise's shared support address -- rather than maintaining any independent support channel of its own.

427. Upon information and belief, Joshua Capital knowingly accepted the benefit of, and received proceeds derived from, the Enterprise's transactions with PEB, notwithstanding that

Joshua Capital never entered into any Agreement directly with PEB. Joshua Capital's receipt of these proceeds, without any independent contractual basis for doing so, is consistent only with Joshua Capital's knowing participation in, and receipt of a share of the proceeds of, the Enterprise's collection of unlawful debt from PEB.

428. Through the conduct described above -- sharing its telephone number and support infrastructure with PMF 26's own servicing and collection of PEB's account, being directed and controlled by the same individual who executed PEB's Consulting Agreement on PMF 18's behalf, cloning and operating a public-facing website designed to present Joshua Capital as part of the same operation as PMF 18 and PMF 26, and accepting proceeds of the Enterprise's collection of unlawful debt from PEB without any independent contractual basis -- Joshua Capital has knowingly participated in the operation and management of the Enterprise's affairs.

**E. <u>Interstate Commerce</u>**

429. The Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily business activities. PEB's injury is a domestic injury. PEB is a corporation organized under the laws of the State of California with its principal place of business in California; the funds of which PEB was deprived were held in, and taken from, PEB's bank accounts in the United States; and all of the conduct alleged in this Complaint occurred within the United States.

430. The members of the Enterprise maintain residences and offices in, *inter alia*, the States of New York, New Jersey, Texas, Connecticut and Virginia, and use personnel in these offices to originate, underwrite, fund, service and collect upon the usurious loans made by the Enterprise to entities in California, including PEB, and throughout the United States, via extensive use of interstate emails, mail, wire transfers and bank withdrawals processed through an automated clearing house.

431. In the present case, other than telephone calls, all communications between the members of the Enterprise were by interstate email, text message, mail, wire transfers or ACH debits and other interstate wire communications. Specifically, the Enterprise used interstate emails and wires to originate, underwrite, service and collect upon the Agreements, communicate between members of the Enterprise, fund the advances under each of the Agreements and to collect the daily or weekly withdrawals and charge fees via interstate electronic ACH debits.

432. In addition, at the direction of PMF 26, each of the Agreements was executed in California, and executed copies of the Consulting Agreement and the Agreements were sent from California to personnel associated with the Enterprise located in New York and New Jersey, among other states.

433. The Enterprise's collection of unlawful debt from PEB was not isolated but was carried out through repeated, dated acts over the life of the parties' dealings, including, without limitation: (i) the Enterprise's funding of successive advances to PEB under the Agreements; (ii) the Enterprise's daily and weekly ACH withdrawals from PEB's bank account in collection of the usurious debt; (iii) the Enterprise's seizure of approximately $860,000 of the proceeds of PEB's Newtek Loan within hours of its deposit; (iv) the $21,250 fee taken by PMF One from the Newtek Loan closing; (v) the November 22, 2023 wire of $100,000 in "Management Fees" to PMF One, referencing Gieselmann; and (vi) a series of coordinated interstate funding commitments by and among members of the Enterprise. Each such act was effected through interstate wires and the interstate banking system in furtherance of the Enterprise's collection of unlawful debt.

434. The Enterprise's collection of unlawful debt from PEB was not a one-time occurrence but reflects the Enterprise's regular and continuing way of conducting business. Upon information and belief, the Enterprise has solicited, funded, and collected upon materially identical

form Merchant Agreements from numerous other small-business merchants throughout the United States, and has filed substantially similar collection actions and confessions of judgment against such merchants in courts across the country. The Enterprise's collection of unlawful debt is therefore open-ended and ongoing, posing a continuing threat of repetition.

435. The Enterprise's use of this scheme against PEB is not unique. In the *JLK* Action, another small-business merchant alleged that PMF 18 employed materially the same scheme that the Enterprise used against PEB. As alleged there, PMF 18 entered into a written Consulting Agreement with the merchant -- executed on PMF 18's behalf by Burger -- under which PMF 18 assumed fiduciary duties to advise the merchant on financing; PMF 18 then arranged a $5,000,000 Small Business Administration loan, dated March 31, 2022, funded by Newtek Small Business Finance, LLC, and a $450,000 commission (9% of the loan) out of the loan proceeds -- a fee it concealed from the SBA and Newtek Small Business Finance, LLC, while concealing from the merchant its obligation to disclose that fee; and the merchant asserted a RICO claim for the collection of unlawful debt under 18 U.S.C. § 1962(c) and (d) naming Burger (and Brugman) as the culpable persons, with PMF 26 and PMF 18 as members of the unlawful enterprise.

436. The *JLK* Action confirms that the Enterprise's conduct toward PEB -- the use of a PMF 18 Consulting Agreement to establish a fiduciary relationship, the steering of the merchant into an SBA-guaranteed loan funded by one of the Newtek Entities and the Agreements, and the extraction of outsized fees from the loan proceeds without the disclosures required of loan brokers -- reflects the Enterprise's standard, repeated method of operation against small-business merchants, and not an isolated transaction.

437. To state a claim under RICO based on the collection of an unlawful debt, a plaintiff must allege that (1) the debt was unenforceable in whole or in part because of state or federal laws

relating to usury; (2) the debt was incurred in connection with the business of lending money at a usurious rate; and (3) the usurious rate was at least twice the enforceable rate. *See Espire Ads LLC v. TAPP Influencers Corp.*, 655 F. Supp. 3d 223, 256 n.11 (S.D.N.Y. 2023) (citing *Wade Park Land Holdings, LLC v. Kalikow*, 589 F. Supp. 3d 335, 376 (S.D.N.Y. 2022)); *see also Sonata* Action, slip op. at 27-28 (S.D.N.Y. Mar. 30, 2026) (applying the same test and finding all three elements satisfied as to the same PMF enterprise at issue here). Each element is satisfied. The Agreements are unenforceable as usurious loans under New York and California law, as alleged herein. The debt was incurred in the Enterprise's business of lending money at usurious rates. The rates charged satisfy the third element, as alleged in paragraph 299.

438. As alleged herein, PMF 18 was not registered to do business in the State of California by the California Secretary of State at the time of the transactions at issue. Defendant PMF One, however, maintains a California office at 16000 Ventura Boulevard, Suite 300, Encino, California 91436, from which the Enterprise conducts its California lending operations. The Enterprise, through PMF 18 and PMF 26, solicited, underwrote, funded, and collected upon the transactions with PEB -- a California corporation -- from outside the state.

439. Willful violation of California's usury laws constitutes the felony of "loan sharking" under California Civil Code § 1916-3(b), punishable by imprisonment for up to five years.

440. PMF 18 was aware of the general nature and conduct of the Enterprise, agreed to facilitate the Enterprise in connection with its special and confidential relationship with PEB and at all times was knowledgeable that the Enterprise extended beyond its individual role.

441. PEB has been injured in its business and property by reason of the Enterprise's collection of unlawful debt, in violation of 18 U.S.C. § 1962(c), in an amount to be determined at

trial.

442. The injuries to PEB directly, proximately, and reasonably foreseeably resulting from or caused by the Enterprise's collection of unlawful debt include, but are not limited to, millions of dollars in improperly collected criminally usurious loan payments, without duplication of any overlapping recovery for the same dollars awarded under the Second, Third, or Fourth Counts below.

443. PEB has incurred attorneys' fees and costs associated with exposing and prosecuting the Enterprise's collection of unlawful debt.

444. Pursuant to 18 U.S.C. § 1964(c), PEB is entitled to treble damages, plus costs and attorneys' fees, for this violation of 18 U.S.C. § 1962(c).

445. Each Defendant who violates 18 U.S.C. § 1962(c) by conducting or participating in the conduct of the Enterprise's affairs through the collection of unlawful debt is jointly and severally liable, together with PMF 26 and the other members of the Enterprise, for all damages proximately caused by the Enterprise's collection of unlawful debt, including the damages described in the preceding paragraphs of this Count. Joint and several liability under 18 U.S.C. § 1962(c) does not require that every member of the Enterprise be named as a defendant in this action; PEB may recover the full amount of such damages from any defendant found liable under 18 U.S.C. § 1962(c) for the Enterprise's collection of unlawful debt.

446. PMF 26 and the PMF 26 Individual Parties are not named as Defendants in this action and are pursued separately, for their own independent liability as members of the Enterprise, in the Arbitration. To the extent any portion of the damages sought in this Count against Defendants overlaps with damages sought against PMF 26 and/or the PMF 26 Individual Parties in the Arbitration for the same acts or the same injury, PEB seeks a single, non-duplicative

recovery for that overlapping injury, and any amount actually recovered in the Arbitration for such overlapping injury shall be credited against, and shall not be recovered again from, Defendants in this action.

**SECOND COUNT**
**(Pattern of Racketeering Activity – Accelerated-Recovery and Reverse-Consolidation Scheme – Violation of 18 U.S.C. § 1962(c))**

447. PEB repeats and realleges the allegations contained in each of the preceding paragraphs as if set forth at length herein.

448. This Count is separate from, and independent of, the collection of unlawful debt alleged in the First Count above. The conduct described in this Count constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1) and (5), arising from the Enterprise's accelerated-recovery and reverse-consolidation scheme, and providing a second and independent basis for Defendants' liability under 18 U.S.C. § 1962(c). Each predicate act described in the following paragraphs constitutes wire fraud in violation of 18 U.S.C. § 1343, committed in furtherance of a common scheme to defraud PEB by misrepresenting and concealing the true consideration, structure and control of the transactions described herein, and executed through the interstate wires and interstate banking system described in the Interstate Commerce section above.

449. On September 15, 2023, Defendant Burger, acting on behalf of PMF 18, executed and transmitted to PEB the Consulting Agreement, representing that PMF 18 would provide PEB with innovative financing solutions, tailored solutions, and a thorough review of the various metrics of PEB's business, and that PMF 18 was authorized to represent, negotiate and correspond on PEB's behalf. At the time this representation was made, Burger and PMF 18 did not intend to provide the consulting services represented and instead intended to use the Consulting Agreement, and the access to PEB's financial records and bank account that PEB provided in reliance on it, as

a mechanism to steer PEB into transactions with PMF 26 and other lenders from which PMF 18 and its affiliates would receive undisclosed compensation. This transmission -- via DocuSign, Envelope ID 73F5EA33-E4B6-4D35-A16E-EE2AF16AA014 -- and the $50,000 fee payment wired from PEB's account in reliance on it -- received on September 22, 2023 by PMF One, after two earlier wires to PMF 26 were returned as "sent to incorrect account" -- were each effected by interstate wire between California and New York.

450. On October 17, 2023, PMF 26 transmitted to PEB a Merchant Agreement representing a 52-week repayment schedule of $13,217.60 per week, totaling $687,315.19, and representing that there was no fixed time period during which the Purchased Amount had to be collected. In fact, PMF 26 collected the entire $687,315.19 Purchased Amount within six days of the Agreement's execution: after depositing only $47,486 on October 18, 2023, through two withdrawals of $262,500 and $262,500 on October 20, 2023, and $162,315 on October 23, 2023. Each of these transfers was transmitted by interstate wire in furtherance of a scheme to represent a contingent, 52-week collection schedule to PEB while intending, and acting, to collect the full Purchased Amount within days.

451. On November 6, 2023, PMF 26 transmitted to PEB a Merchant Agreement stating a Purchase Price of $750,000.00, together with a "Payoff Existing Advance" Addendum showing that, at signing, $152,500.00 of that stated Purchase Price was paid directly to "PMF Contract ID# 5674115067" -- PMF 26's own prior balance -- $131,545.70 was paid to Kapitus, $38,000.00 to Clearfund, $195,000.00 to Alpine, and $75,140.00 as an origination fee, leaving PEB a net of $157,814.30, approximately 21% of the stated Purchase Price. The November 6, 2023 Agreement represented the transaction as a purchase of future receivables at a discount, with no fixed collection schedule; the Addendum transmitted with it shows that PMF 26 had, before a single

receivable was collected, already committed 79% of the stated Purchase Price to retiring its own prior balance and other lenders' balances. This transmission was effected by interstate wire and was in furtherance of a scheme to represent the transaction as a receivables purchase while using it, in substance, to accelerate collection of a prior balance. The Pre-Payment Addendum transmitted with that Merchant Agreement, issued in PMF 18's own name and designating PMF 18 to accept a $975,000.00 payoff, was transmitted by the same interstate wire and was a further act by PMF 18 in furtherance of the same scheme.

452. On January 22, 2024, PMF 26 transmitted to PEB the largest Merchant Agreement at issue in this case, stating a Purchase Price of $2,684,478.27. Kashat's own sworn Reply Affidavit, filed July 14, 2026 in the Monroe County Action (NYSCEF Doc. No. 125), states that, under that Agreement's Addendum, PEB's principal agreed to deduct from the Purchase Price the "$1,841,250.88 balance then owed to PMF on prior agreements" -- a figure the Addendum itself allocates to "PMF AND CLEARFUND" -- and a further $550,585.56 "representing payments PMF was to make to Seamless and Zahav." After PMF 26's fee, the Addendum left PEB with $22,689.00 at closing -- less than one percent of the stated $2,684,478.27 Purchase Price. Kashat's affidavit characterizes this Agreement's mechanics as a "reverse consolidation" -- a description of a payment mechanism, not a good-faith purchase of receivables. The January 22, 2024 Agreement and its Addendum were transmitted by interstate wire, in furtherance of the same scheme described in the two preceding paragraphs, with the face amount of the transaction exceeding $2.6 million.

453. The pattern across the October 17, November 6 and January 22 Merchant Agreements -- each new Merchant Agreement's proceeds substantially and immediately diverted to retire PMF 26's own prior balance and other lenders' balances, while each Merchant Agreement's own boilerplate represented an uncertain, contingent, receivables-dependent

collection schedule -- is relevant not only as three discrete predicate acts, but as evidence of the scheme's overall design and of Defendants' intent, because the same mechanism recurred with mechanical regularity across a three-and-a-half-month span and in connection with the funding of eight of the ten Merchant Agreements issued to PEB by PMF 26.

454. On or about November 7, 2023, Scheff, acting as PMF One's "Agent Contact Person," executed and transmitted SBA Form 159 in connection with PEB's Newtek Bank SBA 7(a) loan, certifying that PMF One would receive $21,250.00 in compensation and certifying, under 18 U.S.C. § 1001, that PMF One had not and would not charge or receive any payment except for services actually performed. At the time this certification was transmitted, PMF-affiliated personnel had access to Newtek Bank's loan-servicing portal for PEB's loan file. On November 20, 2023, at 2:29 p.m. EST, Newtek Bank's title company wired $960,195.36 into PEB's account; at 3:23 p.m. EST the same day, fifty-four minutes later, PMF 26 wired $860,000.00 out of that account to itself, an amount corresponding to no line item in Newtek Bank's own approved Use-of-Proceeds table for the loan. The SBA Form 159 transmission, the $21,250.00 fee wire, and the $860,000.00 seizure wire were each transmitted by interstate wire in furtherance of a single scheme to obtain money from a federally regulated lending transaction by materially understating the Enterprise's true compensation and control over PEB's loan proceeds.

455. The predicate acts described in the foregoing paragraphs share a common purpose -- extracting fees and accelerated, undisclosed repayment from PEB while concealing the Enterprise's true compensation and control -- common participants, including defendants Golshan and Burger and Enterprise members Kashat, Gieselmann and Scheff, a common victim, PEB, and a common method: electronically transmitted agreements and addenda that represented a contingent, receivables-dependent purchase while the accompanying wires executed a fixed,

accelerated and substantially self-directed collection. These predicate acts span from September 15, 2023 through at least January 22, 2024 -- approximately four months -- across the Agreements and the Newtek Loan transaction described above, together with the individual wire transfers effecting them, and together constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

456. As alleged above, the Enterprise's use of this scheme is not unique to PEB. The same pattern was used against another merchant in the *JLK* action, confirming that the racketeering activity alleged herein reflects the Enterprise's regular and repeated way of doing business, and poses a continuing threat of repetition, rather than conduct confined to an isolated transaction. The Enterprise's regular way of doing business is the extension and collection of usurious debt by the means alleged herein: as alleged above, it has prosecuted hundreds of collection actions on materially identical Merchant Agreements, and it continues to pursue collection of the debt at issue from PEB and its principal to this day. The racketeering acts alleged in this Count therefore carry a threat of continued criminal activity.

457. Each predicate act described in this Count was committed by or at the direction of one or more Defendants, or by PMF 26 or other Enterprise members under the direction and control of one or more Defendants, in furtherance of the conduct of the Enterprise's affairs. Each such predicate act was related to the others in purpose, participants, victim and method and, together, they constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5), independently satisfying the racketeering-activity element of 18 U.S.C. § 1962(c) and providing a basis for Defendants' liability independent of, and in addition to, the Enterprise's collection of unlawful debt alleged above.

458. Each of Defendants PMF 18, PMF One, Golshan and Burger, together with Kashat,

Gieselmann and Bejko, in the roles described above, participated in the operation and management of the Enterprise's affairs in connection with the accelerated-recovery and reverse-consolidation scheme alleged in this Count, including, as to PMF 18, by originating PEB for the Enterprise through the Consulting Agreement and issuing the Pre-Payment Addendum described above; as to PMF One, by serving as the Enterprise's agent of record on the Newtek Loan; as to Burger, by executing the Consulting Agreement and directing the Enterprise's legal, underwriting and risk-management functions; and, as to Golshan, Kashat, Gieselmann and Bejko, by underwriting, approving, and directing the Payoff Existing Advance Addenda described above and the resulting diversion of each Agreement's stated Purchase Price to retire PMF 26's own prior balances and other lenders' balances, within the meaning of *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993).

459. Each Defendant acted knowingly and with intent to defraud PEB. Each knew, at the time each Merchant Agreement and its Addendum were transmitted to PEB, that the stated Purchase Price was not being delivered to PEB as new working capital and that the transaction was represented to PEB as something other than what it was, and each intended that PEB rely on that representation and execute the Merchant Agreement.

460. This Count alleges a different injury than the First and Third Counts. The First Count addresses the excessive price of the credit PEB was charged -- that the Agreements' effective interest rates exceeded New York's and/or California's criminal usury threshold -- regardless of how much of any given Agreement's proceeds PEB actually received. The Third Count addresses what happened to PEB's payments after each Agreement was funded, through the undisclosed, centralized servicing mechanism described below. This Count addresses a third, independent wrong: the false representations, made at the time of signing each Merchant Agreement, that PEB was receiving new working capital in exchange for a discounted purchase of

future receivables, when in truth the vast majority of the stated Purchase Price was never intended to reach PEB at all.

461. This scheme benefited the Enterprise in multiple, mutually reinforcing ways. PMF 26 collected a substantial new underwriting or origination fee on each Merchant Agreement's full, stated Purchase Price, calculated on money that never left the Enterprise's own control and was never advanced to PEB as new capital. PMF 26 also used each new Merchant Agreement to retire its own prior balance in full and immediately, collecting on that balance far ahead of the schedule on which it was purportedly earning a return as a purchaser of receivables, and without bearing any of the collection risk that a genuine purchase of future receivables would have entailed. And the Enterprise used PEB's continuing reliance on other lenders as the pretext for originating the next Merchant Agreement in the series -- retiring those lenders' balances, in whole or in part, out of the new Merchant Agreement's proceeds -- generating the next fee and the next accelerated collection from debt that already existed, rather than from any new value the Enterprise actually provided to PEB.

462. The harm to PEB was the mirror image of that benefit. With each successive Merchant Agreement, PEB was fraudulently induced to take on a larger, more heavily marked-up repayment obligation -- the Purchased Amount, typically 1.55 to 1.65 times the stated Purchase Price -- based on the representation that it was receiving genuine new working capital in return. In fact, PEB received little or nothing resembling the capital it was contractually obligated to repay. PEB remained obligated to make daily or weekly payments calculated on the full, inflated Purchased Amount, even though the overwhelming majority of the underlying Purchase Price had never been placed in its hands. This injury exists independent of, and is not measured by, the interest rate implicit in any Merchant Agreement -- PEB was harmed by receiving little or no

capital for an inflated debt obligation, regardless whether the rate charged on the sliver of capital it did receive would itself be considered usurious.

463. This direct, unbroken chain from the predicate acts to PEB's injury -- the Merchant Agreements, their Addenda, and the payoff wires that carried out the diversion were themselves the means by which the fraud was executed and communicated -- satisfies RICO's proximate-cause requirement. *See Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268 (1992); *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 457 (2006).

464. PEB's injuries arising from the accelerated-recovery and reverse-consolidation scheme alleged in this Count include the full amount PEB remains contractually obligated to repay Newtek Bank under the Newtek Loan, net of the value PEB actually retained and was able to use. PEB never received the benefit of the $860,000 in loan proceeds PMF 26 seized within an hour of funding, or of the $21,250 and $100,000 in fees and compensation diverted to PMF One, notwithstanding that PEB remains liable to Newtek Bank for the full $1,500,000 loan amount, including principal and interest, in an amount to be determined at trial.

465. PEB's injuries further include the debt PEB was fraudulently induced to take on without receiving corresponding capital, as a direct and proximate result of the wire-fraud predicate acts described above. Pursuant to the Payoff Existing Advance Addenda executed in connection with the November 6, 2023 and January 22, 2024 Agreements, PMF 26 diverted the great majority of each Agreement's stated Purchase Price -- $592,185.70 of $750,000.00 (November 6, 2023) and $2,660,284.27 of $2,684,478.27 (January 22, 2024) -- to pay down PMF 26's own prior contract balances and other merchant-cash-advance lenders, including Kapitus, Clearfund, Alpine, Seamless, and Zahav, rather than deliver that Purchase Price to PEB as usable working capital, while nonetheless obligating PEB to repay the full, marked-up Purchased Amount

under each Agreement and charging PEB underwriting and origination fees on the diverted amounts.

466. Across these two Agreements alone, PEB was thereby saddled with at least $3,252,469.97 in diverted principal for which it received no corresponding capital; adding the Underwriting Fees deducted from the funding of PEB's November 22, 2023, December 12, 2023, December 18, 2023 and January 16, 2024 Agreements, as reflected in PEB's own bank records, this figure is at least $3,448,390.57, and, measured by the portion of each Agreement's stated Purchased Amount attributable to the diverted Purchase Price, at least $5,307,356.88 -- in each case an amount to be more precisely determined at trial and subject to further amendment as additional Agreements' use-of-proceeds addenda are obtained in discovery. This injury was directly and proximately caused by the wire-fraud predicate acts described above, in that each Agreement, its Addendum, and the wire transfers effecting the diversions described above were transmitted in interstate commerce by wire, and independently supports PEB's damages under this Count, as well as under the First Count's collection of unlawful debt, without duplication of recovery for the same dollars under both Counts.

467. PEB has incurred attorneys' fees and costs associated with exposing and prosecuting the Enterprise's racketeering activity alleged in this Count. Pursuant to 18 U.S.C. § 1964(c), PEB is entitled to treble damages, plus costs and attorneys' fees, for the injuries alleged in this Count.

468. Each Defendant who violates 18 U.S.C. § 1962(c) by conducting or participating in the conduct of the Enterprise's affairs through the accelerated-recovery and reverse-consolidation pattern of racketeering activity alleged in this Count is jointly and severally liable, together with PMF 26 and the other members of the Enterprise, for all damages proximately caused

by that pattern of racketeering activity, including the damages described in the preceding paragraphs of this Count. Joint and several liability under 18 U.S.C. § 1962(c) does not require that every member of the Enterprise be named as a Defendant in this action; PEB may recover the full amount of such damages from any Defendant found liable under 18 U.S.C. § 1962(c) for this pattern of racketeering activity.

469. PMF 26 and the PMF 26 Individual Parties are not named as Defendants in this action and are pursued separately, for their own independent liability as members of the Enterprise, in the Arbitration referenced above. To the extent any portion of the damages sought in this Count against Defendants overlaps with damages sought against PMF 26 and/or the PMF 26 Individual Parties in the Arbitration for the same predicate acts or the same injury, PEB seeks a single, non-duplicative recovery for that overlapping injury, and any amount actually recovered in the Arbitration for such overlapping injury shall be credited against, and shall not be recovered again from, Defendants in this action.

**THIRD COUNT**
**(Pattern of Racketeering Activity – Undisclosed Shadow-Servicing Scheme – Violation of 18 U.S.C. § 1962(c))**

470. PEB repeats and realleges the allegations contained in each of the preceding paragraphs as if set forth at length herein.

471. This Count is separate from, and independent of, the collection of unlawful debt alleged in the First Count and the accelerated-recovery and reverse-consolidation scheme alleged in the Second Count above. The conduct described in this Count constitutes a further, independent pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1) and (5), arising from the Enterprise's undisclosed shadow-servicing scheme, and providing a third and independent basis for Defendants' liability under 18 U.S.C. § 1962(c). Each predicate act described in the following paragraphs constitute wire fraud in violation of 18 U.S.C. § 1343, committed in

furtherance of a common scheme to defraud PEB by concealing the true disposition and control of PEB's receivables, and executed through the interstate wires and interstate banking system described in the Interstate Commerce section above.

472. Beginning at least by January 23, 2024 and continuing through at least July 2024, PMF 26 operated a centralized collection-and-disbursement mechanism, administered from its own Citibank account, under which amounts nominally due from PEB were divided among PMF 26 itself and four other companies and members of the Enterprise -- Zahav, Seamless, Clearfund and Meged -- with only a residual amount remitted to PEB. PMF 26's own payment ledger records this mechanism directly, including an entry stating: "Apply $43,058.10 to PMF, $41,639 to ZAHAV, $23,555.70 to SEAMLESS, $39,172.00 to CLEARFUND / MERCHANT NET $22,689.00." PMF 26's own CitiBusiness Online wire transfer confirmations, produced in the Monroe County Action (NYSCEF Doc. No. 128), show that every wire to Zahav, Seamless, Clearfund and Meged under this mechanism was approved, without exception, by Defendant Golshan, including recurring weekly transmissions of $41,639.00 to Zahav captioned "Payoff for PEB / Contract # 5674119946," $23,555.70 to Seamless captioned "Balance Payment PEB / Contract ID:11922," and $39,172.00 to Clearfund captioned "Payoff for PEB / Ref CF01797." The Merchant Agreements serviced through this mechanism, including the January 16, 2024 and January 22, 2024 Agreements, represented to PEB that it was selling a defined percentage of its future receivables directly to PMF 26, subject to a nominally contingent weekly remittance. In fact, and as never disclosed to PEB, PEB's receivables were swept into a PMF-controlled pool and distributed, at Defendant Golshan's personal direction and approval, among PMF 26 and the four other companies before any residual reached PEB.

473. The "Contract # 5674119946" referenced on every Zahav wire is not a Zahav-specific identifier, but is drawn from the same internal numbering sequence as the PMF Contract IDs referenced in the November 6, 2023 and December 11, 2023 Addenda described above, evidencing that Zahav is a PMF-administered account rather than an independent lender. Each of these wire transmissions, personally approved by Defendant Golshan, independently constitutes a predicate act of wire fraud committed in furtherance of the Enterprise's affairs. In all, PMF 26's own wire transfer records show no fewer than thirty-six (36) wire transfers sent directly from PMF 26's own account to Zahav, Seamless, Clearfund and Meged between January 23, 2024 and July 2024 -- thirty-one (31) to Zahav, Seamless and Clearfund, and five (5), aggregating $77,000.00, to Meged.

474. The predicate acts described in the foregoing paragraphs share a common purpose -- concealing from PEB that its receivables were being swept into a centralized, PMF-controlled pool and distributed among PMF 26, Zahav, Seamless, Clearfund and Meged, rather than collected and applied as PEB's Merchant Agreements represented -- common participants, including Defendant Golshan, who personally approved every wire effecting the scheme, and Enterprise members Kashat and Gieselmann, described above, a common victim, PEB, and a common method: weekly wire transfers captioned to disguise the Enterprise's centralized control of PEB's receivables as independent third-party lender payments. These predicate acts span from at least January 23, 2024 through at least July 2024 -- approximately six months -- and include dozens of individual wire transfers described above, together constituting a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

475. Kashat's own sworn characterization of this mechanism -- that PMF 26 paid Seamless, Zahav, and Clearfund "at Merchant's direction" -- does not cure the nondisclosure

alleged above. Nominal, boilerplate "consent" recorded in a pre-printed addendum, obtained from a merchant already financially dependent on the Enterprise for continued operating capital, does not disclose that the Enterprise's own personnel personally controlled and approved the entire disbursement mechanism, that the Enterprise was simultaneously collecting undisclosed compensation through it, or the true relationship between PMF 26 and the recipient companies. None of that was disclosed to PEB before it signed a Merchant Agreement largely identical in form to each previous Merchant Agreement.

476. This shadow-servicing scheme, like the accelerated-recovery and reverse-consolidation scheme alleged in the Second Count, reflects the Enterprise's regular and repeated way of doing business rather than an isolated transaction. Upon information and belief, the Enterprise has employed materially the same centralized, undisclosed wire-sweep mechanism to service and collect upon Merchant Agreements with other small-business merchants, using Zahav, Seamless, Clearfund, and other nominally independent companies as conduits for PMF 26's own collections, posing a continuing threat of repetition.

477. Defendant Golshan personally approved every wire transfer effecting the shadow-servicing scheme described above, exercising direct, standing, and exclusive control over the disbursement of PEB's receivables among PMF 26, Zahav, Seamless, and Clearfund. Kashat and Gieselmann, in the roles described above, directed and participated in the day-to-day administration of this mechanism through PMF 26's Citibank account. Each thereby participated in the operation and management of the Enterprise's affairs.

478. This Count alleges a materially different injury than the Second Count above. The Second Count addresses what happened to each Merchant Agreement's stated Purchase Price at the moment of funding -- namely, that the amounts represented as new capital were, in substance,

immediately redirected to retire PMF 26's own prior balance and other lenders' balances, so that PEB never received the capital it was promised. This Count addresses a separate and later injury, arising from the operation of the undisclosed mechanism described above throughout the period from at least January 23, 2024 through July 2024.

479. The injury this mechanism inflicted on PEB was a loss of money. The Enterprise exercised control over PEB's own funds -- deciding, unilaterally and without disclosure, how each payment would be allocated among PMF 26, Zahav, Seamless, Clearfund and Meged -- a decision that belonged to PEB, and it used that control for its own benefit and for the benefit of the other Enterprise members whose balances it kept current through this mechanism, without PEB's knowledge, consent, or any accounting. PMF 26's own wire transfer records, produced in the Monroe County Action, fix the amount. Of the $1,514,475.80 wired out of PMF 26's own Citibank account during this period, no less than $1,007,554.60 was applied to the balances of Zahav, Seamless, Clearfund and Meged, rather than to the obligations PEB had actually incurred to PMF 26. That is PEB's money, taken from PEB and applied to balances claimed by other companies without authority or disclosure, and its loss is a direct injury to PEB's business and property within the meaning of 18 U.S.C. § 1964(c).

480. Because PEB did not know that this mechanism existed, it had no occasion, for the more than six months during which the mechanism operated, to contest the arrangement, seek an accounting, or pursue relief directly against PMF 26 or the other companies whose balances were serviced through it. The concealment alleged in this Count accordingly caused PEB to continue performing under the January 2024 Merchant Agreements, and to forgo any opportunity to correct, contest, or seek relief from the arrangement, for as long as the concealment continued.

481. The predicate act described in this Count was committed by or at the direction of

one or more Defendants, by PMF 26 or other Enterprise members under the direction and control of one or more Defendants, in furtherance of the conduct of the Enterprise's affairs, and independently satisfies the racketeering-activity element of 18 U.S.C. § 1962(c), providing a basis for Defendants' liability independent of, and in addition to, the collection of unlawful debt alleged in the First Count and the pattern of racketeering activity alleged in the Second Count above.

482. PEB has been injured in its business and property by reason of the shadow-servicing scheme alleged in this Count, in violation of 18 U.S.C. § 1962(c), in an amount to be determined at trial. PEB's injuries include, without limitation, the amounts swept from PEB's receivables and distributed among PMF 26, Zahav, Seamless, Clearfund and Meged under this mechanism without disclosure to PEB -- no less than $1,007,554.60 of the $1,514,475.80 wired out of PMF 26's own Citibank account during this period -- without duplication of any overlapping recovery for the same dollars under the First, Second, or Fourth Counts. PEB has also incurred attorneys' fees and costs associated with exposing and prosecuting this scheme. Pursuant to 18 U.S.C. § 1964(c), PEB is entitled to treble damages, plus costs and attorneys' fees, for the injuries alleged in this Count.

483. Each Defendant who violates 18 U.S.C. § 1962(c) by conducting or participating in the conduct of the Enterprise's affairs through the shadow-servicing pattern of racketeering activity alleged in this Count is jointly and severally liable, together with PMF 26 and the other members of the Enterprise, for all damages proximately caused by that pattern of racketeering activity, including the damages described in the preceding paragraphs of this Count. Joint and several liability under 18 U.S.C. § 1962(c) does not require that every member of the Enterprise be named as a defendant in this action; PEB may recover the full amount of such damages from any Defendant found liable under 18 U.S.C. § 1962(c) for this pattern of racketeering activity.

484. PMF 26 and the PMF 26 Individual Parties are not named as Defendants in this

action and are pursued separately, for their own independent liability as members of the Enterprise, in the Arbitration referenced above. To the extent any portion of the damages sought in this Count against Defendants overlaps with damages sought against PMF 26 and/or the PMF 26 Individual Parties in the Arbitration for the same predicate act or the same injury, PEB seeks a single, non-duplicative recovery for that overlapping injury, and any amount actually recovered in the Arbitration for such overlapping injury shall be credited against, and shall not be recovered again from, Defendants in this action.

**FOURTH COUNT**
**(Conspiracy – Violation of 18 U.S.C. § 1962(d))**

485. PEB repeats and realleges the allegations contained in each of the preceding paragraphs as if set forth at length herein.

486. Defendants, together with PMF 26, the PMF 26 Individual Parties and the other members of the Enterprise, have unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed together to violate 18 U.S.C. § 1962(c) as described above, in violation of 18 U.S.C. § 1962(d).

487. By and through each of their business relationships with one another, their close coordination with one another in the affairs of the Enterprise, and their frequent email and other communications concerning the underwriting, funding, servicing and collection of the unlawful loans, including the Agreements, the members of the Enterprise knew its nature, and each individual member knew that the Enterprise extended beyond his/her/its individual role. Moreover, through the same connections and coordination, each individual member knew that the other members were engaged in a conspiracy to collect upon unlawful debt, and to conduct the Enterprise's affairs through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

488. The Defendants' agreement is shown by, among other things: (a) the PMF Entities' use of the same personnel, offices, email domain and telephone numbers; (b) PMF 18's delivery of PEB, and of the confidential financial information PEB provided under the Consulting Agreement, to PMF 26 and PMF One; (c) PMF 18's issuance, in its own name, of the Pre-Payment Addendum transmitted with PMF 26's November 6, 2023 Agreement; (d) PMF One's receipt of PEB's $50,000 consulting fee, the $21,250 taken from the closing of the Newtek Loan and the $100,000 wired to PMF One on November 22, 2023; and (e) Defendant Golshan's approval of every wire through which PMF 26 administered its collection of PEB's debt.

489. Each individual member agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to collect upon unlawful debts, including the Agreements, and to conduct the Enterprise's affairs through the patterns of racketeering activity alleged in the Second and Third Counts, in violation of 18 U.S.C. § 1962(c). In particular, each individual member was a knowing, willing, and active participant in the Enterprise and its affairs, and each of the members shared a common purpose, namely the orchestration, planning, preparation, deception, and execution of the scheme to solicit, underwrite, fund, and collect upon unlawful debt.

490. PEB has been injured in its business and property by reason of the Enterprise's violations of 18 U.S.C. § 1962(d), in an amount to be determined at trial.

491. The injuries to PEB directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to, millions of dollars in improperly collected usurious loan payments.

492. PEB has also incurred attorneys' fees and costs associated with exposing and prosecuting the Enterprise's unlawful activities.

493. Pursuant to 18 U.S.C. § 1964(c), PEB is entitled to treble damages, plus costs and attorneys' fees.

494. By virtue of its agreement with PMF 26 and the PMF 26 Individual Parties, as well as concerted action and mutual assistance in furtherance of an unlawful objective of PMF 26 and the PMF 26 Individual Parties, PMF 18 is jointly and severally liable for all damages proximately caused by the conspiracy carried out by it, PMF 26 and the PMF 26 Individual Parties. Likewise, each of the other Defendants, by virtue of its/his/her agreement with the other members of the Enterprise and its/his/her knowing participation in the conspiracy, is jointly and severally liable for all damages proximately caused by the conspiracy to collect unlawful debt in violation of 18 U.S.C. § 1962(d).

495. PMF 26 and the PMF 26 Individual Parties are not named as Defendants in this action and are pursued separately, for their own independent liability as members of the Enterprise, in the Arbitration referenced above. To the extent any portion of the damages sought in this Count against Defendants overlaps with damages sought against PMF 26 and/or the PMF 26 Individual Parties in the Arbitration for the same predicate acts or the same injury, PEB seeks a single, non-duplicative recovery for that overlapping injury, and any amount actually recovered in the Arbitration for such overlapping injury shall be credited against, and shall not be recovered again from, Defendants in this action.

**FIFTH COUNT**
**(Breach of Fiduciary Duty)**

496. PEB repeats the allegations of paragraphs 21 through 84, 142, 205, 207, 214, 218, 283 through 291, 382, 384 and 385 above and incorporates them in this Count by reference. This Count does not incorporate the allegations of the First through Fourth Counts.

497. A confidential, agency and fiduciary relationship existed between PEB and PMF

18.

498. By accepting the grant of authority under the Consulting Agreement to "represent, negotiate, and correspond" on PEB's behalf in matters concerning PEB's financing, PMF 18 and Defendant Burger -- who executed the Consulting Agreement on PMF 18's behalf as its Chief Operating Officer -- undertook a relationship of trust and confidence with PEB and became fiduciaries of PEB under New York law, obligated to act with undivided loyalty and in PEB's best interest in performing the represented services. PEB pleads Burger's own fiduciary status in the alternative to, and without limiting, its allegations in the Tenth Count that Burger knowingly participated in and substantially assisted PMF 18's breach.

499. By virtue of the Consulting Agreement and the trust and confidence reposed in PMF 18 regarding PEB's finances, PMF 18 owed a fiduciary duty to PEB, including a duty of undivided loyalty, care, utmost good faith, candor, full disclosure, and to act in the best interests of PEB.

500. At all relevant times, PMF 18 owed PEB a duty of full disclosure, which required PMF 18 to disclose to PEB any and all adverse or remunerative interests which may have influenced PMF 18's judgment or advice. PMF 18 never disclosed to PEB that the Merchant Agreements into which it steered PEB were agreements with PMF 18's own corporate affiliate. PMF 26 has since certified that affiliation to a federal court, disclosing under Federal Rule of Civil Procedure 7.1 that PMF 18 and PMF One are its corporate affiliates and that Sam Lallouz and Defendant Golshan are its members.

501. PMF 18's fiduciary duty required that it not place its own pecuniary interests above those of PEB in rendering consulting and advisory services in furtherance of the Consulting Agreement.

502. With PMF 18's superior knowledge and PEB's lack of sophistication in evaluating the structure and true cost of alternative financing, PMF 18 was empowered by PEB's reliance. This circumstance prevented PEB from effectively protecting itself from PMF 18's violation of its fiduciary duty.

503. PMF 18 breached its fiduciary duty by engaging in the wrongful acts and omissions as alleged herein, including, but not limited to: (i) steering PEB into transactions with PMF 18's own undisclosed affiliate, and into other transactions, on terms substantially adverse to PEB's economic interests; (ii) engaging in self-dealing by recommending transactions in which PMF 18 stood to profit through referral compensation, kickbacks and profit sharing; (iii) concealing material facts; and (iv) placing its own interests ahead of PEB's interests in obtaining working capital at the most inexpensive cost available in the market.

504. PMF 18 and Burger did not provide, and never intended to provide, the represented consulting services. Instead, PMF 18 and Burger used the trust, financial disclosures, and bank account access PEB extended to them under the Consulting Agreement to steer PEB into the Merchant Agreements -- agreements from which PMF 18 and its affiliates received undisclosed compensation -- without ever disclosing to PEB that PMF 18 and Burger stood to profit from PEB's entry into those Agreements, or that the "consulting" relationship PEB had been promised was never going to be performed.

505. In breaching its fiduciary duty, PMF 18 acted recklessly, maliciously, oppressively, constructively fraudulent, egregiously and/or intentionally towards PEB in disregard of its rights.

506. But for PMF 18's breach of fiduciary duty as alleged herein, PEB would not have suffered and sustained damages.

507. As a direct and proximate result of PMF 18's breach of fiduciary duty, PEB has

sustained actual and ascertainable damages.

508. PEB has suffered and sustained damages in an amount to be proven at trial.

509. PEB's damages on this Count do not depend on whether any Merchant Agreement is a loan, is usurious or is enforceable, and include, without limitation: (a) the $50,000 PEB paid for consulting services that PMF 18 never provided; (b) all compensation that PMF 18, PMF One and their affiliates received in connection with PEB, including the $21,250 taken from the closing of the Newtek Loan and the $100,000 wired to PMF One on November 22, 2023; (c) the amount PEB remains obligated to repay on the Newtek Loan, net of the value PEB actually retained and was able to use, since PEB was permitted the use and benefit of only a small fraction of that $1,500,000 loan; and (d) the fees and charges PEB paid in the financing transactions into which PMF 18 steered it, which PEB would not have entered had PMF 18 disclosed its affiliation with PMF 26 and the compensation it and its affiliates would receive.

510. In equity and good conscience, PMF 18 should forfeit the compensation it received in connection with the performance of its fiduciary duty and compensate PEB for the damages proximately caused by PMF 18's breach of fiduciary duty.

511. PMF 18's conduct evinces a high degree of moral culpability, manifest moral turpitude, wanton dishonesty and/or conduct that is morally reprehensible.

512. Upon information and belief, this same fiduciary-capture arrangement -- a PMF 18 consulting agreement followed by an undisclosed, compensated referral into PMF financing -- has been used by PMF 18, Burger, and their affiliates against at least one other small business, as alleged in the *JLK Action*, demonstrating that the conduct alleged in this Count reflects a regular business practice directed at the public generally, rather than an isolated private wrong to PEB alone.

513. Because the conduct alleged in this Count involved self-dealing, deliberate concealment, and a business practice directed at the public generally rather than an isolated transaction, PEB is entitled to punitive damages under New York law, in addition to compensatory damages, attorneys' fees, and costs.

**SIXTH COUNT**
**(Breach of Contract)**

514. PEB repeats the allegations of paragraphs 21 through 84, 142, 205, 207, 214, 218, 283 through 291, 382, 384 and 385 above and incorporates them in this Count by reference. This Count does not incorporate the allegations of the First through Fourth Counts.

515. PEB and PMF 18 entered into a valid, binding and enforceable contract whereby PMF 18 agreed to provide consulting services to PEB that met professional standards.

516. PEB performed all, or substantially all, of its obligations under the Consulting Agreement, including timely payment of the agreed upon consulting fee and provided PMF 18 with access to necessary financial records and accounts as authorized and limited by the Consulting Agreement.

517. PMF 18 was required to provide financial consulting and advisory services to PEB using a reasonable degree of skill and care.

518. PMF 18 materially breached its contractual obligations by failing to provide consulting and advisory services that met professional standards and that evinced a reasonable degree of skill and care -- indeed, by providing no consulting or advisory services at all.

519. Had PMF 18 not breached the Consulting Agreement, PEB would not have suffered and sustained the substantial damages it did.

520. PMF 18's breach of the Consulting Agreement was the "but for" cause of the damages PEB sustained.

521. PEB's damages on this Count include, at a minimum, the $50,000 fee PEB paid for services PMF 18 never rendered.

522. PEB has suffered and sustained damages in an amount to be proven at trial.

**SEVENTH COUNT**
**(Breach of Implied Covenant of Good Faith and Fair Dealing)**

523. PEB repeats the allegations of paragraphs 21 through 84, 142, 205, 207, 214, 218, 283 through 291, 382, 384 and 385 above and incorporates them in this Count by reference. This Count does not incorporate the allegations of the First through Fourth Counts.

524. The Consulting Agreement entered into by and between PEB and PMF 18 is a valid, binding and enforceable contract.

525. Under the laws of the State of New York, every contract contains an implied covenant of good faith and fair dealing.

526. PMF 18 breached the implied covenant of good faith and fair dealing by acting in bad faith and using its superior knowledge, position, and discretion granted to it under the Consulting Agreement to steer PEB into high-cost transactions with PMF 18's own undisclosed affiliate and into other transactions that were economically disadvantageous and harmful to PEB.

527. PMF 18 steered PEB toward merchant cash advance and other transactions without disclosing the economic benefit that PMF 18 would receive by steering PEB into transactions with affiliates and other companies from whom PMF 18 received referral compensation, kickbacks and/or profit sharing.

528. As a proximate cause of PMF 18's acts and omissions in breaching the implied covenant of good faith and fair dealing, PEB suffered and sustained damages.

529. PEB has suffered and sustained damages in an amount to be proven at trial.

**EIGHTH COUNT**
**(Constructive Fraud)**

530. PEB repeats the allegations of paragraphs 21 through 84, 142, 205, 207, 214, 218, 283 through 291, 382, 384 and 385 above, and paragraphs 496 through 513 of the Fifth Count, and incorporates them in this Count by reference. This Count does not incorporate the allegations of the First through Fourth Counts.

531. An agency and confidential relationship existed between PEB and PMF 18.

532. At all relevant times, PMF 18 was required to disclose to PEB any and all direct or indirect beneficial ownership, remunerative interests and/or direct or indirect economic benefit it may receive in connection with the Agreements and the transactions it steered PEB toward and recommended that PEB enter into with PMF 26 and other lenders. As a fiduciary, PMF 18 was required to disclose any and all conflicts of interest which influenced PMF 18's judgment and advice.

533. PMF 18 made material misrepresentations and/or omissions by steering PEB toward PMF 18's own undisclosed affiliate, PMF 26, and toward other lenders, on highly unfavorable economic terms, while representing that it was acting in PEB's best interest. PMF 18 also deliberately and intentionally failed to disclose conflicts of interest and self-dealing in connection with the transactions it recommended PEB pursue.

534. PMF 18 was aware that if it disclosed its beneficial or remunerative interests in the transactions or companies and its conflicts of interest, PEB would have declined to enter into the Agreements and other economically disadvantageous transactions it entered into.

535. Had PMF 18 acted honestly and disclosed the true nature of the agreements and transactions, as well as the economic benefit PMF 18 obtained by PEB entering into transactions with PMF 26 and other lenders, PEB would have declined to enter into the transactions or the

agreements, which were structured to be economically disadvantageous to PEB.

536. PMF 18 claimed expertise in alternative lending for which PEB had little or no knowledge or expertise such that PMF 18 and PEB were not dealing on terms of equality. PMF 18 knew or should have known PEB would not have engaged PMF 18 to aid its business in obtaining financing if PEB had the ability to do so for itself. In short, PEB confided in PMF 18 for guidance to obtain "safe" financing that would benefit PEB and resolve short-term working capital needs until such time as it qualified for a traditional loan.

537. PEB reasonably relied to its detriment on PMF 18's superior position, knowledge, purported expertise in financial matters and undertaking to act in PEB's best interests, and on the incomplete and misleading information and material misrepresentations and omissions provided by PMF 18 concerning the benefits and safety of the transactions it steered PEB toward.

538. PEB suffered and sustained damages as a direct and proximate result of PMF 18's acts and omissions as alleged herein in amounts to be proven at trial. Additionally, PEB is entitled to receive equitable remedies including an accounting, imposition of a constructive trust and disgorgement of compensation PEB paid to PMF 18 and amounts PMF 18 received in connection with transactions PEB entered into at the urging and behest of PMF 18.

## NINTH COUNT
## (Accounting)

539. PEB repeats the allegations of paragraphs 21 through 84, 142, 205, 207, 214, 218, 283 through 291, 382, 384 and 385 above, and paragraphs 496 through 513 of the Fifth Count, and incorporates them in this Count by reference. This Count does not incorporate the allegations of the First through Fourth Counts.

540. PMF 18 and its affiliate, PMF 26, wrongfully benefited from transactions entered into by PEB with PMF 26 and third parties with whom PMF 18 had a direct or indirect beneficial,

equitable or pecuniary interest and through which it received referral compensation, kickbacks and/or profit sharing.

541. PEB cannot ascertain the extent of profits or funds obtained by PMF 18 or PMF 26 through PMF 18's violation of its fiduciary duty, or breach of the Consulting Agreement.

542. The transactions at issue are complex and/or concealed by PMF 18 and PMF 26.

543. The extent and nature of the compensation received by PMF 18 and PMF 26 is unknown and concealed by PMF 18 and PMF 26.

544. An accounting is appropriate to compel disclosure of all financial benefits obtained by PMF 18 and PMF 26 through PMF 18's violation of its fiduciary duty owed to PEB, and breach of the Consulting Agreement.

## TENTH COUNT
## (Aiding and Abetting Breach of Fiduciary Duty)

545. PEB repeats the allegations of paragraphs 21 through 84, 142, 205, 207, 214, 218, 283 through 291, 382, 384 and 385 above, and paragraphs 496 through 513 of the Fifth Count, and incorporates them in this Count by reference. This Count does not incorporate the allegations of the First through Fourth Counts.

546. As alleged above, PMF 18 owed PEB a confidential, agency and fiduciary duty arising out of the Consulting Agreement and the relationship of trust and confidence between PEB and PMF 18, and PMF 18 breached that fiduciary duty.

547. Defendants PMF One, Golshan, and Burger (collectively, the "Aiding and Abetting Defendants") had actual knowledge of the fiduciary relationship between PEB and PMF 18 and of PMF 18's breach of its fiduciary duty.

548. The Aiding and Abetting Defendants knowingly induced and participated in PMF 18's breach of fiduciary duty and rendered substantial assistance to that breach, including by

orchestrating and carrying out the scheme through which PMF 18 steered PEB into financing with PMF 18's undisclosed affiliates; by receiving, accepting and distributing the proceeds of the breach, including the $21,250 fee taken by PMF One from the closing of the Newtek Loan and the November 22, 2023 wire of $100,000 in "Management Fees" to PMF One; and by concealing the true nature and purpose of the transactions from PEB.

549. The Aiding and Abetting Defendants provided substantial assistance to PMF 18's breach through affirmative acts and, where they were under a duty to act, through their failure to act, thereby enabling the breach to occur.

550. As a direct and proximate result of the Aiding and Abetting Defendants' knowing participation in and substantial assistance of PMF 18's breach of fiduciary duty, PEB has suffered and sustained damages in an amount to be determined at trial.

**ELEVENTH COUNT**
**(Aiding and Abetting Fraud)**

551. PEB repeats the allegations of paragraphs 21 through 84, 142, 205, 207, 214, 218, 283 through 291, 382, 384 and 385 above, and paragraphs 496 through 513 of the Fifth Count, and incorporates them in this Count by reference. This Count does not incorporate the allegations of the First through Fourth Counts.

552. As alleged above, PMF 18 committed fraud against PEB by making material misrepresentations and by concealing and failing to disclose material facts concerning the nature, purpose and terms of the financing and the consulting and advisory services PMF 18 was retained to provide, upon which PEB justifiably relied to its detriment.

553. The Aiding and Abetting Defendants had actual knowledge of the fraud committed against PEB.

554. The Aiding and Abetting Defendants knowingly provided substantial assistance in

the commission of the fraud, including, as to Burger, by executing the Consulting Agreement on PMF 18's behalf; as to PMF One, by receiving PEB's $50,000 consulting fee and the $21,250 and $100,000 payments alleged above; as to Golshan, upon information and belief, by directing, as a member of PMF 18 and the Chief Executive Officer of PMF One, the entities through which the fraud was carried out and its proceeds received; and, as to each, by concealing from PEB PMF 18's affiliation with PMF One and PMF 26 and the compensation they received, as well as PMF 26's relationships with and benefits received in connection with transactions involving Zahav, Seamless, Clearfund and Meged.

555. As a direct and proximate result of the Aiding and Abetting Defendants' knowing and substantial assistance in the commission of the fraud, PEB has suffered and sustained damages in an amount to be determined at trial.

**TWELFTH COUNT**
**(Faithless Servant)**

556. PEB repeats the allegations of paragraphs 21 through 84, 142, 205, 207, 214, 218, 283 through 291, 382, 384 and 385 above, and paragraphs 496 through 513 of the Fifth Count, and incorporates them in this Count by reference. This Count does not incorporate the allegations of the First through Fourth Counts.

557. By reason of the confidential, agency and fiduciary relationship created by the Consulting Agreement, PMF 18 acted as PEB's agent and was bound to exercise the utmost good faith, loyalty and fidelity in the performance of its services for PEB.

558. PMF 18 was faithless and disloyal in the performance of its services, including by acting in its own interest and in the interest of its affiliates rather than in the interest of PEB; by steering PEB into financing with its own undisclosed affiliates, from which PMF 18 and its affiliates profited; by failing to provide the consulting and advisory services for which it was

retained; and by concealing its self-dealing from PEB.

559. Under the faithless servant doctrine, an agent who is faithless in the performance of its duties is not entitled to retain any compensation paid for its services from the time of its first disloyal act, regardless of whether the principal suffered provable damages and regardless of whether the agent intended to defraud the principal.

560. PMF 18's compensation under the Consulting Agreement was general compensation that was not allocated on a task-by-task basis.

561. By reason of its faithlessness and disloyalty, PMF 18 is required to forfeit, surrender and disgorge all compensation it received in connection with PEB, including the $50,000 paid by PEB under the Consulting Agreement, whether received by PMF 18 directly or through its affiliate PMF One.

**THIRTEENTH COUNT**
**(Unjust Enrichment)**

562. PEB repeats the allegations of paragraphs 21 through 84, 142, 205, 207, 214, 218, 283 through 291, 382, 384 and 385 above and incorporates them in this Count by reference. This Count does not incorporate the allegations of the First through Fourth Counts.

563. This Count is pleaded in the alternative to PEB's claims for breach of contract and is asserted against Defendant PMF One, with which PEB entered into no contract other than SBA Form 159, which does not govern the November 22, 2023 wire or any compensation beyond the $21,250.00 stated on its face.

564. PMF One was enriched at PEB's expense, including through PMF One's receipt of the $21,250 fee taken from the closing of the Newtek Loan and the November 22, 2023 wire of $100,000 in "Management Fees."

565. A sufficiently close relationship existed between PEB and PMF One, arising from

its participation in the same financing transactions and its receipt of PEB's funds, to support recovery.

566. It is against equity and good conscience to permit PMF One to retain the benefits it obtained at PEB's expense.

567. PEB is entitled to restitution from PMF One in an amount to be determined at trial.

**FOURTEENTH COUNT**
**(Constructive Trust)**

568. PEB repeats the allegations of paragraphs 21 through 84, 142, 205, 207, 214, 218, 283 through 291, 382, 384 and 385 above, and paragraphs 496 through 513 of the Fifth Count, and incorporates them in this Count by reference. This Count does not incorporate the allegations of the First through Fourth Counts.

569. A confidential and fiduciary relationship existed between PEB and PMF 18 in connection with the financing transactions at issue.

570. In reliance on the promises made to PEB, PEB paid PMF 18's $50,000 fee and permitted the proceeds of the Newtek Loan to be deposited into its own account, to which the PMF Entities had access, and portions of those funds were obtained by PMF One, including the $21,250 fee and the $100,000 wire.

571. PMF One and the other Defendants holding such funds would be unjustly enriched if permitted to retain the funds obtained from PEB and any property or proceeds traceable thereto.

572. PEB has no adequate remedy at law with respect to the specific funds obtained from PEB and the proceeds traceable thereto.

573. PEB is entitled to the imposition of a constructive trust upon the funds wrongfully obtained from PEB and any property or proceeds traceable thereto, and to an order directing the disgorgement and return of those funds to PEB.

**WHEREFORE**, Plaintiff, PEB, Inc. requests judgment against Defendants Premium Merchant Funding 18, LLC, Premium Merchant Funding One, LLC, Elie Golshan, and Abe Burger jointly and severally, as follows:

On the First Count (Violation of 18 U.S.C. § 1962(c)):

(a) declaring each of the Agreements and the underlying transactions to be a usurious loan in violation of New York Penal Law § 190.40, California Constitution Article XV, § 1 and California Civil Code § 1916-3(b), or other applicable law;

(b) declaring that each of the Agreements, and the obligations they purport to create, are void and unenforceable in whole;

(c) declaring that PMF 26 has charged, received and collected interest under each of the Agreements in the amount of at least twice the highest rate allowable by law and that Defendants must refund to PEB any and all interest payments received in connection with the usurious loans;

(d) declaring that Defendants PMF 18, PMF One, Elie Golshan, and Abe Burger have violated 18 U.S.C. § 1962(c) by collecting unlawful debt from PEB and are liable, to the fullest extent permitted by law, to PEB for all damages proximately caused by such violations;

(e) awarding compensatory, direct, and consequential damages, including prejudgment interest, in an amount to be proven at trial;

(f) awarding treble damages in accordance with 18 U.S.C. § 1964(c);

(g) requiring Defendants to indemnify, pay and/or reimburse PEB for the cost of all reasonable attorneys' fees and all costs and expenses in accordance with 18 U.S.C. § 1964(c); and

(h) such other and further relief as this Court deems just and proper.

(i) to the extent any portion of the relief awarded on this Count duplicates relief actually recovered by PEB in the Arbitration for the same injury, crediting such amount against, and declining to award it a second time as part of, the judgment in this action.

<u>On the Second Count (Pattern of Racketeering Activity – Accelerated-Recovery and Reverse-Consolidation Scheme)</u>:

(a) declaring that Defendants PMF 18, PMF One, Elie Golshan, and Abe Burger have violated 18 U.S.C. § 1962(c) by engaging in a pattern of racketeering activity through the accelerated-recovery and reverse-consolidation scheme, and are liable, to the fullest extent permitted by law, to PEB for all damages proximately caused by such violations;

(b) declaring that Defendants engaged in a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c), through the accelerated-recovery and reverse-consolidation scheme, independent of and in addition to the Enterprise's collection of unlawful debt alleged in the First Count;

(c) awarding compensatory, direct, and consequential damages, including prejudgment interest, in an amount to be proven at trial;

(d) awarding treble damages in accordance with 18 U.S.C. § 1964(c);

(e) requiring Defendants to indemnify, pay and/or reimburse PEB for the cost of all reasonable attorneys' fees and all costs and expenses in accordance with 18 U.S.C. § 1964(c); and

(f) such other and further relief as this Court deems just and proper;

(g) to the extent any portion of the relief awarded on this Count duplicates relief actually recovered by PEB in the Arbitration for the same injury, crediting such amount against, and declining to award it a second time as part of, the judgment in this action.

On the Third Count (Pattern of Racketeering Activity – Undisclosed Shadow-Servicing Scheme):

(a) declaring that Defendants PMF 18, PMF One, Elie Golshan, and Abe Burger have violated 18 U.S.C. § 1962(c) by engaging in a pattern of racketeering activity through the undisclosed shadow-servicing scheme, and are liable, to the fullest extent permitted by law, to PEB for all damages proximately caused by such violations;

(b) declaring that Defendants engaged in a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c), through the undisclosed shadow-servicing scheme, independent of and in addition to the Enterprise's collection of unlawful debt alleged in the First Count and the accelerated-recovery and reverse-consolidation scheme alleged in the Second Count;

(c) awarding compensatory, direct, and consequential damages, including prejudgment interest, in an amount to be proven at trial;

(d) awarding treble damages in accordance with 18 U.S.C. § 1964(c);

(e) requiring Defendants to indemnify, pay and/or reimburse PEB for the cost of all reasonable attorneys' fees and all costs and expenses in accordance with 18 U.S.C. § 1964(c); and

(f) such other and further relief as this Court deems just and proper;

(g) to the extent any portion of the relief awarded on this Count duplicates relief actually recovered by PEB in the Arbitration for the same injury, crediting such amount against, and declining to award it a second time as part of, the judgment in this action.

On the Fourth Count (Conspiracy):

(a) declaring that Defendants conspired to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d), and are jointly and severally liable, to the fullest extent permitted by law, to PEB for all damages proximately caused by the conspiracy;

(b) awarding compensatory, direct, and consequential damages, including prejudgment interest, in an amount to be proven at trial;

(c) awarding treble damages in accordance with 18 U.S.C. § 1964(c);

(d) requiring Defendants to indemnify, pay and/or reimburse PEB for the cost of all reasonable attorneys' fees and all costs and expenses in accordance with 18 U.S.C. § 1964(c); and

(e) such other and further relief as this Court deems just and proper;

(f) to the extent any portion of the relief awarded on this Count duplicates relief actually recovered by PEB in the Arbitration for the same injury, crediting such amount against, and declining to award it a second time as part of, the judgment in this action.

On the Fifth Count (Breach of Fiduciary Duty):

(a) compensatory damages;

(b) consequential damages;

(c) punitive damages;

(d) forfeiture, surrender and disgorgement of all compensation received by PMF 18 in connection with PEB;

(e) an accounting compelling PMF 18 to produce all material and necessary financial records, statements of account, banking records, ledgers, communications or other documents reflecting compensation received by PMF 18 and/or PMF 26 in connection with transactions entered into by PEB;

(f) pre- and post-judgment interest;

(g) costs of suit, including reasonable attorney's fees; and

(h) such other and further relief as this Court deems just and proper.

On the Sixth (Breach of Contract) and Seventh Counts (Breach of the Implied Covenant of Good Faith and Fair Dealing):

(a) compensatory damages;

(b) consequential damages;

(c) pre- and post-judgment interest;

(d) costs of suit, including reasonable attorney's fees; and

(e) such other and further relief as this Court deems just and proper.

On the Eighth Count (Constructive Fraud):

(a) compensatory damages;

(b) consequential damages;

(c) punitive damages;

(d) pre- and post-judgment interest;

(e) costs of suit, including reasonable attorney's fees;

(f) an accounting compelling PMF 18 to produce all material and necessary financial records, statements of account, banking records, ledgers, communications or other documents reflecting compensation received by PMF 18 and/or PMF 26 in connection with transactions entered into by PEB; and

(g) such other and further relief as this Court deems just and proper.

On the Ninth Count (Accounting):

(a) an accounting compelling PMF 18 to produce all material and necessary financial records, statements of account, banking records, ledgers, communications or other documents reflecting compensation received by PMF 18 and/or PMF 26 in connection with transactions entered into by PEB; and

(b) such other and further relief as this Court deems just and proper.

On the Tenth (Aiding and Abetting Breach of Fiduciary Duty) and Eleventh Counts (Aiding and Abetting Fraud):

(a) compensatory damages;

(b) consequential damages;

(c) punitive damages;

(d) pre- and post-judgment interest;

(e) costs of suit, including reasonable attorney's fees; and

(f) such other and further relief as this Court deems just and proper.

On the Twelfth Count (Faithless Servant):

(a) forfeiture, surrender and disgorgement of all compensation received by PMF 18 in connection with PEB, including the $50,000 paid by PEB under the Consulting Agreement;

(b) pre- and post-judgment interest;

(c) costs of suit, including reasonable attorney's fees; and

(d) such other and further relief as this Court deems just and proper.

On the Thirteenth (Unjust Enrichment) and Fourteenth Count (Constructive Trust):

(a) restitution of all amounts by which Defendants were unjustly enriched at PEB's expense;

(b) the imposition of a constructive trust upon the funds wrongfully obtained from PEB and any property or proceeds traceable thereto;

(c) an order directing the disgorgement and return of those funds to PEB;

(d) pre- and post-judgment interest;

(e) costs of suit, including reasonable attorney's fees; and

(f) such other and further relief as this Court deems just and proper.

DATED: Basking Ridge New Jersey
October 2, 2026

REYNOLDS LAW GROUP LLC

*New York Office*
21 Rock Ridge Drive, Suite A
Rye Brook, NY 10573
(908) 367-9060
sreynolds@reynolds-lawgroup.com

*and*

*Main Office*
233 Mt. Airy Road, Suite 100
PMB 8491
Basking Ridge, NJ 07920
(908) 367-9060
sreynolds@reynolds-lawgroup.com

*Attorneys for Plaintiff, PEB, Inc.*

By: /s/ *Scott E. Reynolds*
SCOTT E. REYNOLDS, ESQ.

**DEMAND FOR TRIAL BY JURY**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff PEB, Inc. hereby demands a trial by jury of any issue triable of right by a jury.

DATED: Basking Ridge New Jersey
October 2, 2026

REYNOLDS LAW GROUP LLC

*New York Office*
21 Rock Ridge Drive, Suite A
Rye Brook, NY 10573
(908) 367-9060
sreynolds@reynolds-lawgroup.com

*and*

*Main Office*
233 Mt. Airy Road, Suite 100
PMB 8491
Basking Ridge, NJ 07920
(908) 367-9060
sreynolds@reynolds-lawgroup.com

*Attorneys for Plaintiff, PEB, Inc.*

By: /s/ *Scott E. Reynolds*
SCOTT E. REYNOLDS, ESQ.